Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300 / Fax: 415.373.9435

*Interim Lead Counsel*

**[Additional Counsel listed on signature page]**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-02985-EJD <br><br> Judge:  Hon. Edward J. Davila <br><br> **PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS UNDER SECTION 230 OF THE COMMUNICATIONS DECENCY ACT** <br><br> Date: August 4, 2022 <br> Time: 9:00 a.m. <br> Judge: Hon. Edward J. Davila <br> Room: Courtroom 4 – 5th Floor |
| IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-03001-EJD <br><br> Judge:  Hon. Edward J. Davila <br><br> **PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS UNDER SECTION 230 OF THE COMMUNICATIONS DECENCY ACT** <br><br> Date: August 4, 2022 <br> Time: 9:00 a.m. <br> Judge: Hon. Edward J. Davila <br> Room: Courtroom 4 – 5th Floor |

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

EDELSON PC
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

| IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-cv-02777-EJD |
|---|---|
| | Judge:   Hon. Edward J. Davila |
| | **PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS UNDER SECTION 230 OF THE COMMUNICATIONS DECENCY ACT** |
| | Date: August 4, 2022 Time: 9:00 a.m. Judge: Hon. Edward J. Davila Room: Courtroom 4 – 5th Floor |

Pls.' Consol. Opp'n to CDA 230 Motions to Dismiss
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  RELEVANT FACTUAL ALLEGATIONS ......................................................... 3

    A.  Offering, Categorizing, and Promoting the Social Casino Apps ...................... 4

    B.  Booking Illegal Transactions for a Fee: Selling Virtual Chips for Wagering in the Social Casinos .................................................................................. 5

    C.  Collecting and Analyzing Player Data, Marketing, and Targeting "Whales" .................................................................................................. 6

III.  ARGUMENT ...................................................................................................... 7

    A.  Summary of Argument .................................................................................. 7

    B.  Legal Framework ......................................................................................... 8

    C.  Plaintiffs' Claims Do Not Inherently Require the Court to Treat the Platforms as "Publishers or Speakers" of Third-Party Content. .................... 9

        1.  *Booking Illegal Gambling Transactions Is Not "Publication."* .......... 10

            a.  <u>*HomeAway* and Other Relevant Cases Distinguish Between Immunity for Posting Content and Liability for Booking Illegal Transactions.</u> ................................................................ 10

            b.  <u>Plaintiffs Allege that The Platforms Illegally Transact Virtual Casino Chips.</u> .................................................................. 13

            c.  <u>None of the Platforms' Arguments Suggest that Their Direct Participation in Illegal Transactions Should Be Immunized.</u> ........ 16

            d.  <u>Avoiding Liability for Plaintiffs' Claims Does Not Force the Platforms to Review, Edit, or Remove Third-Party Content.</u> ........ 19

            e.  <u>*Taylor v. Apple* and *Coffee v. Google* Both Militate Against CDA Immunity Here.</u> .................................................. 22

        2.  *Directly Participating in Unfair Business Practices Is Not Publisher Conduct.* .............................................................................. 25

        3.  *That the Platforms' Tools Are Available To Other Apps Does Not Immunize The Platforms' Participation in Illegal Gambling Operations.* ......................................................................... 27

    D.  In the Alternative, the Court Should Grant Leave to Amend. ...................... 30

IV.  CONCLUSION ................................................................................................. 30

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

i

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

1

**TABLE OF AUTHORITIES**

2

**United States Circuit Court of Appeals Cases**

3

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ...................................................................*passim*

4

5

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ............................................... 13, 17, 26

6

7

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ..........................................................8, 11

8

9

*Ebner v. Fresh, Inc.*,
    838 F.3d 958 (9th Cir. 2016) ............................................................ 30

10

11

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ..........................................3, 16, 27, 29

12

*Fyk v. Facebook, Inc.*,
    808 F. App'x 597 (9th Cir. 2020) .................................................... 18

13

14

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) ..............................................3, 20, 24, 29

15

16

*HomeAway.com v. Santa Monica*,
    918 F.3d 676 (9th Cir. 2018) ...........................................................*passim*

17

*Lemmon v. Snap, Inc.*,
    995 F.3d 1085 (9th Cir. 2021) .........................................................*passim*

18

**United States District Court Cases**

19

*Airbnb, Inc. v. City of Boston*,
    386 F. Supp. 3d 113 (D. Mass. 2019)....................................... 12, 21

20

21

*Airbnb, Inc. v. City & Cty. of San Francisco*,
    217 F. Supp. 3d 1066 (N.D. Cal. 2016)......................................2, 11, 21

22

23

*Benson v. DoubleDown Interactive LLC*,
    No. 18-cv-525 (W.D. Wash. Nov. 24, 2021) ................................. 30

24

25

*Coffee v. Google, LLC*,
    No. 20-cv-03901-BLF, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022)............... 14, 22, 24, 25

26

27

28

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

ii

EDELSON PC
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

*Goddard v. Google, Inc.*,
    No. 08-cv-2738-JF-PVT, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) .................. 18, 27

*Evans v. Hewlett-Packard Co.*,
    No. 13-cv-02477 WHA, 2013 WL 4426359 (N.D. Cal. Aug. 15, 2013) ......................... 18

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020).................................................................... 17

*Jurin v. Google Inc.*,
    695 F. Supp. 2d 1117 (E.D. Cal. 2010) ........................................................... 18

*La Park La Brea A LLC v. Airbnb, Inc.*,
    285 F. Supp. 3d 1097 (C.D. Cal. 2017)........................................................ 18

*Mai v. Supercell Oy*,
    No. 5:20-cv-05573-EJD, 2021 WL 4267487 (N.D. Cal. Sept. 20, 2021) ...................... 14

*Nunes v. Twitter, Inc.*,
    194 F. Supp. 3d 959 (N.D. Cal. 2016)................................................................26, 29

*Opperman v. Path*,
    87 F. Supp. 3d 1018 (N.D. Cal. 2014)........................................................8, 27

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
    390 F. Supp. 3d 964 (W.D. Wis. 2019)....................................................... 13

*Taylor v. Apple, Inc.*,
    No. 20-cv-3906-RS (N.D. Cal. Mar. 19, 2021).................................... 14, 22, 23

*Turo Inc. v. City of Los Angeles*,
    No. 2:18-cv-06055-CAS-GJSX, 2020 WL 3422262 (C.D. Cal. June 19, 2020) ............. 12

**State Court Cases**

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816 (2002) ........................................................................ 18

*Massachusetts Port Auth. v. Turo Inc.*,
    166 N.E.3d 972 (2021) ............................................................................. 13

**Miscellaneous Authority**

47 U.S.C. § 230 .............................................................................................8, 9

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

iii

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

**L.R. 7-4(a)(3) Statement of Issue To Be Decided**

Under recent Ninth Circuit precedent, online platforms enjoy CDA Section 230 immunity from liability for "publication activities (*i.e.*, "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content"), but *do not* enjoy CDA immunity from liability for "booking" illegal transactions for a fee—even when those transactions flow from the protected third-party content. In this litigation, Plaintiffs allege that the online platform Defendants have booked, for a 30% fee, billions of dollars of illegal online casino chip sales transactions directly to class members. Does the CDA immunize the online platform Defendants from Plaintiffs' claims seeking to recover the value of those illegal online casino chip sales?

Pls.' Consol. Opp'n to CDA 230 Motions to Dismiss
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

iv

**Edelson PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

**PLAINTIFFS' CONSOLIDATED OPPOSITION MEMORANDUM**

Plaintiffs in the above-captioned actions submit this consolidated opposition to the various Motions to Dismiss Under Section 230 of the Communications Decency Act ("CDA") filed by Defendants Apple, Inc. ("Apple"), Meta Platforms, Inc. ("Facebook"), and Google LLC together with Google Payment Corp. ("Google") (all together, the "Platforms").[1]

## I.    INTRODUCTION

In this litigation, Plaintiffs claim that the Platforms, separate and apart from publishing social casino apps, have illegally booked tens of billions of dollars of social casino chip sales directly to class members. Plaintiffs allege that the Platforms act essentially as bookies for online casinos: the Platforms illegally sell to class members casino chips that are substantially certain to be wagered on slot machines, illegally process those payments, illegally obtain the full value of the casino chip sales, illegally earn 30% of the gross sales (at a gobsmacking profit margin) for their contribution to the enterprise, and at some later date illegally remit the 70% remainder to the social casino developers—*i.e.*, their co-conspirators in the illegal gambling enterprise.

The Platforms claim that the CDA shields them from liability for their illegal conduct. But three years ago, the Ninth Circuit squarely decided the exact issue presented here. Under *HomeAway v. City of Santa Monica*, online platforms (i) enjoy CDA immunity from liability for "publication" activities (*i.e.*, "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content"), but (ii) *do not* enjoy CDA immunity from liability for "booking" illegal transactions for a fee—even when those transactions flow from the protected

_____

[1]    *See* Apple's Mot. to Dismiss, Dkt. 92, *In re: Apple Inc. App Store Simulated Casino-Style Games Litig.*, No. 5:21-md-02985 (N.D. Cal. Apr. 8, 2022) ("*Apple* Motion"); Facebook's Mot. to Dismiss, Dkt. 99, *In re: Facebook Simulated Casino-Style Games Litig.*, No. 5:21-cv-02777 (N.D. Cal. Apr. 8, 2022) ("*Facebook* Motion"); Google's Mot. to Dismiss, Dkt. 69, *In re: Google Play Store Simulated Casino-Style Games Litig.*, No. 5:21-md-03001 (N.D. Cal. Apr. 8, 2022) ("*Google* Motion").

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

1

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

third-party content.[2] This commonsense distinction, reiterated by courts nationwide in the years since *HomeAway*, forecloses the Platforms' Motions. That is so because Plaintiffs' claims do not turn on the Platforms' publication of—or failure to withdraw from publication—social casino apps. They turn, instead, on the Platforms' "bookings," for a fee, of billions of dollars of illegal online casino chip sales directly to class members.

  Because the challenged conduct here—*i.e.*, the Platforms' bookings, for a fee, of illegal online casino chip sales—is indistinguishable from the vacation rental platforms' bookings of unlicensed properties in *HomeAway*, that case controls and disposes of the Platforms' Motions. Apple and Google fail, for whatever reason, to even cite *HomeAway*. Facebook's attempts to distinguish it—first by falsely claiming that Plaintiffs do not allege "any illegal payment[s] or other financial transaction[s]" (they do), and then by offering the non-sequitur that Plaintiffs' claims do not target any "real-world" activity (they do, and that's not relevant anyway)—fare no better.[3] Those failures aren't surprising: distinguishing *HomeAway*, it turns out, is impossible.

  The result that *HomeAway* compels here is consistent with both the original intent and modern interpretation of the CDA. As the Ninth Circuit recently explained in another case, "[t]he original goal of § 230 was modest," seeking to "allow interactive computer services to perform some editing on user-generated content without thereby becoming liable for all defamatory or

_____

[2]   *HomeAway.com v. City of Santa Monica*, 918 F.3d 676, 684-85 (9th Cir. 2018) (holding that platforms "face no liability for the content" others post on their websites, but do face liability for illegally "booking" unlicensed home rental transactions); *see also Airbnb, Inc. v. City & Cty. of San Francisco*, 217 F. Supp. 3d 1066, 1072-73 (N.D. Cal. 2016) (denying, in opinion cited by Ninth Circuit in *HomeAway*, platforms immunity where challenged ordinance "create[d] no obligation on [the platforms'] part to monitor, edit, withdraw or block" third party content, but instead held platforms "liable only for their own conduct, namely for providing, and collecting a fee for, Booking Services in connection with an unregistered unit.").

[3]   *Facebook* Motion at 12.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

2

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

otherwise unlawful messages that they didn't edit or delete."[4] The CDA certainly was "not meant to create a lawless no-man's-land on the Internet."[5] That explains why the Ninth Circuit has "consistently eschewed an expansive reading of the statute that would render unlawful conduct magically . . . lawful when [conducted] online."[6] And that's just the case here: the Platforms' illegal and extremely lucrative participation in a multi-billion-dollar gambling enterprise has not "magically" become lawful simply because it is conducted online.[7]

As discussed elsewhere in this brief, the Platforms' Motions fail for other reasons, too, including that Plaintiffs' consumer protection claims do not treat the Platforms as publishers or speakers and that the Platforms' arguments about "neutral tools" misunderstand the relevant analysis under *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009). Consequently, Plaintiffs' respectfully request that the Court deny the Platforms' Motions or, alternatively, grant Plaintiffs leave to amend their complaints.

## II.   RELEVANT FACTUAL ALLEGATIONS

Social casino apps generate over $6 billion in annual revenue, and Platforms like Apple, Google, and Facebook tax and permanently retain 30% of that revenue (over $2 billion) each year. Compl. ¶¶ 7-8, Dkt. 73, *In re: Apple Inc. App Store Simulated Casino-Style Games Litig.*, No. 5:21-md-2985 ("*Apple* Compl."); Compl. ¶¶ 8-9, Dkt. 80, *In re: Facebook Simulated Casino-Style Games Litig.*, No. 5:21-cv-2777 ("*Facebook* Compl."); Compl. ¶¶ 7-8, Dkt. 52, *In re: Google Play Store Simulated Casino-Style Games Litig.*, No. 5:21-md-3001 ("*Google* Compl."); *see also Facebook* Compl. ¶ 8 ("[O]f the top twelve grossing apps available on

_____

[4]      *Gonzalez v. Google LLC*, 2 F.4th 871, 887 (9th Cir. 2021) (internal quotation marks omitted).

[5]      *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 & n.15 (9th Cir. 2008).

[6]      *HomeAway*, 918 F.3d at 683 (internal quotation marks omitted).

[7]      *Id.*

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD                                                    3                     **EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

Defendant Facebook, *nine* are social casinos."). The Platforms would have the Court believe they are merely passive publishers of these cash-cow apps. *See Apple* Motion at 5 ("Apple's role is limited to innovating and providing a marketplace on which developers can offer these apps for download."); *Facebook* Motion at 3 ("Facebook is merely a platform for developers to make these games available to others."); *Google* Motion at 10 ("Google simply publishes apps to Google Play in accordance with its publicly-available content policies."). But Plaintiffs' Master Complaints describe an "illegal internet gambling enterprise" between the Platforms and the developers of social casino applications, in which the Platforms play multiple, distinct, active roles. *Apple* Compl. at 1; *Facebook* Compl. at 2; *Google* Compl. at 1.

For purposes of this limited opposition, Plaintiffs need not repeat here their allegations of how social casinos work, how they cause real harm to consumers, and how they violate dozens of states' gambling and consumer protection laws. What is relevant for these Motions is how the Platforms participate in the illegal gambling scheme, illegal gambling transactions, and unfair business practices. Plaintiffs allege that the Platforms' involvement in the illegal gambling enterprise extends far beyond passively hosting the social casino apps and in fact involves acting as the social casinos' bookmaker (*i.e.*, handling the sale of virtual chips, collecting money from players, skimming 30% of the sales, and then remitting the remainder to the developer), promoting the apps, collecting and analyzing valuable user data, and helping the developers target high-spenders. *See, e.g.*, *Apple* Compl. ¶¶ 5-6; *Facebook* Compl. ¶¶ 5-6; *Google* Compl. ¶¶ 5-6 (Developers' "business [model] of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with the Platforms.").

## A. Offering, Categorizing, and Promoting the Social Casino Apps

It is not in dispute that, each year, the Platforms sell to consumers billions of dollars of online casino chips to be used in social casino slot machines. Beyond booking those transactions, the Platforms also review, categorize, and apply special rules to social casino apps. *Apple* Compl. ¶¶ 82-84; *Facebook* Compl. ¶¶ 76-77; *Google* Compl. ¶¶ 78-80 (explaining app review process and that social casinos are categorized as "Casino" games, distinct from "Arcade" and "Card"

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

4

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

game categories). Apple in fact rates the social casino app category— "apps that feature Frequent/Intense Simulated Gambling"—as "17+" in order "to help make the App Store safe for kids." *Apple* Compl. ¶ 85. Facebook executives focus closely on this category; Facebook's Director of Global Platform Partnerships once stated: "It's the number one category on Facebook. It's a category that, you know, never stops growing … It's very good for gaming companies because they can decide to target on Facebook, or on mobile, you know, specific users, or just the whales." *Facebook* Compl. ¶ 85. And Google, for its part, bars "ads which promote gambling, real-money games, contests, and tournaments" from being displayed in social casino apps. *Google* Compl. ¶ 83.

The Platforms also provide "marketing guidance, tools, promotional offers, and more" to the developers of social casinos to help drive users' "discovery of apps and in-app purchases." *Apple* Compl. ¶ 87; *Google* Compl. ¶ 85; *see also Facebook* Compl. ¶¶ 78, 171. Apple selects apps to "feature" within its App Store, which "increases app installs." *Apple* Compl. ¶ 88. Google "offers App Campaigns to promote apps on Google Search, YouTube, Google Play, and more." *Google* Compl. ¶ 85. And Facebook uses tools like "targeted ads" and "in-game rewards" to encourage new users to play social casinos. *Facebook* Compl. ¶ 80.

### B. Booking Illegal Transactions for a Fee: Selling Virtual Chips for Wagering in the Social Casinos

The Platforms also "operate[] as the payment processor for all in-app purchases of virtual chips in the Illegal Slots." *Apple* Compl. ¶ 63; *Facebook* Compl. ¶ 60; *Google* Compl. ¶ 61. Though the Platforms do not determine the odds of winning any slot machine spins within the apps, they otherwise act much like bookmakers in gambling parlance: accepting players' real money, provisioning casino chips to be wagered on illegal slot machine games, earning 30% of the gross sales for their contribution to the enterprise, and sometime later remitting the purchase amount (net of their fee) to the gambling game developers. When players run out of chips, they cannot continue playing the same slot machine game unless they purchase more chips. *Apple* Compl. ¶¶ 61-63; *Facebook* Compl. ¶¶ 58-60; *Google* Compl. ¶¶ 59-61.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

5

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

Virtual chips can only be used inside each social casino app, and "[s]ubstantially all virtual chips are used on slot machine spins." *Apple* Compl. ¶ 65; *Facebook* Compl. ¶ 62; *Google* Compl. ¶ 63. And the challenged apps in this litigation derive substantially all of their revenue from slot machine games. *Apple* Compl. ¶ 56; *Facebook* Compl. ¶ 53; *Google* Compl. ¶ 54. In other words, when a user buys virtual chips from the Platforms within a social casino app, it is substantially certain that those chips will be used to wager on a slot machine spin.

**C.  Collecting and Analyzing Player Data, Marketing, and Targeting "Whales"**

Finally, the Platforms are closely involved in social casinos' business strategies. For example, the Platforms and developers work together to "monitor the game activity and use the collected data to increase user spending." *Apple* Compl. ¶ 91; *Facebook* Compl. ¶ 81; *Google* Compl. ¶ 88. Because the Platforms handle all payment processing for social casinos, the developers often can access user data only from the Platforms. *Apple* Compl. ¶ 91; *Facebook* Compl. ¶ 81; *Google* Compl. ¶ 88. The Platforms and developers also "work together to target and exploit high-spending users, or 'whales.'" *Apple* Compl. ¶ 92; *Facebook* Compl. ¶ 82; *Google* Compl. ¶ 89. For example, Apple "aids in the design and direction of targeted advertising, both on and within its App Store and other related Apple platforms, all aimed at driving new customers to [social casinos] and retaining current gamblers." *Apple* Compl. ¶ 94. Facebook provides "App Ads [which] allow Illegal Slot companies to target high spending users and activate non-spending users," "sends targeted ads offering in-game rewards to users who invite their Facebook friends to also play the [social casinos]," and provides online "tournaments" which "driv[e] increased chip sales." *Facebook* Compl. ¶¶ 80, 84. And Google "aids in the design and direction of targeted advertising, both on Google.com, its larger Display Network, and within other apps and platforms, all aimed at driving new customers to the [social casinos] and retaining current gamblers." *Google* Compl. ¶ 91.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

6

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

III.   **ARGUMENT**

A. **Summary of Argument**

The Platforms move to dismiss all of Plaintiffs' Master Complaints on grounds that all forty causes of action in the Complaints seek to punish the Platforms merely for passively publishing social casino apps created by third parties, and that such liability is precluded by Section 230 of the CDA. But while Section 230 immunizes platforms from liability for *publishing* third-party content, it does not "declare[] a general immunity from liability *deriving from* third-party content." *Barnes*, 570 F.3d at 1100 (emphasis added). In particular, recent and directly on-point Ninth Circuit authority—authority that Apple and Google fail to even mention in their Motions—squarely holds that platforms hosting third-party content are not immune for their own conduct when they book and collect a fee for unlawful transactions (even if the transactions flow from protected third-party content). *HomeAway*, 918 F.3d at 684. *HomeAway* applies cleanly to the allegations here, since Plaintiffs allege that the Platforms booked and earned a 30% fee for every illegal gambling transaction Plaintiffs challenge. Specifically, the Platforms received and processed payment for (and taxed a 30% cut of) all purchases of virtual chips within the social casino apps. Those purchases total tens of billions of dollars and are themselves illegal transactions, since in every instance the purchased chips were substantially certain to be wagered on illegal slot machines.

The Platforms' Motions rest on a fundamental misunderstanding of Plaintiffs' claims. Plaintiffs' claims do not seek to hold the Platforms liable for publishing or hosting social casino apps. Instead, Plaintiffs seek to hold the Platforms liable for their own conduct both in booking and taking a cut of illegal gambling transactions and in directly participating in unfair business practices. These claims do not seek to regulate publisher activity, since avoiding liability would not force the Platforms to review, monitor, or edit any third-party content. Declining to extend CDA immunity here thus is consistent not only with *HomeAway* and other relevant precedent, but also with two recent decisions in this District regarding CDA immunity and claims of unlawful gambling. *See infra* Section III.C.1.e. (discussing *Taylor v. Apple* and *Coffee v.*

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

7

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

1  *Google*). In addition, though the Platforms insist that the challenged conduct is simply the
2  provision of "neutral tools" offered to all apps, the Platforms can "face the prospect of liability,
3  even for their 'neutral tools,'" since their potential liability is based on their own conduct and not
4  solely on the content of third parties. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021).
5  Because Plaintiffs' claims fall outside the scope of CDA immunity, the Court should deny the
6  Platforms' Motions to Dismiss.

7  **B. Legal Framework**

8  At the pleadings stage, the Court must "accept all factual allegations in the complaint as
9  true and construe the pleadings in the light most favorable to the nonmoving party." *Dyroff v.*
10 *Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). A complaint that "states a
11 plausible claim for relief" falling outside the scope of CDA immunity "may survive a motion to
12 dismiss." *Id.*

13 Section 230 of the CDA "protects from liability (1) a provider or user of an interactive
14 computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a
15 publisher or speaker (3) of information provided by another information content provider."
16 *Barnes*, 570 F.3d at 1100-01; *see also* 47 U.S.C. § 230.[8] A defendant can fall outside the scope
17 of CDA immunity, therefore, if the plaintiff's claim *either* (a) challenges conduct other than
18 publisher or speaker conduct, *or* (b) challenges the defendant's publication of information where
19 the defendant itself is one of the "information content providers." *See Opperman v. Path*, 87 F.
20 Supp. 3d 1018, 1043 (N.D. Cal. 2014).

21

22 _____

23 [8]   47 U.S.C. § 230(c)(1) provides: "No provider or user of an interactive computer service
24 shall be treated as the publisher or speaker of any information provided by another information
25 content provider."

26 47 U.S.C. § 230(e)(3) states: "No cause of action may be brought and no liability may be
27 imposed under any State or local law that is inconsistent with this section."

28
PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

8

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

Plaintiffs do not dispute that the first prong of the *Barnes* test is satisfied here, since the Platforms are providers of an "interactive computer service." 47 U.S.C. § 230(f)(2). And while Plaintiffs do contend that the Platforms' own conduct, as alleged, qualifies them as "information content providers" for CDA purposes, Plaintiffs do not reach that issue in this brief because—in light of *HomeAway*—the "publisher or speaker" issue is dispositive of the Platforms' Motions.[9] Consequently, the sole issue before the Court is whether Plaintiffs' claims "inherently require[] the court to treat the [Platforms] as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1102.

### C. Plaintiffs' Claims Do Not Inherently Require the Court to Treat the Platforms as "Publishers or Speakers" of Third-Party Content.

"[N]either [CDA § 230(c)(1)] nor any other [subsection] declares a general immunity from liability deriving from third-party content." *Id.* at 1100. Rather, under the second prong of the *Barnes* test, CDA immunity applies only if Plaintiffs' "cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Id.* at 1102. For present purposes, "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.*

The Platforms all argue that Plaintiffs' claims seek to punish the Platforms simply for hosting or publishing third-party content (*i.e.*, the social casino apps). *See Apple* Motion at 9 ("Apple's involvement with the Simulated Casino Apps, and its alleged role in any wrongful conduct, is limited to that of a publisher, *i.e.*, making the Simulated Casino Apps available to consumers."); *Facebook* Motion at 8 ("The Complaint explicitly treats Meta 'as the publisher o[r] speaker of' casino-themed video games."); *Google* Motion at 3 ("Plaintiffs essentially seek to hold Google liable for failing to block or remove this content from Google Play."). These

---

[9]     To be clear, Plaintiffs are likely to advance an "information content provider" argument later in this litigation, including potentially at class certification, summary judgment, trial, or—if need be—in pleadings briefing regarding any Amended Master Complaints.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

9

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

arguments mischaracterize Plaintiffs' allegations and incorrectly minimize the Platforms' role in the alleged illegal gambling enterprise. None of Plaintiffs' claims turn on the Platforms' conduct as the mere publisher of the social casino apps; instead, all of their claims turn on either (i) the Platforms' booking of (and profiting from) illegal gambling transactions, or (ii) the Platforms' direct participation in unfair business practices.

### 1. Booking Illegal Gambling Transactions Is Not "Publication."

Plaintiffs seek to hold the Platforms liable not for hosting social casino apps but rather for the Platforms' own bookmaking conduct—*i.e.*, booking illegal gambling transactions, for a generous fee, by selling virtual casino chips. This conduct is categorically distinct from mere *publication* of social casino games, and thus exceeds the scope of CDA immunity.

#### a. *HomeAway* and Other Relevant Cases Distinguish Between Immunity for Posting Content and Liability for Booking Illegal Transactions.

The Ninth Circuit's recent decision in *HomeAway.com, Inc. v. City of Santa Monica* is directly on point, distinguishing between a platform's CDA immunity for *posting* unlawful rental listings and its liability for *booking* unlawful rental transactions. 918 F.3d at 684. In *HomeAway*, the platform-appellants (HomeAway.com, Inc. and Airbnb Inc.) operated websites that are "essentially online marketplaces that allow 'guests' seeking accommodations and 'hosts' offering accommodations to connect and enter into rental agreements with one another." *Id.* at 679. For their services, "the Platforms collect[ed] a fee from each successful booking." *Id.* at 679 n.1. The platforms argued that the City of Santa Monica's ordinance, which barred the platforms from "completing any booking transaction" for an unlicensed property and from "collecting or receiving a fee" in connection with bookings for unlicensed properties, was preempted by the CDA because it required them "to monitor the content of a third-party listing . . . before allowing any booking to proceed," effectively forcing the platforms to remove third-party content. *Id.* at 680-83. The Court rejected the contention that Santa Monica's ordinance "reaches 'publication' activities," focusing in part on the fact that the Ordinance "does not require the Platforms to monitor third-party content." *Id.* at 682. Rather, the ordinance "prohibits processing transactions

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

10

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

for unregistered properties," only requiring the platforms to review (and decline) "incoming requests to complete a booking transaction—content that, while *resulting from* the third-party listings, is distinct, internal, and nonpublic." *Id.* In other words, "the Platforms face no liability for the content of the bookings; rather, any liability arises only from unlicensed bookings." *Id.* at 684; *accord Dyroff*, 934 F.3d at 1098 (distinguishing *HomeAway*, where "liability arose from facilitating unlicensed booking transactions" rather than "the content of their listings," from Ultimate Software's CDA immunity for "acting as a publisher of others' content").

The *HomeAway* opinion echoed the CDA analysis in *Airbnb Inc. v. City & County of San Francisco*, a forerunner case challenging a similar ordinance passed years earlier in San Francisco. 217 F. Supp. 3d at 1069. There, Judge Donato drew the same distinction between posting unlawful rental listings and booking those rental listings for a fee:

> [The Ordinance] does not regulate what can or cannot be said or posted in the listings. It creates no obligation . . . to monitor, edit, withdraw or block the content supplied by hosts. . . . The Ordinance holds plaintiffs liable only for their own conduct, namely for providing, and collecting a fee for, Booking Services in connection with an unregistered unit.

*Id.* at 1072-73. In brief, Judge Donato used the same analysis to reach the same conclusion that the Ninth Circuit used and reached years later in *HomeAway*: platforms enjoy immunity for posting unlawful content, but not for booking transactions for a fee related to that content.

Applying the same rule here, Plaintiffs' claims fall outside the scope of CDA immunity. Plaintiffs do not seek to hold the Platforms liable for hosting or publishing the social casino games, but rather for the Platforms' own conduct as bookmakers—booking the illegal sale of virtual chips for a (hefty) fee. *See Apple* Compl. ¶ 96; *Facebook* Compl. ¶ 89; *Google* Compl. ¶ 93 (alleging the Platforms act "as the 'bank' for the Illegal Slots"). In support of their claims under state gambling laws, for example, Plaintiffs allege that the Platforms do not merely publish unlawful games of chance. The Platforms sell to players the virtual chips that are substantially certain to be used wagering on illegal slot machines. *See Apple* Compl. ¶ 65; *Facebook* Compl. ¶ 62; *Google* Compl. ¶ 63 ("Substantially all virtual chips are used on slot machine spins."). The

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

11

EDELSON PC
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

Platforms sell these chips through their own payment processing systems,[10] so while the transaction "result[s] from" the third-party content in the slot machine games, the transaction itself is "distinct, internal, and nonpublic." *HomeAway*, 918 F.3d at 682. The Platforms collect all the revenue from the players, retain 30% of it, and at some later date remit 70% of it to the social casino developers. In other words, the Platforms have retained 30% of every gambling loss Plaintiffs seek to recover under the various state "loss recovery acts." Just as the *HomeAway* platforms could be held liable for booking unlawful rental transactions, the Platforms may be held liable here for their booking (and taking a 30% fee for) illegal gambling transactions.

In addition to *HomeAway* and *Airbnb, Inc. v. City & Cty. of San Francisco*, several other courts have similarly denied CDA immunity to platform services where the alleged liability was based on the platforms' booking of illegal transactions:

- In ***Airbnb, Inc. v. City of Boston***, the federal district court found that the CDA did not shield Airbnb from a city ordinance imposing a fine on booking agents who accept a fee for booking an ineligible unit for a short-term rental. The court explained that CDA immunity did not apply since the ordinance "reaches Airbnb in its capacity as a booking agent and payment processor. In doing so, it imposes no liability, nor requires any action, that necessarily arises from Airbnb's publication of content provided by another." 386 F. Supp. 3d 113, 122 (D. Mass. 2019).

- In ***Turo Inc. v. City of Los Angeles***, the federal district court addressed whether the CDA made Turo—a peer-to-peer car sharing platform—immune from the City's regulation of rental car businesses at Los Angeles Airport. The court found that "Section 230 does not apply because the City seeks to hold Turo liable for its role facilitating online rental car transactions, not as the publisher or speaker of its users' listings." No. 2:18-cv-06055-CAS-GJSX, 2020 WL 3422262, at *7 (C.D. Cal. June 19, 2020), *rev'd on other grounds*, 847 F. App'x 442 (9th Cir. 2021).

---

[10] Apple seems to suggest that it is not a "payment processor" because it contracts with providers like Chase Bank for in-app purchases. *Apple* Motion at 4. But Apple admits that it provides an "in-app purchases ('IAP') system," through which players can "use real money to purchase virtual currency." *Id.* Whether Apple involves additional parties in the at-issue transactions does not change the analysis. What is relevant here is that players purchase virtual chips "through IAP," *id.*, and that Plaintiffs' claims seek to hold Apple liable for permitting these unlawful transactions through Apple's IAP system.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

12

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

1

2

3

- In **Massachusetts Port Auth. v. Turo Inc.**, the Massachusetts Supreme Court similarly held that the Massachusetts Port Authority ("Massport") could sue Turo for "operating an unauthorized rental business at Logan Airport" without running afoul of the CDA because "Massport's claims sought to hold Turo liable for its own role in facilitating the online car rental transactions that resulted in its customers' continuing trespass." 166 N.E.3d 972, 977, 979 (2021).

4    Each of these cases, like *HomeAway*, parses the platforms' dual roles as both publishers *and*

5    booking agents of allegedly illegal transactions. And each of these cases finds that, while CDA

6    immunity may attach to the first role, it does not apply to the second. [11/12]

7                    b.   Plaintiffs Allege that The Platforms Illegally Transact Virtual Casino Chips.

8            None of the Platforms distinguish *HomeAway*—indeed, Apple and Google don't even try

9    —and none of the Platforms can explain why CDA immunity should apply to the Platforms' own

10   conduct of booking of illegal gambling transactions. Instead, all three Platforms try to hide the

11   ball by falsely claiming that their transactions with class members—*i.e.*, their sales of virtual

12   casino chips—are not alleged to be illegal. *Apple* Motion at 2 ("Apple indisputably does not

13   _____

14   [11]    The Ninth Circuit has also held in two recent cases that CDA immunity did not reach

15   negligent-product-design claims or failure-to-warn claims, as in those cases the plaintiffs' tort

16   claims did not seek to hold the defendant liable as the "publisher or speaker" of third-party

17   content. *See Lemmon v. Snap*, 995 F. 3d 1085, 1093 (9th Cir. 2021) (negligent product design);

18   *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (failure to warn).

19   [12]    At least one district court has also recently held that CDA immunity likewise does not

20   reach strict products liability claims. In *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, the

21   federal district court found that the CDA did not immunize Amazon from a strict product

22   liability action because the plaintiff was "not seeking to treat Amazon as the publisher of the

23   product description" or to "hold Amazon liable for the product description at all. Rather,

24   [plaintiff] is seeking to hold Amazon liable for putting a defective product into the stream of

25   commerce. . . . Amazon's active participation in the sale, through payment processing, storage,

26   shipping, and customer service, is what makes it strictly liable. This is not activity immunized by

27   the CDA." 390 F. Supp. 3d 964, 973–74 (W.D. Wis. 2019).

28

Pls.' Consol. Opp'n to CDA 230 Motions to Dismiss
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

13

**Edelson PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

participate in the transaction alleged to be illegal . . . ."); *Facebook* Motion at 5 ("Plaintiffs do not allege that processing transactions . . . are acts that are unlawful in and of themselves."); *Google* Motion at 9 ("Plaintiffs do not allege that Google, by . . . processing payment transactions for those apps, . . . contributed in any material way to what allegedly makes the relevant apps unlawful (*i.e.*, their alleged illegal gambling purpose)."). In doing so, the Platforms ignore the express allegations in the Master Complaints and wrongly suggest that the Court should consider the purchase of virtual chips as an event distinct from the (substantially certain) wagering of those chips and distinct from the alleged illegal gambling operation.

When a player buys virtual chips from the Platforms within a social casino app, it is not a benign transaction where the chips could be put to lawful use. Rather, it is substantially certain that those chips will be used to wager on a slot machine spin.[13] *See Apple* Compl. ¶¶ 56, 65; *Facebook* Compl. ¶¶ 53, 62; *Google* Compl. ¶¶ 54, 63 (Almost all of the games within each social casino app are slot machines and "[s]ubstantially all virtual chips are used on slot machine spins."). Attempting to separate the purchase of chips from the wagering of chips does not make sense under these facts; in a brick-and-mortar casino operating without a license, for example, selling chips would be illegal, just as accepting those chips at the roulette table would be. Here, too, the sale of virtual chips and the wagering of those virtual chips on slot machine games are both part of the same illegal gambling operation.

---

[13]   These allegations distinguish Plaintiffs' claims from other cases alleging illegal gambling within apps or video games. In cases involving "loot boxes," for example, virtual currency purchased from the Platforms were used primarily for lawful uses within the games, and the allegedly illegal "loot boxes" were merely ancillary (though allegedly unlawful) features. *See* Order Granting Motion to Dismiss at 8, Dkt. 46, *Taylor v. Apple, Inc.*, No. 20-cv-3906-RS (N.D. Cal. Mar. 19, 2021); *Coffee v. Google, LLC*, No. 20-cv-03901-BLF, 2022 WL 94986, at *6 (N.D. Cal. Jan. 10, 2022); *Mai v. Supercell Oy*, No. 20-cv-05573-EJD, 2021 WL 4267487, at *3 (N.D. Cal. Sept. 20, 2021).

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

14

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

Moreover, Plaintiffs expressly allege that it is illegal under RICO and the various state gambling laws for the Platforms to sell virtual chips in the social casino apps, including because doing so makes the Platforms co-conspirators in an illegal gambling enterprise and because the state gambling statutes all prohibit "profiting from gambling activity." *See, e.g.*, *Facebook* Compl. ¶ 496 (alleging Facebook agreed to and acted in furtherance of the gambling conspiracy, including by collecting unlawful debts); *id.* ¶ 170 (alleging Facebook "has profited and continues to profit from each payment made by Alabama Class Members to purchase virtual coins," in violation of Alabama law); *id.* ¶ 197 (same for Arkansas); *id.* ¶ 222 (same for Georgia); *id.* ¶ 247 (same for Illinois); *id.* ¶ 273 (same for Kentucky); *id.* ¶ 297 (same for Minnesota); *id.* ¶ 312 (same for Missouri); *id.* ¶ 338 (same for Montana); *id.* ¶ 353 (same for New Jersey); *id.* ¶ 379 (same for New York); *id.* ¶ 394 (same for South Carolina); *id.* ¶ 409 (same for Tennessee); *id.* ¶ 424 (same for Virginia); *id.* ¶ 442 (same for Washington).[14] Plaintiffs thus allege—over and over again—that the Platforms' sale of virtual chips is an illegal gambling transaction.

Facebook likewise ignores the allegations in the Master Complaint in its half-hearted attempt to distinguish *HomeAway*. Facebook claims that "[u]nlike . . . *HomeAway*, this case does not seek to penalize Meta for any illegal payment or other financial transaction" and that "Plaintiffs do not seek to regulate any *real-world* activity." *Facebook* Motion at 12. But Plaintiffs squarely allege that Facebook participated in countless illegal financial transactions when it sold virtual chips to social casino players. *E.g.*, *Facebook* Compl. ¶¶ 60, 88-89 (alleging that Facebook acts as the "payment processor for all in-app purchases of virtual chips in the

---

[14]   The same exact allegations are present in the *Apple* and *Google* Complaints, all citing the following statutory provisions:

Ala. Code § 8-1-150(a); Ark. Code. Ann. § 16-118-103; Ga. Code Ann. § 13-8-3; 720 Ill. Comp. Stat. Ann. 5/28-8; Ky. Rev. Stat. Ann. § 372.020; Minn. Stat. Ann. § 541.20; Mo. Ann. Stat. § 434.030; Mont. Code Ann. § 23-5-131; N.J. Stat. Ann. § 2A:40-5; N.Y. Gen. Oblig. Law §§ 5-419 & 5-421; S.C. Code § 32-1-10; Tenn. Code § 28-3-106; Va. Code § 11-15; and Wash. Rev. Code § 4.24.070.

*See e.g.*, *Facebook* Compl. at 80.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

15

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

Illegal Slots," that social casinos "are required to use Facebook Payments to process all in-game purchases," and that Facebook "act[s] as the 'bank' for the Illegal Slots"). Indeed, those illegal financial transactions are the crux of this litigation. And Plaintiffs absolutely seek to recover the billions of dollars of "*real-world*" money they lost buying and gambling away casino chips sold by Facebook and the other Platforms—chips that could essentially only be used on illegal slot machines. *Id.* ¶ 62. Nor, in any event, is it relevant for CDA purposes whether the challenged activities are conducted in the "real world," on the internet, in the metaverse, or anywhere else; the relevant inquiry is only whether claims inherently require the Court to treat the online platform as a publisher or speaker of third-party content.

Because the Platforms sell virtual chips that are substantially certain to be wagered on illegal slot machines, Plaintiffs allege that players' transactions with the Platforms are themselves unlawful gambling transactions. If a physical casino sold casino chips for slot machines that were created, owned, and operated by a third party, but players purchased chips to wager on those slot machines from the casino's central cashier, and the casino kept 30% of that purchase revenue, the casino would surely be considered a direct participant in gambling transactions and the entire gambling operation. The same logic applies here, since unlawful conduct does not become "magically . . . lawful when [conducted] online," thereby "giv[ing] online businesses an unfair advantage over their real-world counterparts." *HomeAway*, 918 F.3d at 683 (alterations in original) (quoting *Roommates.Com*, 521 F.3d 1157, 1164 & n.15 (9th Cir. 2008)). Because the slot machine games within the social casino apps are unlawful, and because both federal and state laws prohibit participating in or profiting from illegal gambling transactions, purchases of virtual chips from the Platforms to be used on in social casinos are also unlawful gambling transactions.

  c. <u>None of the Platforms' Arguments Suggest that Their Direct Participation in Illegal Transactions Should Be Immunized.</u>

Though they fail to engage meaningfully with the rule set forth in *HomeAway*, the Platforms do make two other arguments related to their role selling virtual chips. Neither of these

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

16

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

arguments changes the analysis under the second prong of the *Barnes* test or indicates that Plaintiffs' claims seek to treat the Platforms as publishers or speakers.

First, Facebook and Google both argue that the slot machine games would be "allegedly unlawful . . . independent of anything that [the Platforms] did." *Facebook* Motion at 14; *see also Google* Motion at 10 (Plaintiffs' "core theory of illegality is that the gaming apps at issue are illegal from the moment a player takes his or her first spin on an animated slot machine, before and irrespective of any involvement by Google.") (emphasis omitted). It's true that the social casinos would violate state gambling laws if they were provided directly by the developers without involvement from the Platforms. But that is not the case here. And regardless, the developers' liability does not immunize the Platforms from liability for their own, non-publication conduct, including booking and taking a cut of the illegal transactions. *See Internet Brands*, 824 F.3d at 853 (explaining that publication of offensive material provided by a third-party was a "but-for" cause of the plaintiff's claim since "without that posting the plaintiff would not have suffered any injury," but "that did not mean that the CDA immunized the proprietor of the website from all potential liability"); *HomeAway*, 918 F.3d at 682 ("*Internet Brands* rejected use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content."). Here, the Platforms directly participated in illegal gambling transactions and retained for themselves 30% of the gambling losses at issue in these actions. The CDA does not preclude Plaintiffs from seeking recovery of those losses from the Platforms.

Second, holding the Platforms liable for processing these transactions does not run afoul of caselaw noting that receiving a commission from third-party content does not necessarily destroy CDA immunity. *See Apple* Motion at 11-12; *Facebook* Motion at 9; *Google* Motion at 8-9. In the cases the Platforms cite, CDA immunity applied—notwithstanding the hosting website's profits—because the plaintiffs' claims turned on traditional publication activities like the decision of whether to host, publish, or withdraw from publication third-party content. *See Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1119 (N.D. Cal. 2020)

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

17

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

1   ("Plaintiffs' claims are based on Facebook's decision to *remove* [plaintiff's] account, postings,

2   and content.") (emphasis added); *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 597 n.2 (9th Cir.

3   2020) ("[I]t is clear that Fyk seeks to hold Facebook liable as a publisher for its decisions to *de-*

4   *publish* and *re-publish* the pages") (emphasis added); *Goddard v. Google, Inc.*, No. 08-cv-2738-

5   JF-PVT, 2008 WL 5245490, at *5 (N.D. Cal. Dec. 17, 2008) (plaintiff's claims based on mobile

6   service providers' fraudulent advertisements essentially alleged "she was harmed because

7   Google *hosted* certain online content") (emphasis added); *La Park La Brea A LLC v. Airbnb,*

8   *Inc.*, 285 F. Supp. 3d 1097, 1107 (C.D. Cal. 2017) ("Thus, it is with Airbnb's *publication* of this

9   content that Aimco takes issue") (emphasis added); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816,

10  831 (2002) ("The substance of appellants' allegations reveal they ultimately seek to hold eBay

11  responsible for . . . eBay's *dissemination of representations* made by the individual defendants,

12  or the *posting* of compilations of information . . .") (emphasis added).

13          In *Evans v. Hewlett-Packard Co.* and *Jurin v. Google Inc.*, neither court explicitly

14  addressed whether the plaintiffs' claims sought to treat the defendant as a publisher (focusing

15  instead on whether the defendant was an information content provider), but the claims in both

16  cases were based on the use of the plaintiff's trademark in content created by third parties.

17  *Evans*, No. 13-cv-02477 WHA, 2013 WL 4426359, at *1, 3 (N.D. Cal. Aug. 15, 2013); *Jurin*,

18  695 F. Supp. 2d 1117, 1120 (E.D. Cal. 2010). The claims in those cases plainly turned on

19  publication activities because they could not be remedied without removing or altering the

20  challenged content. Here, Plaintiffs' claims against the Platforms could be remedied without

21  forcing the Platforms to remove or alter any social casino apps.

22          To be clear, Plaintiffs do not contend that "Section 230 vanishe[s]," *Facebook* Motion at

23  9, whenever a website happens to profit from hosting third-party content. Nor do Plaintiffs argue

24  that a website automatically loses immunity whenever it processes a third-party transaction and

25  there is a claim of illegality related to that transaction. *See id.* For example, if Airbnb books a

26  transaction and collects a fee for a vacation rental that is (unbeknownst to Airbnb) fraudulently

27  advertised, Airbnb nevertheless likely enjoys CDA immunity because finding Airbnb liable for

28

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD                                    18          **EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

fraud would require a finding that it violated a duty not to make false statements—a duty that "stems from [Airbnb's] status or conduct as a publisher." *See Lemmon*, 995 F.3d at 1091 ("[R]egardless of the type of claim brought, we focus on whether the duty the plaintiff alleges stems from the defendant's status or conduct as a publisher or speaker." (internal quotation marks omitted)).[15] By contrast, here—as in *HomeAway* and its progeny—the Platforms can permissibly be held liable for booking illegal gambling transactions because the Platforms are violating duties under state and federal law not to directly book or profit from illegal gambling transactions. That prohibited conduct—booking and profiting from illegal gambling transactions—"cannot be fairly classified as 'publication' of third-party content." *See HomeAway*, 918 F.3d at 682-83 (upholding ordinance "prohibit[ing] processing [of] transactions for unregistered properties," even though the Ordinance would create "a duty to cross-reference bookings against Santa Monica's property registry," because "such conduct cannot be fairly classified as 'publication' of third-party content").

> d. <u>Avoiding Liability for Plaintiffs' Claims Does Not Force the Platforms to Review, Edit, or Remove Third-Party Content.</u>

The Platforms argue that Plaintiffs seek to treat the Platforms as publishers of social casino apps because—according to the Platforms—Plaintiffs have requested that the Court order the Platforms to remove the social casino apps from publication. *See Apple* Motion at 10 ("Plaintiffs also seek an injunction requiring Apple to *remove* the Simulated Casino Apps from the App Store (*e.g.*, Compl. Prayer for Relief ¶ e) . . . .") (emphasis added); *Facebook* Motion at 9 ("Plaintiffs nonetheless seek to impose a duty to monitor and *remove* third-party content—the Complaint explicitly requests an injunction 'to force Facebook to stop participating in' the publication of casino-themed video games. (Compl. ¶ 20, *see also id.* at 80.)") (emphasis added);

---

[15]     Put another way, Airbnb likely would enjoy CDA immunity from a fraud claim because the associated vacation rental *transaction* itself is not illegal; instead, liability for the fraud claim would (impermissibly) turn on *publication* of the third-party's fraudulent misrepresentation.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

19

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

*Google* Motion at 13 (Plaintiffs "ask[] the Court to 'enjoin[] [Google] from continuing the challenged conduct' alleged in the Master Complaint, which in practice means to review, monitor, and *remove* certain third-party content from Google Play. (*See* Compl., Prayer for Relief, (e).)") (emphasis added).

For one thing, these contentions and selective quotations misrepresent Plaintiffs' Master Complaints. What Plaintiffs' Prayers for Relief actually request is that the Court "[e]njoin[] Defendants from continuing the challenged conduct," and Paragraph 20 of the *Facebook* Complaint states, in full: "Through this case, Plaintiffs seek to force Facebook to stop participating in, and to return to consumers the money it has illegally profited from, the Social Casino Enterprise." *See Apple* Compl. at 81; *Facebook* Compl. at 80 and ¶ 20; *Google* Compl. at 85. To be clear, none of the Master Complaints request any Court Orders requiring the Platforms to withdraw any apps from publication.

In any event, Plaintiffs' claims do not inherently require the Court to treat the Platforms as publishers or speakers of third-party content. In *HomeAway*, the Circuit explained that CDA immunity attaches if legal compliance "would necessarily require an internet company to monitor third-party content." 918 F.3d at 682. The ordinance at issue in that case was not precluded by the CDA because "[i]t does not require the Platforms to review the content provided by the hosts of listings on their websites. Rather, the only monitoring that appears necessary in order to comply with the Ordinance relates to incoming requests to complete a booking transaction . . . ." *Id.* And even if "removing certain listings may be the Platforms' most practical compliance option," "[o]n its face, the Ordinance does not proscribe, mandate, or even discuss the content of the listings that the Platforms display on their websites." *Id.* at 683; *see also Gonzalez*, 2 F.4th at 898 ("Perhaps the best indication that the Gonzalez Plaintiffs' revenue-sharing allegations are not directed to any third-party content is that Google's alleged violation of the ATA could be remedied without changing any of the content posted by YouTube's users.").

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

20

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

One way the Platforms could avoid future liability for Plaintiffs' claims here would be to take a cue from the Ninth Circuit's observation in *HomeAway*: the Platforms need not review, edit, or remove the content of the social casino apps to avoid liability, but rather could simply refrain from booking in-app transactions for apps in the Casino category within certain states, as objectively determined by IP address information. *See Apple* Compl. ¶ 99; *Facebook* Compl. ¶ 91; *Google* Compl. ¶ 96 (alleging that the Platforms have the ability to, and in fact do, employ geo-restrictions). Alternatively, the Platforms could advise social casino developers that in-app transactions—as opposed to, *e.g.*, one-time download fees or monthly subscriptions fees—are barred for social casino apps. *See, e.g.*, *City & Cty. of San Francisco*, 217 F. Supp. 3d at 1075 (listing Airbnb's various options to avoid liability without editing or removing third-party content, such as "charging fees for publishing listings, rather than for facilitating transactions"). In addition, as a practical matter, the Platforms could—in addition to advising social casino developers that in-app transactions for social casino games are prohibited—seek to enforce indemnity provisions located within the Terms of Service developers are forced to agree to. *See, e.g.*, *City of Boston*, 386 F. Supp. 3d at 121-22 (listing additional options to avoid liability, such as enforcing indemnification agreements against the content-providers).

The Platforms may argue that taking these steps would require them to review content to determine which of the many apps they host are social casino apps (in which substantially all in-app purchases are gambling transactions to be used in illegal slot machines) and not some other type of video game app. *E.g.*, *Facebook* Motion at 9 ("If one State bans one type of online video game, and another State bans another, the costs and strain on all platforms to monitor all games (and, if necessary, revise or remove them) would directly undermine Congress's vision of a 'vibrant and competitive free market . . . unfettered by Federal or State regulation.'"). But the Ninth Circuit addressed this issue in *HomeAway*, explaining that:

> While keeping track of the city's registry is 'monitoring' third-party content in the most basic sense, such conduct cannot be fairly classified as 'publication' of third-party content. The Platforms have *no* editorial control over the registry whatsoever. *As with tax regulations or criminal statutes,*

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

21

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

> *the Ordinance can fairly charge parties with keeping abreast of the law*
> *without running afoul of the CDA.*

918 F.3d at 682-83 (emphasis added). If recognizing and prohibiting transactions that seek to

book short-term rentals of unlicensed properties within a certain geographical jurisdiction does

not qualify as "publication" activity, then neither does recognizing transactions that seek to

purchase virtual chips within social casino apps. The Platforms already review all apps submitted

by developers and categorize the social casino apps in a "Casino" category, distinct from

"Arcade" and "Card" game apps. *Apple* Compl. ¶¶ 82-84; *Facebook* Compl. ¶¶ 76-77; *Google*

Compl. ¶¶ 78-80. Consequently, the Platforms in fact already know which purchases come from

social casino apps, and with no further monitoring could decline to process in-app transactions,

within certain states, for those apps—all without engaging in publication or editorial activity.

      Complying with state gambling laws, therefore, would not place undue "costs and strain

on all platforms to monitor all games (and, if necessary, revise or remove them)." *Facebook*

Motion at 9. The Platforms have multiple options for avoiding liability, none of which require

revising or removing third-party content. "As with tax regulations or criminal statutes," states

"can fairly charge [Apple, Google, and Facebook] with keeping abreast of [gambling] law

without running afoul of the CDA." *HomeAway*, 918 F.3d at 683.

      e.   <u>*Taylor v. Apple* and *Coffee v. Google* Both Militate Against CDA Immunity Here.</u>

      The Platforms' Motions unsurprisingly feature two recent cases in this District. *See, e.g.*,

*Apple* Motion at 16-17; *Facebook* Motion at 10-12 & 12 n.3; *Google* Motion at 12 n.3. In both

*Taylor v. Apple, Inc.*, No. 20-cv-3906-RS (N.D. Cal.) and *Coffee v. Google, LLC*, No. 20-cv-

3901-BLF (N.D. Cal.), the courts addressed Section 230 arguments related to video game apps—

available through Apple and Google—containing "loot boxes." The *Taylor* and *Coffee* plaintiffs

both alleged that loot boxes are illegal slot machines under California law and that Apple and

Google are civilly liable to all persons who have purchased loot boxes in apps downloaded from

Apple or Google. *See* Order Granting Motion to Dismiss at 1, Dkt. 46, *Taylor*, No. 20-cv-03906-

RS. *Coffee*, 2022 WL 94986, at *1. On the question of CDA immunity, the two District Courts

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

22

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

came out differently: the *Taylor* court denied CDA immunity, and the *Coffee* court applied CDA immunity.

Though there are important factual distinctions between Plaintiffs' allegations here and the allegations in *Taylor* and *Coffee*,[16] the logic of each of those court's CDA analysis is instructive. In *Taylor*, Judge Seeborg agreed with the plaintiffs' "simple[] and dispositive argument . . . that Apple's alleged liability in this case simply does not turn on it being 'treated as the publisher or speaker of any information'" since "Plaintiffs are seeking to hold Apple liable for selling allegedly illegal gaming devices, not for publishing or speaking information." Order Granting Motion to Dismiss at 6, Dkt. 46, No. 20-cv-3906-RS. Applying *HomeAway* and *Barnes*, the court noted that "section 230 applies to information and internet content, but does not otherwise insulate unlawful activity or transactions." *Id.* at 7. As an example, Judge Seeborg explained:

> If, hypothetically, an internet retail site allowed third-party sellers to post listings for illegal narcotics, section 230 would protect it from any liability arising merely from the listing appearing on the website. If the retailer then accepted orders, took payment, and processed the orders for the third parties . . . , however, section 230 surely would not insulate the retailer from drug dealing charges.

*Id.* The same reasoning applies here: though Section 230 may protect the Platforms from liability arising merely from listing social casino apps, it does not insulate them from liability for booking orders for virtual chips, taking payment, and retaining a fee for those unlawful gambling transactions.

The Platforms all make unconvincing and conclusory attempts to distinguish Judge Seeborg's analysis in *Taylor*. Apple largely argues that *Taylor* is "not binding," is "dicta," and was "wrongly decided." *Apple* Motion at 17. Apple also argues that it "does not participate in the allegedly illegal act of spending virtual currency to play games in the Apps," but that argument plainly mischaracterizes Plaintiffs' allegations that Apple unlawfully sells virtual casino chips

---

[16]    *See supra* note 13.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

23

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

for use in those apps. *See id.* Facebook similarly claims that *Taylor* was "decided incorrectly" and falsely claims that Plaintiffs seek to hold Facebook liable only for "hosting" social casino apps. *Facebook* Motion at 12 n.3.  Facebook acknowledges that CDA immunity for "disseminat[ing] information"—*i.e.*, content—would not apply when "[i]nternet intermediaries . . . distribute, for example, narcotics or unlisted rental properties." *Id.* But Facebook fails to acknowledge Plaintiffs' allegations that Facebook does much more than publish video game content: it *sells* virtual casino chips in illegal gambling transactions. Google, too, argues that *Taylor* is "dicta" and ignores Plaintiffs' allegations that the Platforms themselves book illegal gambling transactions. *Google* Motion at 13.[17] The Platforms offer no compelling reasons for the Court to depart from *Taylor.*

In *Coffee*, meanwhile, Judge Freeman came out the other way on CDA immunity—but reached that conclusion based on a rubric that would likely deny the Platforms CDA immunity here. Judge Freeman found it significant that in the games at issue in *Coffee*, loot boxes were but one small part of otherwise lawful games. *See Coffee*, 2022 WL 94986, at *6 ("[V]irtual currency may be used for multiple types of in-app purchases, of which only Loot Boxes are alleged to be illegal.") Judge Freeman also found that "Google's conduct in processing sales of virtual currency is not alleged to be illegal," since Google had no way of knowing (at the time of the transaction) whether players would use that currency within the game for lawful purchases or to buy loot boxes. *Id.* In turn, Judge Freeman found that CDA immunity applied since "the

_____

[17]     Google also argues the holding in *Gonzalez v. Google*—that "taking action that is necessary to the display of the allegedly illegal content" does not make a platform an "information content provider," 2 F.4th at 892—casts doubt on the *Taylor* ruling. But that analysis in *Gonzalez* relates to the third prong of the *Barnes* test and whether a website qualifies as an "information content provider," not to whether a website is facing liability for its role as a publisher or speaker. The *Taylor* court's CDA holding focused on this second prong only, so it is unaffected by the *Gonzalez* ruling.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

24

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

conduct alleged in the FAC amounts to Google's publication of third-party apps," not to any involvement in unlawful transactions. *Id.* Crucially, however, Judge Freeman observed that CDA immunity would likely not apply if the plaintiffs had alleged "direct sales of Loot Boxes through the Play Store for money," since "[c]laims based on Google's processing of Loot Box sales, and retaining a 30% cut of those sales, would not be based solely on publication of third-party apps and provision of neutral tools." *Id.* at *7.

Plaintiffs here allege a materially different fact pattern than in *Coffee* and make claims based on the Platforms' illegal "direct sales." Specifically, the social casino apps contain almost entirely slot machine games, virtual chip purchases are substantially certain to be wagered on those slot machines, and there consequently can be no question what social casino chips are going to be used for once the Platforms sell them to class members. *See Apple* Compl. ¶ 65; *Facebook* Compl. ¶ 62; *Google* Compl. ¶ 63. The Platforms know, at the time they sell virtual chips to players within the pre-categorized social casino apps, that they are selling chips to be wagered on illegal slot machines, within apps in a "Casino" category that "feature Frequent/Intense Simulated Gambling." *See Apple* Compl. ¶¶ 84-86; *Facebook* Compl. ¶ 77; *Google* Compl. ¶¶ 80-84. Plaintiffs allege that the Platforms make illegal direct sales of virtual chips to players, process payments, and retain a 30% cut of those sales. So Judge Freeman's analysis in *Coffee*, when applied to the facts presented here, leads to the conclusion that Plaintiffs' claims are "not based solely on publication of third-party apps and provision of neutral tools" and consequently are outside "the scope of immunity provided by Section 230." *Coffee*, 2022 WL 94986, at *7.

### 2. *Directly Participating in Unfair Business Practices Is Not Publisher Conduct.*

Plaintiffs also seek to hold the Platforms liable for directly participating in unfair business practices, including unscrupulous conduct such as helping the developers target "whales," problem gamblers, and other vulnerable consumers. *See supra* Section II (describing the Platforms' involvement in promoting the social casino apps, collecting and analyzing user data, marketing, and targeting users likely to spend money on the slot machine games). Just like

the bookmaking conduct, this conduct is distinct from the publication of third-party content and thus falls outside the scope of CDA immunity.

Because the Platforms "could have satisfied [their] 'alleged obligation' . . . without altering the content that [third-parties] generate," Plaintiffs' unfair business practices claims do not seek to regulate publisher or speaker activity. *Lemmon*, 995 F.3d at 1092. In *Lemmon*, the Ninth Circuit found that Snap was not immune from negligent-product-design claims related to its smartphone application Snapchat because Snap could have met its duty to "take reasonable measures to design a product more useful than it was foreseeably dangerous" without "editing, monitoring, or removing" any of the content generated by Snapchat's users. *Id.* at 1092-93. Similarly, in *Doe v. Internet Brands, Inc.*, the Ninth Circuit found that the plaintiffs' failure-to-warn claims against website operator Internet Brands "d[id] not seek to hold Internet Brands liable as a 'publisher or speaker' of content someone posted . . . or for Internet Brands' failure to remove content posted" because "[t]he duty to warn . . . would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content." 824 F.3d at 851. And as the court in *Nunes v. Twitter, Inc.* explained, Twitter can be held liable under the TCPA for "unwanted tweets sent by text" because the challenged conduct is unrelated to the content of those tweets:

> To analogize to a more traditional publishing platform, . . . if the [newspaper] delivery person throws an unwanted newspaper noisily at a door early in the morning, and the homeowner sues the delivery person for nuisance, that suit doesn't seek to treat the delivery person as a publisher. The suit doesn't care whether the delivery person is throwing a newspaper or a rock, and the suit certainly doesn't care about the content of the newspaper. It does not involve the delivery person's "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content."

194 F. Supp. 3d 959, 967 (N.D. Cal. 2016).

Here, Plaintiffs allege that the Platforms collect and analyze user data, *Apple* Compl. ¶ 91; *Facebook* Compl. ¶ 81; *Google* Compl. ¶ 88, and that they work with the developers to create and deploy targeted advertising aimed at "driving new customers to the Illegal Slots and retaining current gamblers." *Apple* Compl. ¶ 94; *Google* Compl. ¶ 91; *see also Facebook* Compl.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

26

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

¶¶ 80, 84. The Platforms can be held liable for this conduct because they could satisfy their obligations not to engage in these unfair business practices without reviewing or altering any of the slot machine games generated by third parties. *See Lemmon*, 995 F.3d at 1092. For example, the Platforms could stop collecting player data in the social casino apps, could stop promoting the apps, and/or could stop sending targeted ads to minors, so-called "whales" (in the parlance of the Platforms and the social casino developers), addicted gamblers, or other vulnerable users— all without "editing, monitoring, or removing" any of the content in the apps themselves. *Id.* Plaintiffs are not challenging the Platforms' hosting of social casino apps, but rather are challenging the Platforms' own business conduct—separate and apart from the content of the apps—as unfair and unscrupulous, and such claims are not precluded by the CDA.

### 3. That the Platforms' Tools Are Available To Other Apps Does Not Immunize The Platforms' Participation in Illegal Gambling Operations.

The Platforms lean heavily on an argument that their challenged conduct is standard for all apps—*i.e.*, that the Platforms simply offer "neutral tools" to all app developers. *See, e.g.*, *Apple* Motion at 12; *Facebook* Motion at 10; *Google* Motion at 12. But that has no bearing on whether Plaintiffs' claims treat the Platforms as publishers or speakers of third-party content.

Whether a Platform uses "neutral tools" relates to the third prong of the *Barnes* test—the "'information content provider' exception." *Opperman*, 87 F. Supp. 3d at 1045. Specifically, is it under this prong that courts consider whether websites "contribute materially . . . to [the content's] alleged unlawfulness" and do more than "merely provide[] third parties with neutral tools to create web content." *Goddard*, 640 F. Supp. 2d at 1195-96 (alterations in original) (internal quotation marks omitted); *see also Roommates.Com*, 521 F.3d at 1166, 1168 (holding that co-developers of content qualify as "information content provider[s]" if they "contribute[] materially to the alleged illegality of the conduct"). But this analysis is entirely irrelevant if—as here—the claims at issue do not treat the platform as a publisher or speaker. Under *Barnes*, a platform is immune only if the asserted claims inherently require the Court to treat the platform as a publisher or speaker of third-party content. 570 F.3d at 1100-01.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

27

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

As the Ninth Circuit recently explained in *Lemmon*, a website can be held liable for their "neutral tools" as long as the website is not being treated as the publisher or speaker of third-party content:

> [W]hile providing content-neutral tools does not render an internet company a "creator or developer" of the downstream content that its users produce with those tools, our case law has never suggested that internet companies enjoy absolute immunity from all claims related to their content-neutral tools. . . . Those who use the internet thus continue to face the prospect of liability, even for their "neutral tools," so long as plaintiffs' claims do not blame them for the content that third parties generate with those tools.

995 F.3d at 1094. The Platforms conflate these issues in their Motions. For example, Apple argues that "Plaintiffs' claims uniformly treat Apple as a publisher of third-party content—and *not* as a content creator or developer." *Apple* Motion at 9. That is not the relevant distinction for purposes of the *Barnes* test; even if a website is not a content creator or developer, it can still face "liability deriving from third-party content" as long as that liability is not based on the website's role as publisher or speaker. *Barnes*, 570 F.3d at 1100. Apple's only arguments in support of its contention that "Plaintiffs seek to hold Apple liable solely as a publisher" are that Apple "offer[s] a platform, including neutral tools," and that Apple is not "a creator or developer of any app published through the App Store." *Apple* Motion at 9-10; *see also id.* at 11-16 (making further arguments that "providing 'neutral tools' available to *all* developers . . . does not transform Apple from a mere publisher of the Simulated Casino Apps to a content creator or developer"). Google similarly argues that Plaintiffs' claims "seek to hold Google liable as the 'publisher or speaker' of allegedly harmful third-content [sic]" because "all four categories of [Plaintiffs'] claims . . . attempt to hold Google liable for . . . providing the third[-]party developers the same set of content[-]neutral tools available to everyone that uploads content to Google Play." *Google* Motion at 11.

Here, the Platforms "face the prospect of liability, even for their 'neutral tools'" because their potential liability is based on their own conduct in booking illegal transactions and helping with predatory advertising, not based on their role as publisher and not based solely on "the

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

28

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

content that third parties generate with those tools." *Lemmon*, 995 F.3d at 1094; *see, e.g.*, *Apple* Compl. ¶¶ 61-63, 91-94; *Facebook* Compl. ¶¶ 58-60, 80-84; *Google* Compl. ¶¶ 59-61, 88-91. The fact the Platforms offer some of the same services to all app developers does not mean that the conduct is immune from scrutiny. If Section 230 could be read that broadly, platforms like Apple, Facebook, and Google could violate all manner of laws as long as they applied the same unlawful conduct to all the content they host. They could promote third-party content in unwanted text messages in violation of the TCPA, for example, as long as they did so for every third-party content provider. *See Nunes*, 194 F. Supp. 3d at 967. Congress certainly did not intend such a result, and the "Communications Decency Act was not meant to create a lawless no-man's-land on the Internet." *Roommates.Com*, 521 F.3d at 1164; *see also HomeAway*, 918 F.3d at 682 ("To provide broad immunity 'every time a website uses data initially obtained from third parties would eviscerate [the CDA].'") (alteration in original).

Instead, courts have recognized that Platforms may be held liable for their own non-publication conduct, even if that conduct is offered to many different apps or content providers. In *HomeAway*, for instance, HomeAway.com and Airbnb offer booking services to all of their content providers; that "neutral tool" became unlawful when used to "process[] transactions for unregistered properties" in Santa Monica. 918 F.3d at 682. Similarly, in *Gonzalez v. Google LLC*, Google offers its "AdSense program" to all YouTube users, and then "shares with the user a portion of the revenue generated by the advertisements on the user's videos." 2 F.4th at 898. The AdSense program is a "neutral tool" that became illegal under the Anti-Terrorism Act when Google shared advertising revenue with ISIS. *Id.* (holding that "§ 230 does not immunize Google from the claims premised on revenue-sharing"). Here, too, the Platforms' various payment-processing, app-promotion, data-collection, user-targeting, and marketing tools may be available to all app developers, but they become unlawful when used to book illegal gambling transactions and to unfairly target vulnerable consumers. Consequently, that these tools are "neutral" provides no basis for the Platforms' immunity from Plaintiffs' claims.

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

29

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

**D. In the Alternative, the Court Should Grant Leave to Amend.**

Alternatively, if the Court grants any of the Platforms' Motions in whole or in part, Plaintiffs request leave to amend their pleadings. Courts "should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016). The allegation of other facts could cure any claims dismissed on the grounds of CDA immunity, since additional facts about the social casino games and the Platforms' involvement could help the Court determine whether the at-issue conduct qualifies as publisher or speaker activity and/or whether the Platforms themselves are information content providers by materially contributing to unlawful content.[18]

Further, Plaintiffs' counsel is involved in ongoing litigation against various developers of social casino games. Discovery in those cases continues to shed light on the Platforms' role in the alleged Social Casino Enterprise, but the vast majority of documents produced are—at present—subject to protective orders. There are pending disputes in those actions regarding the propriety of the bulk of the confidentiality designations, and Plaintiffs' counsel anticipate the imminent unsealing of large volumes of documents in those cases. *See, e.g.*, Pls.' Mot. to Unseal, Dkt. 460, *Benson v. DoubleDown Interactive LLC*, No. 18-cv-525 (W.D. Wash. Nov. 24, 2021). As those disputes are resolved, Plaintiffs here anticipate being able to plausibly allege additional facts about the Platforms' non-publisher, non-speaker roles in the Social Casino Enterprise. Consequently, to the extent the Court is inclined to grant the Platforms' Motions, it should grant leave to amend.

**IV.   CONCLUSION**

The Court should deny the Platforms' Motions to Dismiss Under Section 230 in their entirety. In the alternative, the Court should grant Plaintiffs leave to amend their pleadings.

---

[18]     *See supra* n.9.

Pls.' Consol. Opp'n to CDA 230 Motions to Dismiss
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

30

**Edelson PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

1

Respectfully submitted,

2
Dated: April 29, 2022

**EDELSON PC**

3
By: /s/ Todd Logan

4
RAFEY S. BALABANIAN (Bar No. 315962)

5
rbalabanian@edelson.com
TODD LOGAN (Bar No. 305912)

6
tlogan@edelson.com
BRANDT SILVER-KORN (Bar No. 323530)

7
bsilverkorn@edelson.com
150 California Street, 18th Floor

8
San Francisco, CA 94111
Tel: 415.212.9300

9
Fax: 415.373.9435

10

11
JAY EDELSON*
jedelson@edelson.com

12
ROGER PERLSTADT*
rperlstadt@edelson.com

13
THEO BENJAMIN*
tbenjamin@edelson.com

14
AMY B. HAUSMANN*
abhausmann@edelson.com

15
350 North LaSalle St., 14th Floor

16
Chicago, IL 60654
Tel: 312.589.6370

17
Fax: 312.589.6378

18
**TYCKO & ZAVAREEI LLP**

19
ANDREA R. GOLD*

20
agold@tzlegal.com
GLENN CHAPPELL*

21
gchappell@tzlegal.com
HASSAN A. ZAVAREEI (Bar No. 181547)

22
hzavareei@tzlegal.com
1828 L Street NW Suite 1000

23
Washington, DC 20036
Tel: 202.973.0900

24
Fax: 202.973.0950

25

26

27

28
PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

31

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**

JASON H. ALPERSTEIN*
alperstein@kolawyers.com
KRISTEN LAKE CARDOSO*
cardoso@kolawyers.com
1 West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Tel: 954.525.4100
Fax: 954.525.4300

KRISTEN LAKE CARDOSO
cardoso@kolawyers.com
1 West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Tel: 954.525.4100
Fax: 954.525.4300

**BURSOR & FISHER. P.A.**

PHILIP L. FRAIETTA*
pfraietta@bursor.com
888 Seventh Avenue
New York, NY 10019
Tel: 646.837.7150
Fax: 212.989.9163

SARAH N. WESTCOT (Bar No. 264916)
swestcot@bursor.com
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: 305.330.5512

**TOUSLEY BRAIN STEPHENS, PLLC**

CECILY C. JORDAN*
cjordan@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel: 206.682.8600
Fax: 206.682.2992

**DOVEL & LUNER, LLP**

SIMON FRANZINI (Bar No. 287631)

Pls.' Consol. Opp'n to CDA 230 Motions to Dismiss
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

32

EDELSON PC
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9435

simon@dovel.com
GREGORY S. DOVEL (Bar No. 135387)
greg@dovel.com
CHRISTIN CHO (Bar No. 238173)
christin@dovel.com
201 Santa Monica Blvd, Suite 600
Santa Monica, CA 90401
Tel: 310.656.7077
Fax: 310.656.7069

**DAVIS & NORRIS, LLP**

JOHN E. NORRIS*
jnorris@davisnorris.com
D. FRANK DAVIS*
fdavis@davisnorris.com
WESLEY W. BARNETT*
wbarnett@davisnorris.com
DARGAN M. WARE*
dware@davisnorris.com
SCOTT CONNALLY*
sconnally@davisnorris.com
2154 Highland Avenue South
Birmingham, AL 35205
Tel: 205.930.9900
Fax: 205.930.9989

**PEARSON, SIMON & WARSHAW, LLP**

MELISSA S. WEINER*
mweiner@pswlaw.com
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: 612.389-0600
Facsimile: 612.389-0610

JILL M. MANNING (State Bar No. 178849)
jmanning@pswlaw.com
350 Sansome Street, Suite 680
San Francisco, CA 94104
Tel: (415) 433-9000
Fax: (415) 433-9008

*pro hac vice* admitted and/or forthcoming

PLS.' CONSOL. OPP'N TO CDA 230 MOTIONS TO DISMISS
Case Nos. 21-md-02985-EJD; 21-md-03001-EJD;
21-cv-02777-EJD

33

**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435