JOHN SAMUEL GIBSON (SBN 140647)
john.gibson@us.dlapiper.com
COLIN MCGRATH (SBN 351947)
colin.mcgrath@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, CA 90067-4704
Tel: 310.595.3039
Fax: 310.595.3339

RAJ N. SHAH (*pro hac vice*)
raj.shah@dlapiper.com
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
Tel: 312.368.4000
Fax: 312.236.7516

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE

| | |
|---|---|
| IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-02985-EJD<br><br>**APPLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED MASTER COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      March 7, 2025<br>Time:     9:00 a.m.<br>Judge:    Hon. Edward J. Davila<br>Room:    Courtroom 4–5th Floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 7, 2025 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Edward J. Davila, United States District Judge, Northern District of California, located at 280 South 1st Street, San Jose, CA 95113, Courtroom 4, 5th floor, Defendant Apple Inc. ("Apple") will, and hereby does, move for an order dismissing Plaintiffs' Amended Master Complaint ("Complaint") under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief may be granted. Apple's Motion to Dismiss is based upon this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Request for Judicial Notice, all pleadings and papers on file in this matter, and upon such other matters as may be presented to the Court at the time of the hearing or otherwise.

For the reasons set forth in the accompanying Memorandum of Points and Authorities, Apple respectfully requests the Court issue an order (1) granting Apple's Request for Judicial Notice, (2) granting Apple's Motion to Dismiss, and (3) dismissing the Complaint in its entirety with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state any claim upon which relief may be granted and dismissing this action. As indicated specifically in its brief, Apple additionally incorporates the arguments raised in the motions to dismiss that Defendant Meta has filed concurrently in Case Nos. 5:21-cv-02777-EJD and Case No. 5:21-cv-02818-EJD ("Meta MTD") and that Defendant Google has filed concurrently in Case No. 5:21-md-03001-EJD ("Google MTD"). Pursuant to the Court's scheduling order, ECF 141, Apple also submits concurrently a joint state law appendix.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230 (2018), immunizes Apple, as a matter of law, from Plaintiffs' claims in their entirety because Apple serves as a publisher, not a creator, of content on its interactive computer service?

2. Whether Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act must be dismissed because Plaintiffs fail to allege that Apple caused any injury to business or property, participated in an actionable enterprise, or engaged in any RICO conspiracy?

3.      Whether Plaintiffs fail to state a claim under each state's gambling recovery statute because they do not plausibly allege that Apple is the "winner" or recipient of any money or property "lost" through illegal gambling?

4.      Whether Plaintiffs' state-law consumer protection claims must be dismissed because Plaintiffs fail to allege any facts demonstrating any economic loss attributable to Apple as required to establish statutory standing?

5.      Whether Plaintiffs' claim under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL") fails for the additional reason that California does not permit recovery for money lost through alleged gambling?

6.      Whether Plaintiffs' claims for equitable and injunctive relief are barred because they do not plausibly allege the inadequacy of legal remedies?

7.      Whether Plaintiffs' unjust enrichment claims must be dismissed because they are duplicative of Plaintiffs' other deficient claims and are unsupported by any facts demonstrating that Apple unjustly retained any benefit?

## **RESERVATION OF RIGHTS**

Apple brings this Motion to Dismiss without waiver or limitation of its right to compel arbitration of Plaintiffs' claims or to bring any other motion under Federal Rules of Civil Procedure 8, 9, and 12. Furthermore, the Complaint omits the information necessary for Apple to determine whether some or all of Plaintiffs have agreed to arbitrate their claims, including any details regarding Plaintiffs' alleged transactions. Accordingly, Apple respectfully reserves its right to compel individual arbitration of Plaintiffs' claims if and when the necessary information is provided, and/or to bring any other pleading-based motion.

1

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

PROCEDURAL HISTORY ...................................................................................... 6

PLEADING STANDARD ......................................................................................... 7

ARGUMENT ........................................................................................................... 8

    I.      SECTION 230 BARS ALL OF PLAINTIFFS' CLAIMS FOR RELIEF ................ 8

          A.    Plaintiffs' Concessions Since this Court's Prior Ruling ............................. 8

          B.    The Duty-Specific Analysis Confirms Section 230 Applies ...................... 11

    II.     PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED ............................... 15

          A.    Plaintiffs Lack Statutory Standing to Pursue Civil RICO Claims Under Section 1964. ......................................................................................... 15

               1.    Plaintiffs Fail to Allege an Injury to "Business or Property." .......... 16

               2.    Because Apple Has No Role in Determining How a Customer Uses Virtual Tokens, Plaintiffs Fail to Allege that Apple is a Proximate Cause of Plaintiffs' Alleged Injury. ................................. 17

          B.    The Complaint Fails to Allege Facts Plausibly Showing Apple's Participation in a RICO Enterprise .......................................................... 19

               1.    The Complaint Alleges the Existence of a Routine Arms' Length Business Relationship with Developers, Not a RICO Enterprise. ... 19

               2.    The Complaint Fails to Allege Facts Plausibly Showing that Apple Had Any Role in Directing the Affairs of the Alleged Enterprise. ................................................................................... 20

          C.    The Complaint Fails to Allege Facts Plausibly Showing a RICO Conspiracy ............................................................................................. 21

    III.    ALL STATE LAW CLAIMS SHOULD BE DISMISSED ................................... 22

          A.    Plaintiffs Fail to Allege Elements Required Under the State Gambling Recovery Statutes Against Apple. ........................................................... 22

               1.    Under Most State Statutes at Issue, Including the Washington Statute, Plaintiffs May Seek Recovery of Gambling Losses Only from the "Winner." .................................................................... 23

               2.    All Other State Gambling Recovery Statutes at Issue Narrowly Permit Recovery Only of Money or Property "Lost" through Gambling. ............................................................................... 25

               3.    Plaintiffs Have Not Alleged Facts Plausibly Showing that Apple "Won" Anything or Received Anything "Lost" through Alleged Gambling. ............................................................................... 27

          B.    Plaintiffs' State Consumer Protection Law Claims Should Be Dismissed. . 28

               1.    Plaintiffs Lack Standing Because They Fail to Allege a Loss or Injury Caused by Apple. ...................................................... 28

               2.    California Public Policy Bars Claims For Recovery of Gambling Losses. ................................................................................... 31

          C.    Plaintiffs' Claims for Equitable and Injunctive Relief Fail Because the Complaint Alleges the Adequacy of Legal Remedies ............................. 31

NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 5:21-MD-02985-EJD

       D.     Plaintiffs' Unjust Enrichment Claims Fail for Additional Reasons. ............32

            1.     The Complaint Fails to Plausibly Allege Apple Unjustly Retained a Benefit. ...................................................................................32

            2.     The Unjust Enrichment Claims Are Duplicative of Plaintiffs' Other Failed Claims. ....................................................................33

CONCLUSION ........................................................................................................ 34

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Adell v. Macon Cnty. Greyhound Park, Inc.*,
    785 F. Supp. 2d 1226 (M.D. Ala. 2011).............................................................. 17, 18

5

*Am. DJ Supply Inc. v. Am. Pro Int'l Corp.*,
6
    2013 WL 12123986 (C.D. Cal. Feb. 22, 2013) ......................................................... 33

7
*Armstrong v. Aragon*,
    79 P. 291 (Sup. Ct. N.M. 1905)............................................................................... 27
8

9
*In re Arris Cable Modem Consumer Litig.*,
    2018 WL 288085 (N.D. Cal. Jan. 4, 2018) .............................................................. 33

10
*Ashcroft v. Iqbal*,
11
    556 U.S. 662 (2009) ............................................................................................ 7, 22

12
*In re Atlas Roofing Corp. Chalet Single Prods. Liab. Litig.*,
    2018 WL 2929831 (N.D. Ga. June 8, 2018) ........................................................... 29
13

14
*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013) ................................................................. 10

15

*Barnes v. Yahoo!, Inc.*,
16
    570 F.3d 1096 (9th Cir. 2009)............................................................................... 10

17
*Baumer v. Pachl*,
18
    8 F.3d 1341 (9th Cir. 1993).............................................................................. 21, 22

19
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 7, 19, 20

20

21
*Boyle v. United States*,
    556 U.S. 938 (2009) ............................................................................................... 19

22
*Brill v. Postle*,
23
    2020 WL 2936688 (E.D. Cal. June 3, 2020)........................................................... 17

24
*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011) ............................................................................................... 15

25

*Cafferata v. Ginnochio*,
26
    222 S.W. 867 (Mo. Ct. App. 1920) ........................................................................ 26

27
*Calise v. Meta Platforms, Inc.*,
    103 F.4th 732 (9th Cir. 2024)................................................................ 8, 12, 13, 14

28

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ................................................................................. 18

*Chaset v. Fleer/Skybox Int'l*,
    300 F.3d 1083 (9th Cir. 2002) ........................................................................ 16, 17

*Clark v. Incomm Fin. Servs., Inc.*,
    2024 WL 3005905 (C.D. Cal. May 30, 2024) ........................................................ 34

*Coffee v. Google*,
    2022 WL 94986 (N.D. Cal. Jan. 10, 2022) .............................................. 12, 30, 33

*Coffee v. Google, LLC*,
    2021 WL 493387 (N.D. Cal. Feb. 10, 2021) .................................................... 29, 30

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    2012 WL 10731957 (C.D. Cal. June 29, 2012) ...................................................... 19

*Cousineau v. Microsoft Corp.*,
    992 F. Supp. 2d 1116 (W.D. Wash. 2012) ............................................................ 29

*Crooks v. McMahon*,
    48 Mo. App. 48 (1892) ........................................................................................... 26

*Dane v. UnitedHealthcare Ins. Co.*,
    974 F.3d 183 (2d Cir. 2020) .................................................................................. 29

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
    232 F.3d 173 (3d Cir. 2000) .................................................................................. 17

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ................................................................................. 19

*Evans v. Hewlett-Packard Co.*,
    2013 WL 4426359 (N.D. Cal. Aug. 15, 2013) ...................................................... 10

*In re Facebook Simulated Casino-Style Games Litig.*,
    No. 22-16888, 2024 WL 2287200 (9th Cir. May 21, 2024) ...................... 6, 7, 8, 11

*Fireman's Fund Ins. Co. v. Stites*,
    258 F.3d 1016 (9th Cir. 2001) ............................................................................... 16

*Flores v. Aon Corp.*,
    242 N.E.3d 340 (Ill. Ct. App. 2023) ..................................................................... 29

*In re Ford Tailgate Litig.*,
    2014 WL 3899545 (N.D. Cal. Aug. 8, 2014) ........................................................ 33

*Foreman v. Bank of Am., N.A.*,
    401 F. Supp. 3d 914 (N.D. Cal. 2019) .................................................................... 7

*Gardner v. Starkist Co.*,
    418 F. Supp. 3d 443 (N.D. Cal. 2019) ................................................................ 20

*Gomez v. Guthy-Renker, LLC*,
    2015 WL 4270042 (C.D. Cal. July 13, 2015) .......................................................... 19

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) .................................................................................... 12

*Green v. Aztar Corp.*,
    2003 WL 22012205 (N.D. Ill. Aug. 22, 2003) ........................................................ 18

*Guzman v. Polaris Indus. Inc.*,
    49 F.4th 1308 (9th Cir. 2022) ................................................................................ 31

*Hartman v. Gilead Scis., Inc.*,
    536 F.3d 1049 (9th Cir. 2008) .................................................................... 7, 22, 31

*Hemi Grp., LLC v. City of N.Y.*,
    559 U.S. 1 (2010) .................................................................................................. 18

*Hennessy v. Gap, Inc.*,
    86 F.4th 823 (8th Cir. 2023) .................................................................................. 29

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) .............................................................................................. 18

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ............................................................................ 12, 13

*Howard v. Am. Online Inc.*,
    208 F.3d 741 (9th Cir. 2000) ............................................................................ 21, 22

*Hughes v. Chattem, Inc.*,
    818 F. Supp. 2d 1112 (S.D. Ind. 2011) .................................................................. 32

*Humphrey v. Viacom, Inc.*,
    2007 WL 1797648 (D.N.J. June 19, 2007) ............................................................ 24

*Jane Doe v. WebGroup Czech Repub.*,
    2024 WL 3533426 (C.D. Cal. 2024) ...................................................................... 12

*Jubelirer v. MasterCard Int'l, Inc.*,
    68 F. Supp. 2d 1049 (W.D. Wis. 1999) .................................................................. 21

*Kater v. Churchill Downs Inc.*,
    886 F.3d 784 (9th Cir. 2018) ...................................................................... 22, 25, 28

*Kelly v. First Astri Corp.*,
    72 Cal. App. 4th 462, 84 Cal. Rptr. 2d 810 (1999) ................................... 1, 4, 16, 31

*Larsen v. PTT, LLC*,
___ F.Supp.3d ___, 2024 WL 2943892 (W.D. Wash. June 11, 2024) ...................... 25, 28, 30

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ........................................................................... 11

*In re MacBook Keyboard Litigation*,
2020 WL 6047253 (N.D. Cal. Oct. 13, 2020) ..................................................... 31

*Mai v. Supercell Oy*,
2021 WL 4267487 (N.D. Cal. Sept. 20, 2021) .................................................... 30

*Mai v. Supercell Oy*,
2024 WL 2077500 (9th Cir. May 9, 2024) ...................................................... 3, 16

*Marlowe v. Nature's Bounty Co.*,
2017 WL 2291683 (N.D. Ohio May 25, 2017) .................................................... 33

*In re MasterCard Int'l, Inc.*,
2004 WL 369729 (E.D. La. Feb. 19, 2004) ........................................................ 26

*In re MasterCard Int'l Inc., Internet Gambling Litig.*,
132 F. Supp. 2d 468 (E.D. La. 2001) ................................................................. 19

*In re Mastercard Int'l Internet Gambling Litig.*,
313 F.3d 257 (5th Cir. 2002) ............................................................................. 16

*McAlexander v. Otsuka Am. Pharm., Inc.*,
2022 WL 17549788 (N.D. Ga. Aug. 19, 2022) ................................................... 33

*McLeod v. Valve Corp.*,
2016 WL 5792695 (W.D. Wash. Oct. 4, 2016) ................................................... 17

*Nagle v. Randall*,
132 N.W. 266 (Sup. Ct. Minn. 1911) ................................................................. 24

*Noble Sys. Corp. v. Alorica Cent., LLC*,
543 F.3d 978 (8th Cir. 2008) ............................................................................. 33

*Oscar v. Univ. Students Co-Operative Ass'n*,
965 F.2d 783 (9th Cir. 1992) ............................................................................. 17

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ........................................................................... 10

*Phila. Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) ......................................................................................... 15

*Phillips v. Double Down Interactive LLC*,
173 F. Supp. 3d 731 (N.D. Ill. 2016) ................................................................. 24

*Price v. Pinnacle Brands, Inc.*,
   138 F.3d 602 (5th Cir. 1998) ................................................................................... 17

*Reno v. Flores*,
   507 U.S. 292 (1993) ............................................................................................... 15

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ............................................................................................... 20

*Ristic v. Mach. Zone, Inc.*,
   2016 WL 4987943 (N.D. Ill. Sep. 19, 2016) ........................................................... 24

*Romano v. Torch Elecs., LLC*,
   2023 WL 9064602 (W.D. Mo. Aug. 21, 2023) ........................................................ 18

*Russell v. Walmart, Inc.*,
   680 F. Supp. 3d 1130 (N.D. Cal. July 5, 2023) ....................................................... 32

*Salazar v. Green Square Co.*,
   2022 WL 1492577 (D.N.M. Mar. 16, 2022) ........................................................... 29

*Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*,
   810 F.3d 509 (7th Cir. 2016) ................................................................................... 24

*Spears v. Stewart*,
   283 F.3d 992 (9th Cir. 2001) ................................................................................... 12

*Swaggard v. Hancock*,
   25 Mo. App. 596 (1887) ......................................................................................... 26

*Tamraz v. Bakotic Pathology Assocs., LLC*,
   2022 WL 16985001 (S.D. Cal. Nov. 16, 2022) ...................................................... 29

*Taylor v. Apple, Inc.*,
   2022 WL 35601 (N.D. Cal. Jan. 4, 2022) ......................................................... 30, 31

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023). 598 U.S. 617 (2023) ............................................................ 12

*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................................................... 15

*Ussery v. Goodrich Restoration, Inc.*,
   341 Ga. App. 390 (Ga. Ct. App. 2017) .................................................................. 29

*Walter v. Drayson*,
   538 F.3d 1244 (9th Cir. 2008) ................................................................................ 21

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   865 F. Supp. 2d 1002 (C.D. Cal. 2011) ............................................................. 20, 21

*Williams v. Wall*,
    60 Mo. 318 (1875) ................................................................................................ 26

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ............................................................................... 15

**Statutes**

18 U.S.C. § 1962(c) ............................................................................................ 19, 21, 22

18 U.S.C. § 1964(c) ............................................................................................ 15, 16, 17, 18

28 U.S.C. § 1292(b) ............................................................................................ 6

47 U.S.C. § 230 .................................................................................................. *passim*

47 U.S.C. § 230(b)(2) ......................................................................................... 2

47 U.S.C. § 230(c)(1) .......................................................................................... 8, 10, 12

47 U.S.C. § 230(e)(1), (2), (4), (5) ..................................................................... 10

Ala. Code § 8-1-150(a) ....................................................................................... 13, 25, 26

Conn. Gen. Stat. Ann. § 52-554 ......................................................................... 23

Ga. Code Ann. § 13-8-3(b) .................................................................................. 23

Ill. Comp. Stat. Ann. 5/28-8 ............................................................................... 23

Minn. Stat. Ann. § 541.20 ................................................................................... 23

Miss. Code Ann. § 87-1-5 ................................................................................... 25

N.M. Stat. Ann. § 44-5-1 ..................................................................................... 27

N.M. Stat. Ann. § 44-5-3 ..................................................................................... 27

N.Y. Gen. Oblig. Law §§ 5-419 & 5-421 ........................................................... 23

Ohio Rev. Code § 3763.02 .................................................................................. 23

Or. Rev. Stat. § 30.740 ........................................................................................ 23

S.C. Code § 32-1-10 ............................................................................................ 23

Wash. Rev. Code § 4.24.070 ............................................................................... 23, 25, 28

**Other Authorities**

Fed. R. Civ. App. 12(b) ....................................................................................... 7

NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 5:21-MD-02985-EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fed. R. Civ. App. 12(b)(6) .................................................................................................... 7

*Proprietor*, Black's Law Dictionary (11th ed. 2019) ........................................................ 28

Webster's Third New International Dictionary 1837 (1993) ........................................... 10

NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 5:21-MD-02985-EJD

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### INTRODUCTION

Plaintiffs seek to hold Apple liable for alleged simulated gambling that Plaintiffs engaged in on apps owned and operated solely by third-party developers. But even after amending their Master Complaint, Plaintiffs have managed only to allege that Apple provides the same content-neutral payment processing services and development assistance available to all developers. Section 230 therefore bars every claim, and their Amended Master Complaint must be dismissed. Plaintiffs also have not alleged a cognizable injury caused by Apple, and Plaintiffs have not alleged that Apple received any property lost through alleged illegal gambling. Dismissal with prejudice is appropriate because the Complaint's legal deficiencies cannot be cured through further amendment.

The Amended Master Complaint alleges that Apple hosts third-party simulated casino-style gaming apps through its App Store and processes payments for the *first* transaction in which a player makes an in-app purchase of virtual currency. In a *second*, subsequent transaction, players next use the virtual currency to obtain extended game play on the apps. The Complaint does not allege Apple has any involvement in the second transaction, which involves only the app *developer* and player. As evident from Plaintiffs' own allegations, the purportedly unlawful gambling takes place only in this second transaction. *See* Plaintiffs' Amended Master Complaint ("Compl.") ¶ 64 ("Purchased chips … allow players to place wagers on more spins of the slot machines.").

As explained in Argument Section I *infra*, Section 230 of the Communications Decency Act ("CDA") bars every claim. The Court's previous conclusion that Section 230 did not bar Plaintiffs' "revenue-based" theory was based on Plaintiffs' factual assertion—raised only in their *briefing*—that Apple acts as a "bookie" for allegedly unlawful gambling. Order at 33, ECF 106. But despite taking the opportunity to amend, Plaintiffs have still failed to allege that Apple acted as a "bookie," or as a "broker" as they contended in briefing before the Ninth Circuit. Those theories have been abandoned and cannot be used to evade Section 230. And Plaintiffs' admission on appeal that transactions for third-party content are quintessential publishing activity preclude this case from proceeding on the facts actually pleaded. The Amended Complaint alleges that Apple serves as a payment processor for virtual currency provided by third-party developers. In amending, Plaintiffs

merely added a conclusory allegation in support of each count that Apple's liability arises from "processing and profiting from unlawful transactions for virtual chips." *See, e.g.*, Compl. ¶ 153. But as Plaintiffs conceded on appeal, transactions for third-party content constitute publishing activity protected by Section 230. Plaintiffs-Appellees' Br. at 30–31, ECF 44, Case No. 16914 (9th Cir. Oct. 25, 2023). And here, Apple's alleged transaction is just that—one for third-party content facilitated through a neutral tool. Accordingly, based on the specific facts alleged and Plaintiffs' admissions, the entire Amended Complaint should be dismissed under Section 230.

The lack of clarity in Plaintiffs' allegations shows precisely why Section 230 must bar their claims. The Amended Master Complaint does not even name every app Plaintiffs claim to be in the case, let alone the specific games within each app. Compl. ¶ 15 (defining "Illegal Slots" as "*more than* fifty social casino apps … that the Platforms illegally host") (emphasis added). Apple has requested that Plaintiffs provide this specificity, *see* ECF 122 at 9, but they have failed to do so, even after amending the Master Complaint twice. Plaintiffs' failure highlights the monumental task of sifting through third-party content given the volume and constantly fluctuating universe. Yet, this duty to monitor and adjudicate the legality of the underlying content—which over several years Plaintiffs themselves have been unable to perform—is precisely the duty Plaintiffs seek to impose on Apple. Even worse, because the transaction for virtual chips precedes any alleged gambling, Plaintiffs seek to impose an after-the-fact obligation on Apple to determine the legality of how the chips are spent.

Such a liability regime would stifle innovation and undermine the CDA's objective of "preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services." 47 U.S.C. § 230(b)(2). Section 230 shields Apple from this type of liability.

In Argument Section II, Apple explains why Plaintiffs' RICO claims must be dismissed. Each claim suffers from a second fundamental deficiency: Plaintiffs fail to establish any cognizable injury attributable to Apple. Plaintiffs allege no injury resulting from this first transaction involving Apple because the Complaint shows that the virtual currency provided Plaintiffs exactly what they bargained for and expected: the opportunity to use the chips to obtain digital content. As the Ninth

NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 5:21-MD-02985-EJD

1    Circuit recently recognized in *Mai v. Supercell Oy*, plaintiffs do not "allege a cognizable economic

2    injury-in-fact" where they "received exactly what they expected" through an in-app purchase—in

3    that case a "loot box" containing "at least one mystery virtual item." 2024 WL 2077500, at *1 (9th

4    Cir. May 9, 2024).

5         In Section III, Apple shows that all of Plaintiffs' state gambling loss recovery claims should

6    be dismissed. Plaintiffs assert claims against Apple under sixteen state laws that provide a narrow

7    cause of action permitting a person to recover money or property lost through gambling, often only

8    from the "winner." But Plaintiffs do not allege that Apple participates in alleged illegal gambling,

9    which occurs, if at all, only in the second transaction, and thus do not allege that Apple is a "winner"

10   or received money or property lost through gambling. Each of Plaintiffs' state gambling loss

11   recovery claims must be dismissed because those laws—including the Washington statute on which

12   Plaintiffs rely heavily—provide no cause of action against Apple. *See* Section III.A., *infra*.

13        Plaintiffs' state consumer protection law claims should also be dismissed because plaintiffs

14   fail to allege a loss or injury caused by Apple. Their claims under California law must be dismissed

15   because California public policy bars claims seeking recovery of gambling losses. *See* Section III.B.,

16   *infra*. Plaintiffs' claims for equitable and injunctive relief fail as a matter of law because they do not

17   plausibly allege the inadequacy of legal remedies. And their duplicative unjust enrichment claims

18   also fail because Plaintiffs fail to demonstrate that Apple has unjustly retained any benefit. *See*

19   Sections III.C & D *infra*.

20        Therefore, the Court should dismiss the Complaint in its entirety with prejudice.

21                                **STATEMENT OF FACTS**

22        Plaintiffs are twenty-nine individuals from sixteen states who allegedly downloaded and

23   used certain third-party apps made available through Apple's innovative App Store, an online

24   platform where developers offer apps for download onto users' Apple devices. Compl. ¶ 50. The

25   apps at issue are so-called "social casino" apps that simulate games found in casinos (the "Simulated

26   Casino Apps"). *Id.* ¶ 78. Plaintiffs allege they spent money to obtain in-app virtual currency to

27   extend their use of the apps and allegedly incurred losses by "wagering" their virtual currency in

28   games where the only thing they could win was more virtual currency. They seek to hold Apple

1  liable for money they spent buying virtual chips. But Apple did not develop or operate any of the

2  Simulated Casino Apps that are the subject of this litigation or sell any virtual currency. Rather, as

3  Plaintiffs allege, Apple merely provided a platform for hosting and publishing third-party apps and

4  processing transactions for in-app digital goods and services. Compl. ¶¶ 2, 6, 19, 50, 68, 80–83.

5      Plaintiffs allege that the Simulated Casino Apps look like traditional casino games, such as

6  slot machines, bingo or card games, but function fundamentally differently: A Simulated Casino

7  App user can never win or lose real money. *Id.* ¶¶ 2–3, 57, 60–67. Instead of playing with real

8  money, players use "virtual chips" that "cannot be used outside any individual [Simulated Casino

9  App]." *Id.* ¶ 65. As Plaintiffs allege, the currency can only be used to "(1) place wagers on slot

10 machine spins, (2) place wagers on the few card game or bingo titles in the [Simulated Casino Apps],

11 or (3) give a 'gift' of virtual chips to another account in the app." *Id.* They thus cannot cash out.

12 Plaintiffs do not allege virtual currency is unique to the Simulated Casino Apps: thousands of apps

13 available on the App Store use some form of virtual currency. *See* Compl. ¶ 63 n.8 (citing developer

14 guidelines for any app with in-app currency).

15     The Simulated Casino Apps are free to download. Compl. ¶ 2 n.2 ("the initial download of

16 the game is free"). They are also initially free to use because the players are "typically given an

17 initial allotment of virtual chips for free." *Id.* ¶ 60. Players may secure additional free play

18 opportunities by simply waiting for a period of time to receive "more free chips." *Id.* ¶ 62. Third-

19 party developers also provide users with the option of making "in-app purchases," which are

20 transactions between the user and the developer that the user may initiate while functioning within

21 an app. *Id.* ¶ 2 n.2.

22     As Plaintiffs allege, when a player runs out of chips and wishes to continue playing

23 immediately rather than waiting for more free chips, two transactions are required. First, the player

24 buys additional virtual chips through an in-app purchase. Compl. ¶¶ 62–63. Second, after purchasing

25 the chips, the Player then uses the chips in the app for "more spins of the slot machine." *Id.* ¶ 64.

26     The Complaint alleges that Apple only has involvement in the *first* transaction by serving as

27 the "payment processor" for developers' in-app virtual chip sales. *See* Compl. ¶ 63; *id.* ¶ 153

28 ("Apple's liability under this Count arises from its own conduct, including processing and profiting

1    from unlawful transactions for virtual chips and providing development assistance to social casino

2    app developers."). In fact, Apple does not itself process payments—under the developer program

3    license agreement that Plaintiffs cite, the *developers* are "responsible for hosting and delivering

4    content or services sold by [the developer]." Request for Judicial Notice ("RJN"), Ex. 1 § 3.1. As

5    part of its developer kit, Apple provides a programming interface that allows developers to provide

6    an in-app purchase feature to customers. RJN, Ex. 3. Apple's in-app purchase interface is available

7    to *all* developers, and the extensive documentation of the interface is publicly available. *See id*.

8        Apple has no involvement in the *second*, subsequent transaction: the player's choice to use

9    virtual currency within the Simulated Casino Apps. Once purchased, players can decide to use

10   virtual currency for game play or can give it as gifts to other players or accounts—but players may

11   not use it outside the app and may never redeem it for real money. Compl. ¶ 65 (players can "give

12   a 'gift' of virtual chips to another account in the app").

13       Plaintiffs admit that Apple did not develop any of the Simulated Casino Apps at issue here.

14   Compl. ¶¶ 2, 6, 18, 50, 68, 80–83. Third-party developers created the Apps and their content. *See*

15   *id.* ¶ 19 (distinguishing between "Platforms like Apple" and "developers like DoubleDown"); ¶ 68

16   (identifying "[d]evelopers of social casino games, such as Scientific Games"); ¶¶ 80–83 (explaining

17   process by which Apple reviews and publishes apps created by developers). Apple does not own or

18   operate any of the Simulated Casino Apps. *Id.* ¶ 18, 50. Apple's role is limited to innovating and

19   providing a general-purpose app platform on which developers can offer apps for download. *Id.* ¶

20   50. And while Plaintiffs allege that Apple "facilitates the success" of Simulated Casino Apps "by

21   counseling the app developers through the app launch process and providing them with the resources

22   and business tools necessary to maximize their success on the Apple App Store," Compl. ¶ 80, *see*

23   *also id.* ¶¶ 81–82, 87–90, the Complaint does not allege that Apple provides developers of the

24   Simulated Casino Apps support or tools that are any different from those it provides to all other

25   developers.

26       As part of its role operating a virtual marketplace, Apple promulgates guidelines that are

27   made available and applicable to all app developers who wish to make their apps available through

28   the App Store, including developers of the Simulated Casino Apps. Compl. ¶¶ 82 n.16, 83 n.17. The

1   Simulated Casino Apps are subject to, and must comply with, these guidelines. But Plaintiffs do not

2   allege that the guidelines apply solely to the Simulated Casino Apps or are app- or content-specific;

3   the guidelines provide neutral guidance to all app developers, regardless of the type of app a

4   developer may wish to publish in the App Store.

5       Plaintiffs assert claims under the gambling loss recovery statutes of fifteen states and under

6   eight states' consumer protection laws, including California's Unfair Competition Law. They seek

7   to recover losses by asserting unjust enrichment claims in all sixteen states based on the same alleged

8   gambling losses. And they assert federal civil claims under the Racketeer Influenced and Corrupt

9   Organizations Act ("RICO"). Plaintiffs seek to assert their state law claims on behalf of sixteen

10  statewide classes, and seek to bring their RICO claims on behalf of a nationwide class. In addition

11  to seeking recovery of money lost through alleged illegal gambling, Plaintiffs seek to enjoin Apple

12  from hosting the Simulated Casino Apps on the Apple App Store.

13                      **PROCEDURAL HISTORY**

14      In April 2022, pursuant to the Court's order, ECF 91, Apple moved to dismiss the Master

15  Complaint based on Section 230 of the CDA. The parties agreed to defer motions on other pleading

16  issues until after the Court's decision on Section 230. ECF 90. In its September 2, 2022 Order, ECF

17  106, the Court found that two theories of liability Plaintiffs asserted should be dismissed under

18  Section 230: (1) the theory that Apple could be held liable based on its actions in promoting the

19  apps in the App Store, and (2) the theory that Apple contributed to alleged illegality by monitoring

20  game activity and providing developers with tools to target customers with advertisements. Order

21  at 32, 34–35, ECF 106. The Court concluded that Section 230 did not bar Plaintiffs' "revenue-based"

22  theory and certified its decision for interlocutory appeal. Order at 33, 35–36, ECF 106.

23      On appeal, after full briefing and oral argument, the Ninth Circuit dismissed the appeal for

24  lack of jurisdiction and remanded. The Ninth Circuit concluded that because the Court did not apply

25  its ruling to each cause of action "to determine which, if any, should be dismissed," the Order was

26  "not an 'order' that supports jurisdiction under 28 U.S.C. § 1292(b)." *In re Facebook Simulated*

27  *Casino-Style Games Litig.*, No. 22-16888, 2024 WL 2287200, at *1–2 (9th Cir. May 21, 2024). The

28  Ninth Circuit explained that a court's Section 230 analysis must identify the legal duty underlying

each claim and "determine whether 'it seek[s] to hold the defendant liable as a "publisher or speaker" of third-party content.'" *Id.* at *2. The Ninth Circuit instructed that "[d]isposition of the claims in this case will thus require examining each individual claim." *Id.* at *2.

The parties on remand agreed to a briefing schedule for Rule 12(b) motions, which are not limited to Section 230, and the Court entered a scheduling order on further Rule 12(b) briefing. ECF 141.[1] Plaintiffs filed their Amended Master Complaint on November 1, 2024. ECF 144.

## PLEADING STANDARD

Under Rule 12(b)(6), a court must dismiss a complaint where plaintiffs "fail[] to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). To survive dismissal, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To be plausible, "[f]actual allegations must be enough to raise a right to relief above the speculative level," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Although all reasonable inferences are drawn in favor of the non-moving party, the Court should not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Hartman v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008). A court may dismiss a complaint without leave to amend where amendment would be futile or there has been a "repeated failure to cure deficiencies by amendment." *Foreman v. Bank of Am., N.A.*, 401 F. Supp. 3d 914, 918 (N.D. Cal. 2019).

---

[1] At this stage, Apple is withholding state law specific arguments, which would require voluminous briefing on state gambling laws. Plaintiffs' claims suffer from deficiencies beyond those argued in this motion, including that the transactions alleged to be gambling may be legal under states' laws, and that their gambling loss recovery claims are barred by the statutes' strict limitations periods (e.g., three months). Apple reserves the right to address state-specific deficiencies in separate briefing at a later stage if the claims are not dismissed in full in this round of briefing, including through a motion for judgment on the pleadings.

NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 5:21-MD-02985-EJD

**ARGUMENT**

**I.    SECTION 230 BARS ALL OF PLAINTIFFS' CLAIMS FOR RELIEF**

Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1), bars every claim in the Amended Complaint. Section 230 preempts and bars claims that "treat[]" an internet platform as a "publisher" of "information provided by another information content provider." *Id.* A claim treats a platform as a publisher if "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker," or "would necessarily require an internet company to monitor third-party content." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740–41 (9th Cir. 2024) (quotation marks omitted). The Ninth Circuit directed this Court to analyze the alleged duty supporting each of Plaintiffs' claims. *See In re Facebook Simulated Casino-Style Games Litig.*, 2024 WL 2287200, at *2. In light of Plaintiffs' material concessions since this Court's initial ruling, that analysis confirms that each of Plaintiffs' claims would treat Apple as the publisher of third-party content and must be dismissed.

**A.    Plaintiffs' Concessions Since this Court's Prior Ruling**

***i.    Plaintiffs Have Abandoned their Bookie Theory***

The Court's prior ruling relied on Plaintiffs' theory, articulated in their opposition to Apple's prior motion to dismiss, that "the Platforms['] role as a 'bookie' is illegal." ECF 106 at 33. But as Apple has shown, Apple's Principal Br. at 23–24, ECF 15, Case No. 22-16914 (9th Cir. July 24, 2023), the Complaint does not allege that Apple acts as a "bookie"—indeed, the word "bookie" appears nowhere in the Complaint. Plaintiffs do not allege that Apple booked any bets, set any odds, or "paid" any virtual winners. *See id.* Indeed, it is undisputed that Apple is not a party to the allegedly unlawful exchange of virtual chips for virtual spins on the virtual slots, which exclusively involves the user and app developer. On appeal, Plaintiffs abandoned the "bookie" theory and instead argued that Apple "broker[s]" allegedly illegal gambling transactions. *See* Plaintiffs-Appellees' Br. at 16, 28. But a "broker" is a person who "sells or distributes something," or acts as an agent "who negotiates contracts of purchase and sale." *Broker*, Merriam-Webster (2024). The Complaint does not allege that Apple sells anything, negotiates any gambling contracts, or in any other way "brokers" the transactions that allegedly violate state anti-gambling laws either.

Rather, Plaintiffs' only relevant factual allegations are that "Apple operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots," and that it "collects the money players spend on virtual chips, takes a cut for itself, and remits the rest to the Illegal Slots." Compl. ¶ 63; *see also id.* ¶ 95 (alleging that social casinos "utiliz[ed] Apple for … payment processing"), ¶ 95 ("[B]ecause the Illegal Slots are required to use Apple's payment system to process all in-game purchases, Apple collects a 30 percent service fee off every transaction."). Plaintiffs do not even allege that Apple itself sells virtual chips. Plaintiffs' allegations show that Apple's conduct has nothing to do with the third-party developers' content, which Plaintiffs allege is illegal gambling.

On remand, Plaintiffs amended the Master Complaint. But despite the absence of any allegations supporting their "bookie" or "broker" theories—which Apple highlighted on numerous occasions[2]—Plaintiffs still failed to allege any such facts in their amended pleadings. Rather, aside from naming a new plaintiff, Plaintiffs merely added a single, conclusory allegation to each count in the Complaint: that "Apple's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers." *See, e.g.*, Compl. ¶ 153.[3] This allegation once again alludes only to Apple's neutral role as a payment processor for any transaction, by any developer within any app, for in-app digital goods and services.

### ii.    *Plaintiffs' Legal Concessions on Appeal*

Plaintiffs also made critical concessions on appeal confirming that Section 230 bars liability for processing transactions. Plaintiffs admitted that Section 230 protects publishing transactions:

---

[2] Apple's Principal Br. at 23–24; Apple's Reply Br. at 4–5, 12–13, ECF 64, Case No. 22-16914 (9th Cir. Feb. 2, 2024); ECF 122 at 13–14; July 18, 2024 Hearing Tr. 23:12–23.

[3] In its prior Order, ECF 106 at 34–35, the Court rejected Plaintiffs' assertion that Section 230 does not bar claims seeking to hold Apple liable for providing development assistance to casino app developers. Plaintiffs have acknowledged this allegation does not provide an independent basis for evading Section 230, and that they would need to obtain evidence to plausibly allege that the assistance provided to developers is not a neutral tool. ECF 133 at 1–2.

NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO. 5:21-MD-02985-EJD

1    "Offering a subscription or selling a newsletter," they acknowledge, is "quintessentially publishing

2    conduct." Plaintiffs-Appellees' Br. at 30. Plaintiffs also admit that a platform that "offer[s] app[s]

3    for sale in [an] app store" is engaged in publishing activity, *id.* at 31 (citing *Evans v. Hewlett-*

4    *Packard Co.*, 2013 WL 4426359, at *3 (N.D. Cal. Aug. 15, 2013)), as is a platform that "put[s] up

5    an advertisement for a social casino website" and "'charg[es] … a fee'" to do so, *id.* (quoting

6    *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 824 (M.D. Tenn. 2013)). After all, a

7    "publisher" is "one whose *business* is publishing." Webster's Third New International Dictionary

8    1837 (1993) (emphasis added); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009)

9    (same); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (dismissing claims for

10   processing payments to purchase access to third-party digital content).

11        Plaintiffs' admissions establish that Section 230 applies in this case. Plaintiffs have no basis

12   to distinguish between paid transactions for newsletters and apps, on one hand, and paid transactions

13   for in-app digital content, on the other. Both are transactions for "information provided by another

14   information content provider." 47 U.S.C. § 230(c)(1). Here, the apps, the in-app games, in-app

15   virtual currency, and an award of new in-app virtual currency are all "information provided by

16   another internet content provider." Users can purchase more in-app currency (content) for continued

17   game play (content) and potentially win more in-app currency (more content), but they cannot cash

18   out. The only thing they can obtain is in-app digital content. Transactions for content, however, are

19   quintessentially publishing activity under Plaintiffs' own concessions.

20        Plaintiffs appear to assert that transactions for published content consisting of illegal

21   simulated gambling are different from transactions for all other published content under Section

22   230. But there is no "gambling" exception to Section 230. Congress has created several exceptions

23   to the scope of Section 230's protection, thereby allowing for liability even if the asserted duty

24   requires a platform to monitor certain enumerated forms of content. *See* 47 U.S.C. § 230(e)(1), (2),

25   (4), (5). Congress has not created such an exception for "gambling"—let alone for simulated

26   gambling. Plaintiffs are asking this Court to rewrite Section 230 to create a new exception where

27   none exists. Plaintiffs' admissions establish that Section 230 applies to these transactions for

28   published third-party content in this case.

### B.    The Duty-Specific Analysis Confirms Section 230 Applies

The Ninth Circuit instructed this Court on remand to analyze the duty underlying each claim to determine whether the claim seeks to treat Apple as a publisher. *See In re Facebook Simulated Casino-Style Games Litig.*, 2024 WL 2287200, at *2. This claim-by-claim analysis confirms that each claim must be dismissed.

***State Gambling Statutes.*** In support of each state gambling claim, Plaintiffs repeat word-for-word the same allegation that Apple's liability arises from its "own conduct" of "processing and profiting from unlawful transactions for virtual chips." *See, e.g.*, Compl. ¶ 188. Plaintiffs' claims thus seek to impose an obligation on platforms to refrain from hosting and processing transactions for in-app currency in an app that allegedly includes illegal gambling games, refrain from receiving a share of revenue from those transactions, and relinquish the revenue received. This alleged duty to forbear from transacting in certain published content involves quintessentially publishing activity. A third-party developer—not Apple—created the games. Any duty not to transact in virtual currency that can allegedly be used in illegal gambling video games arises from third-party choices about what content to create and publish, because Apple has created a general-purpose app platform, not a gambling-specific platform. For example, a customer who downloads the Paperless Post app from the App Store may through an in-app purchase obtain virtual coins, which the customer may then use to buy customized virtual invitation cards for events (in-app content). *See* RJN Ex. 4 at 3. Plaintiffs cannot dispute that this use of virtual chips is perfectly legal. Apple's alleged conduct here—processing payments for virtual chips (content) and receiving a share of revenues from those publishing transactions—thus does not qualify as its "own bad acts," ECF 106 at 33. Rather, under Plaintiffs' theory, Apple's otherwise lawful publishing activity (transacting in in-app content) becomes unlawful only depending on the content itself: if a third-party creates an app that includes allegedly illegal gambling and uses Apple's platform to distribute and process transactions for the content. Plaintiffs thus seek to "fault" Apple for publishing "information provided by third parties." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021). The developer who created the app and sells the digital chips for digital spins is potentially liable. But Apple—which merely provided a neutral platform for distributing and transacting in apps and in-app content—is not.

This case is therefore unlike *HomeAway*, where the platform sought immunity for transactions for real-world rental properties. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019). Homes and apartments are not "information provided by another information content provider." 47 U.S.C. § 230(c)(1). In *HomeAway*, the website's duty under the ordinance at issue was to not book unlicensed home rentals, and its duty arose from its own decision to enter the market for booking rentals. *Id.* at 683. The duty did not require removal of or changes to third-party content. *Id.*

The revenue theory in *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), also does not apply.[4] Liability in *Gonzalez* arose from alleged payment of funds to a designated terrorist organization. *Id.* at 897–99. A duty not to provide money to designated terrorists is independent of publishing activity; it arises from making a payment of any kind.[5] By contrast, as the Ninth Circuit's recent decision in *Calise* confirms, a duty not to transact in published third-party content involves publishing activity. *Calise*, 103 F.4th at 743–44. *See also Jane Doe v. WebGroup Czech Repub.*, 2024 WL 3533426, at *7 (C.D. Cal. 2024) (holding that sharing advertising revenue with parties who uploaded illicit videos is insufficient for liability under Section 230 "so long as the methods by which revenue sharing is conducted are neutral with respect to the content"); *Coffee v. Google* ("*Coffee II*"), 2022 WL 94986 at *6 (N.D. Cal. Jan. 10, 2022) (similar).

Further, the only way for Apple to determine whether a transaction for in-app virtual currency is for an allegedly illegal gambling transaction is to monitor millions of third-party apps. To refrain from processing transactions for virtual chips used in alleged illegal gambling, Apple

---

[4] Although this Court's prior order relied on *Gonzalez*, ECF 106 at 31–35, the Supreme Court later granted certiorari, 143 S. Ct. 80, and vacated *Gonzalez* in light of its decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). 598 U.S. 617, 622 (2023). With *Gonzalez* vacated, it is now merely persuasive authority, not binding. *See Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2001).

[5] Apple does not allow use of its in-app purchase mechanism for purchase of "goods or services that will be consumed outside of the app." RJN Ex. 2 § 3.1.3(e)); *compare id.* § 3.1.1 (developers must use in-app purchase to "unlock features or functionality within [their] app")).

would need to determine whether an app includes games, and if so, make a legal assessment as to whether those games simulate illegal gambling and how the virtual currency can be used inside those games. In particular, Apple would need to determine whether the currency can be used to purchase additional virtual spins of virtual slots inside a virtual casino for virtual payouts of more virtual currency. Plaintiffs have failed to identify which specific apps they believe involve illegal gambling, and yet their claims call on Apple to undertake this exceedingly burdensome task. *See* Compl. ¶ 15 (defining "Illegal Slots" as "*more than* fifty social casino apps … that the Platforms illegally host" (emphasis added)). As in *Calise*, to avoid liability and comply with this alleged duty, Apple would necessarily need to actively vet and monitor third-party content. *Calise*, 103 F.4th at 744.

Indeed, on appeal, Plaintiffs failed to identify any way for Apple to ferret out the allegedly illegal transactions other than via monitoring the content of third-party apps to see what they include, assess how any in-app virtual currency can be used inside them, and then apply Apple's sole judgment on whether the activity equated to illegal gambling. Apple cannot determine whether the in-app currency will be used for allegedly illegal gambling inside a third-party app without monitoring millions of third-party apps and identifying the physical location where the apps are used to determine if they are legal in the applicable state. This case is therefore nothing like *HomeAway*, where the websites could comply with their underlying duty not to book certain rentals without monitoring the content of online posts, and by instead simply comparing the address of a new booking to the government's list of registered properties. *See* 918 F.3d at 682–83. Rather, Plaintiffs' only other solution was that Apple could "stop brokering transactions altogether." Plaintiffs-Appellees' Br. at 40. That is, Plaintiffs contend that Apple could avoid liability by entirely halting transactions for published content. That radical solution is no answer. A duty not to transact in published content obviously involves publishing activity, and any narrower duty "would necessarily require [Apple] to monitor third-party content." *Calise*, 103 F.4th at 741 (cleaned up).

To illustrate, in Count III, Plaintiffs assert claims under Alabama's gambling loss recovery statute, alleging that Apple "has profited and continues to profit from each payment made by Alabama Class Members to purchase virtual coins, and therefore is in violation of Ala. Code § 8-1-

1    150(a)." Compl. ¶ 187. Plaintiffs allege that Apple's liability—i.e., its obligation to return money

2    "lost upon any game or wager"—arises from Apple's "conduct" in "processing and profiting from

3    unlawful transactions for virtual chips." *Id.* ¶ 188. Plaintiffs' claim under the gambling recovery

4    statute thus seeks to impose an obligation on Apple to return any money it received from allegedly

5    processing transactions in which Plaintiffs purchased virtual coins. To avoid liability, Plaintiffs'

6    claim would thus require Apple to identify which gaming apps involve illegal gambling, to cease

7    supporting transactions for virtual chips used for games on those apps involving illegal gambling,

8    and to remove the offending apps from the App Store. This corresponding duty necessarily requires

9    Apple to monitor and remove third-party content, and thus treats Apple as a publisher. Each of

10   Plaintiffs' gambling loss recovery claims impose the same duty—treating Apple as a publisher—

11   and are thus barred under Section 230.

12     ***Unjust Enrichment.*** The Plaintiffs' unjust enrichment claims seek "the 'return of [a]

13   benefit'"—namely, the profits Apple received from permitting third-party developers to sell virtual

14   currency for use in virtual casinos. *Calise*, 103 F.4th at 743–44. Again, that imposes a duty to forbear

15   from earning benefits from transactions for virtual currency that allegedly can be used to play illegal

16   video games. That duty involves quintessential publishing activity (to forbear from transactions for

17   third-party published content). It arises from third-party published content (a duty not to engage in

18   gambling transactions arises if, but only if, a third party uses Apple's platform to publish allegedly

19   illegal gambling games and sell in-app currency used to play them). And to comply, Apple would

20   need to monitor millions of third-party apps, return proceeds associated with offending apps, and

21   refrain from publishing apps involving illegal gambling to avoid liability. Plaintiffs' unjust

22   enrichment claims thus impermissibly seek to treat Apple as a publisher. *Calise*, 103 F.4th at 744.

23     ***RICO/Consumer Protection.*** At bottom, Plaintiffs' RICO and state consumer protection law

24   claims allege the same duty as the state gambling statutes: to refrain from processing transactions

25   for virtual chips used for allegedly unlawful gambling transactions. To do so, Apple would have to

26   refrain from engaging in quintessential publishing activity and would need to monitor third-party

27   content. The claims thus seek to treat Apple as a publisher. *Calise*, 103 F.4th at 744.

28

### B.  Constitutional Avoidance Supports Dismissal

Plaintiffs' position also gives rise to serious constitutional problems. The Supreme Court has squarely held that video games "qualify for First Amendment protection," and struck down a law that prohibited the sale of video games to minors that included simulated violent crime. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 789-90 (2011). The First Amendment thus treats transactions for video games the same way it treats transactions for books or films: they are fully protected. There is no First Amendment exception for content that simulates gambling. *See United States v. Stevens*, 559 U.S. 460, 469 (2010) (refusing to create new First Amendment exceptions). And the transactions here are solely for in-app digital content: the only thing a player can obtain is the ability to keep playing the videogame. Plaintiffs' claims thus give rise to serious constitutional problems because they would hold Apple liable for transactions involving content protected by the First Amendment. Faced with potential liability for each virtual currency transaction, Apple and other platforms may choose to restrict the number and type of apps published on their platforms to avoid liability. *Cf. Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997) ("[R]ecognizing that fears of unjustified liability produce a chilling effect antithetical to First Amendment's protection of speech." (citing *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986))). "Statutes should be interpreted to avoid serious constitutional doubts." *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1993). Here, the constitutional problem can easily be avoided by holding that Section 230 applies to each claim because, as Plaintiffs admit, transactions for third-party content are "quintessential publishing activity," and Section 230 includes no exception for third-party content that simulates gambling.

\*        \*        \*

Performing the duty-specific analysis in light of current law and Plaintiffs' concessions confirms that Section 230 bars each of Plaintiffs' claims.

## II.    PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED

### A.    Plaintiffs Lack Statutory Standing to Pursue Civil RICO Claims Under Section 1964.

To have standing to pursue its Civil RICO enterprise (Count XL) and conspiracy (Count XLI) claims under Section 1964(c), Plaintiffs must allege injury to "business or property by reason

of a [RICO] violation." 18 U.S.C. § 1964(c); *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1021 (9th Cir. 2001). This standing requirement has two elements. *First*, Plaintiffs must "show proof of concrete financial loss, and not mere injury to a valuable intangible property interest." *Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1087 (9th Cir. 2002). *Second*, the alleged RICO violation "must be the proximate cause of plaintiff's injury." *Id.* The Complaint fails to satisfy either element. Plaintiffs' own allegations show they received exactly what they paid for when they purchased virtual chips. *See, e.g.*, *Supercell Oy*, 2024 WL 2077500, at *1 (no injury because plaintiff received "exactly what they expected" when purchasing virtual mystery item).

### 1.    Plaintiffs Fail to Allege an Injury to "Business or Property."

Plaintiffs have not alleged a "concrete financial loss." *First*, Plaintiffs incurred no loss from the first transaction, in which Plaintiffs allege they spent money to purchase virtual coins, which in turn provided Plaintiffs the opportunity for extended game play. *See* Compl. ¶¶ 109–139 (named plaintiffs alleging injury in the form of money spent on virtual coins for Social Casino Apps); *id.* at ¶ 60 ("Players use those chips to play the animated slot machines."); *id.* at ¶ 64 ("Purchased chips extend gameplay in the Illegal Slots."). By purchasing virtual currency, Plaintiffs by their own allegations received "exactly what they expected"—a virtual chip that provided them with the opportunity to use that chip to obtain whatever content the developer made available. *Supercell Oy*, 2024 WL 2077500, at *1 (plaintiff who purchased virtual "loot boxes" with "one mystery virtual item" did not allege a "sufficient economic injury-in-fact")[6]; *see also In re Mastercard Int'l Internet Gambling Litig.*, 313 F.3d 257, 264 (5th Cir. 2002) (explaining that RICO provided no remedy to plaintiffs because "independent actors who made a knowing and voluntary choice to engage in a

---

[6] In *Supercell*, the Ninth Circuit agreed with this Court's determination that plaintiffs lacked statutory standing under the California UCL because they "failed to allege a cognizable economic injury-in-fact," but also concluded that Plaintiffs lacked Article III standing. *Supercell*, 2024 WL 2077500, at *1–2. The Ninth Circuit vacated based on plaintiffs' lack of Article III standing and remanded with instructions to dismiss without prejudice. *Id.* at *2. This Court entered judgment dismissing without prejudice on June 14, 2024.

course of conduct" to purchase gambling credits "got exactly what they bargained for"). Plaintiffs

thus incurred no "concrete financial loss" through the first transaction.

*Second*, no concrete financial loss resulted from the second and allegedly illegal gambling transaction. Plaintiffs allege they have been "injured … because they have lost money" through alleged illegal gambling. Compl. ¶¶ 103–105. But Courts have consistently recognized that "injury to expectancy or speculative interests do not constitute harm to business or property interests." *Brill v. Postle*, 2020 WL 2936688, at *9 (E.D. Cal. June 3, 2020); *see also McLeod v. Valve Corp.*, 2016 WL 5792695, at *2 (W.D. Wash. Oct. 4, 2016) ("[G]ambling losses are not sufficient injury to business or property for RICO standing."). Where a person purchases the right to take part in a game of chance, "the chance itself is of value regardless of whether or not the card purchaser later suffers a 'loss.'" *Chaset*, 300 F.3d at 1087. A purchaser who loses after receiving a real chance thus "has not suffered any financial loss or RICO property injury." *Id.*; *see also Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 188 (3d Cir. 2000) (loss in blackjack not an injury to business or property); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests … is not sufficient to confer RICO standing."); *Adell v. Macon Cnty. Greyhound Park, Inc.*, 785 F. Supp. 2d 1226, 1241 (M.D. Ala. 2011) ("The injuries of which Plaintiffs complain — illegal gambling losses (unaccompanied by allegations of fraud affecting their losses) and loss of honest services — do not qualify as RICO injuries to business or property.").

*Third*, Plaintiffs also allege that "players feel addicted" to the Social Casino Apps, and "suffer serious non-economic damages," including depression. Compl. ¶¶ 106–107. But "personal injuries are not compensable under RICO." *Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992), abrogated in part on other grounds by *Diaz v. Gates*, 420 F.3d 897, 898 (9th Cir. 2005). Plaintiffs' alleged addiction and resulting harms are not a loss to "business or property" as required under Section 1964(c) and are thus insufficient to confer RICO standing.

### 2. Because Apple Has No Role in Determining How a Customer Uses Virtual Tokens, Plaintiffs Fail to Allege that Apple is a Proximate Cause of Plaintiffs' Alleged Injury.

Plaintiffs fail to allege that Apple was the proximate cause of any loss. Proximate causation

1    requires that a defendant be the direct cause of the loss. "The general tendency of the law, in regard

2    to damages at least, is not to go beyond the first step," and this "'general tendency' applies with full

3    force to proximate cause inquiries under RICO." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 10

4    (2010); *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (9th Cir. 2008) ("Proximate

5    causation requires 'some direct relation between the injury asserted and the injurious conduct

6    alleged.'" (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992))). Here, Apple is

7    several steps removed from any alleged injury. The Complaint alleges that the player acquires virtual

8    chips through an in-app purchase, Compl. ¶¶ 62–63, and next uses the chip "to place wagers on

9    more spins of the slot machine," *id.* ¶ 64. Plaintiffs' allegations show that the second transaction, in

10    which Plaintiffs used the chips, is the direct cause of the alleged loss. *See Romano v. Torch Elecs.,*

11    *LLC*, 2023 WL 9064602, at *4 (W.D. Mo. Aug. 21, 2023). But Plaintiffs only allege that Apple has

12    involvement in the first transaction, where it allegedly processes payments for the Social Casino

13    Apps. Compl. ¶¶ 8, 63. Plaintiffs do not allege that Apple operates the Social Casino Apps or plays

14    any role in the second transaction in which the player decides to use the virtual currency. Damages

15    thus stop at the first step—with the developer. Plaintiffs thus do not allege that Apple was a direct

16    cause of any alleged gambling loss, and lack standing under Section 1964(c) to pursue any RICO

17    claims against Apple.[7]

18        Courts have also consistently recognized that a person's decision to assume a gambling risk

19    is the direct and proximate cause of the gambling loss. *See, e.g.*, *Green v. Aztar Corp.*, 2003 WL

20    22012205, at *3 (N.D. Ill. Aug. 22, 2003) ("[K]nowing and voluntary gambling interrupted the

21    causal chain between defendants' alleged RICO violations and plaintiff's injuries."); *Romano v.*

22    *Torch Elecs., LLC*, 2023 WL 9064602, at *4 (W.D. Mo. Aug. 21, 2023) ("knowing and voluntary

23    gambling" was proximate cause of alleged injury); *Adell*, 785 F. Supp. 2d at 1244 (same). Plaintiffs'

24    use of virtual currency for alleged gambling is a direct and intervening cause of their alleged injuries

_____

26    [7] Additionally, although Plaintiffs identify "more than fifty social casino apps" as "Illegal Slots,"

27    Compl. ¶¶ 15, 78, each individual Plaintiff lacks standing to seek relief with respect all apps he or

28    she did not use.

1   that "break[s] the chain of causation" and precludes standing. *In re MasterCard Int'l Inc., Internet*

2   *Gambling Litig.*, 132 F. Supp. 2d 468, 496 (E.D. La. 2001), *aff'd* 313 F.3d 257 (5th Cir. 2002).

3       **B.      The Complaint Fails to Allege Facts Plausibly Showing Apple's Participation in**

4               **a RICO Enterprise.**

5       Plaintiffs also fail to plausibly allege that Apple engaged in a substantive RICO violation by

6   participating in an enterprise. A RICO enterprise claim under section 1962(c) has "four elements:

7   defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce

8   (3) through a pattern (4) of racketeering activity or collection of unlawful debt." *Eclectic Props. E.,*

9   *LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)).

10  The Complaint fails to satisfy these elements.

11          **1.      The Complaint Alleges the Existence of a Routine Arms' Length**

12                  **Business Relationship with Developers, Not a RICO Enterprise.**

13      To show the existence of an enterprise, Plaintiffs must allege that "the enterprise has (A) a

14  common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the

15  purpose." *Eclectic Props*, 751 F.3d at 997 (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

16  Critically, courts have reached a "widespread consensus" that routine business relationships are

17  insufficient to impose RICO enterprise liability. *See Gomez v. Guthy-Renker, LLC*, 2015 WL

18  4270042, at *9 (C.D. Cal. July 13, 2015). RICO liability thus requires "a relationship more

19  substantial than a routine contract between a service provider and its client." *Id.* at *11; *see also In*

20  *re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2012 WL 10731957, at *8 (C.D. Cal. June

21  29, 2012) (parties who "enter commercial relationships 'for their own gain or benefit' do not

22  constitute an 'enterprise'").

23      But a routine business relationship is all that Plaintiffs allege. Plaintiffs' conclusory

24  allegations that Apple, other Platforms, and third-party developers are participants in "an informal

25  association and enterprise" are not sufficient to state a claim. Compl. ¶ 18; *Twombly*, 550 U.S. at

26  555 ("[F]ormulaic recitation of the elements of a cause of action will not do."). The Complaint

27  contains no allegations showing any association among the platforms. As for developers, the

28  Complaint alleges that Apple "counsel[s] the app developers through the app launch process";

"examines whether the app violates any company policies and demands that apps comply with all relevant laws"; offers developers "technologies" that allow users to "quickly purchase items within [an] app" and perform other functions using Apple Pay, their Apple ID, and Siri; and provides data regarding customer usage that may aid in developer advertising. Compl. ¶ 80, 82, 89, 90, 91–94. Nowhere does the Complaint allege that these services are any different from those provided to all other developers that offer content through the Apple App Store. Those practices are part of the routine business relationship Apple maintains with all developers. And as Plaintiffs allege, the 30 percent commission that Apple receives is a fee it charges developers in exchange for the "'tools and software for the development, testing and distribution of developers' apps and digital content' that it provides." Compl. ¶¶ 76, 90. The *Apple Developer Program License Agreement* that Plaintiffs cite shows that the commission is a standard fee that applies to all developers. *Id.* ¶ 76, n.14. Plaintiffs' effort to "[s]imply characteriz[e] routine commercial dealing as a RICO enterprise is not enough." *See also Gardner v. Starkist Co.,* 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019).

**2.      The Complaint Fails to Allege Facts Plausibly Showing that Apple Had Any Role in Directing the Affairs of the Alleged Enterprise.**

The Complaint also fails to allege that Apple directed the affairs of an alleged enterprise. Plaintiffs must allege that Apple participated in the "conduct" of an enterprise, which requires allegations that Apple had "some part in directing" its "affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.,* 865 F. Supp. 2d 1002, 1034 (C.D. Cal. 2011) ("Liability for participating in the 'conduct' of a RICO enterprise extends only to those who 'have some part in directing [the enterprise's] affairs.'"). Direction means "participat[ion] in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 183.

On this element, the Complaint contains only the conclusory allegation that Apple "participat[ed] in, facilitat[ed], or conduct[ed] the affairs of the Social Casino Enterprise." Compl. ¶ 539. Plaintiffs' generic recitation of the legal requirement is plainly inadequate to state a claim. *See Twombly*, 550 U.S. at 555. As explained, the Complaint alleges a routine business relationship in which Apple provides support to developers and receives a "commission." Compl. ¶¶ 76, 80, 82, 89, 90, 91–94. The Complaint does not plausibly allege that Apple's relationship with the Simulated

1    Casino App developers differs from its business relationship with all other developers that offer

2    content through the Apple App Store, let alone that Apple operates or manages an enterprise, or

3    "occup[ies] a position in the 'chain of command.'" *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th

4    Cir. 2008). And Apple's business relationship with third-party developers is insufficient to "show

5    that [a defendant] conducted the enterprise." *In re WellPoint, Inc.*, 865 F. Supp. 2d at 1034–35;

6    *Walter*, 538 F.3d at 1249 ("Simply performing services for the enterprise does not rise to the level

7    of direction, whether one is 'inside' or 'outside.'"); *see also Jubelirer v. MasterCard Int'l, Inc.*, 68

8    F. Supp. 2d 1049, 1053 (W.D. Wis. 1999) ("[M]erely having a business relationship with and

9    performing services for such an enterprise, including financial, accounting and legal services, does

10   not support RICO liability because performance of such services is not the equivalent of

11   participation in the operation and management of the enterprise."). Count XL should accordingly be

12   dismissed based on Plaintiffs' failure to allege participation in a RICO enterprise.

13              **C.        The Complaint Fails to Allege Facts Plausibly Showing a RICO Conspiracy.**

14              To state a claim for RICO conspiracy, Plaintiffs must allege either that Apple entered "an

15   agreement that is a substantive violation of RICO" or "agreed to commit, or participated in, a

16   violation of two predicate offenses." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).

17   Plaintiffs must allege that Apple was "'aware of the essential nature and scope of the enterprise and

18   intended to participate in it.'" *Id.* (quoting *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993).

19   Further, for the conspiracy claim to survive a motion to dismiss, Plaintiffs must allege a substantive

20   RICO violation—i.e., a substantive violation of Section 1962(c). *Id.* ("Plaintiffs cannot claim that a

21   conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO.

22   Even if Plaintiffs properly claimed that the defendants agreed to be a part of an enterprise, the failure

23   to allege substantive violations precludes their claim that there was a conspiracy to violate RICO.").

24              As explained *supra*, Plaintiffs fail to allege a substantive RICO violation. The conspiracy

25   claim should be dismissed for that reason alone. Further, Plaintiffs do not plausibly allege an

26   agreement by Apple to participate in directing or controlling an enterprise. Plaintiffs rely on the

27   conclusory assertions that "[e]ach participant agreed to conduct and carry out the affairs and goals

28   of the Social Casino Enterprise," and that "Apple, Google, and Facebook agreed to conduct the

affairs of the Social Casino Enterprise by serving as the gambling premises, hosting the virtual social gambling applications and processing all in-app transactions." Compl. ¶ 547; *see also id.* at ¶¶ 558, 560 (alleging that "Apple conspired to commit predicate acts in violation of § 1962(c)," and "acted knowingly at all times when agreeing to conduct the activities of the Social Casino Enterprise"). This recitation of legal elements fails to plausibly allege the existence of an agreement. *Iqbal*, 556 U.S. at 678 ("legal conclusions" need not be accepted as true). The conclusory allegations are particularly lacking where Apple's alleged role in "serving as the gambling premises" merely involves hosting apps in the same App Store that serves as a platform for all other developers. Compl. ¶ 547; *see also Hartman v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"). The Complaint is also devoid of factual matter "sufficient to infer such an arrangement." *Baumer*, 8 F.3d at 1346. Such an inference is particularly unwarranted here, where Apple and other platforms are fiercely competitive and the only relationship between Apple and the developers described in the Complaint is a routine, independent business relationship between Apple and each Simulated Casino App developer.

Nor do Plaintiffs plausibly allege that Apple possessed the knowledge requisite for conspiracy liability. Plaintiffs allege that Apple had "notice of the illegality of the Social Casino Enterprise" following the Ninth Circuit's decision in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018), in which the court held that certain virtual gaming apps constituted illegal gambling under Washington law. Compl. ¶ 561. But this alleged knowledge is alone insufficient to show intent and agreement to engage in a RICO violation because the Complaint fails to plausibly allege that Apple was aware of the nature or scope of an alleged enterprise. *Howard*, 208 F.3d at 751. Count XLI should accordingly be dismissed.

## III.    ALL STATE LAW CLAIMS SHOULD BE DISMISSED

### A.    Plaintiffs Fail to Allege Elements Required Under the State Gambling Recovery Statutes Against Apple.

Plaintiffs assert claims under fifteen state statutes that allow a person who loses money or other property through illegal gambling to recover the money or property lost from gambling. *See*

Counts III, VI, IX, XII, XV, XVII, XIX, XXI, XXIV, XXVII, XXIV, XXXI, XXXIII, XXXV, and XXXVII. Each claim arising under the state gambling recovery laws should be dismissed because, among other reasons, the statutes provide a narrow cause of action permitting the person to seek recovery only from the "winner" or for the property "lost" through gambling. Apple was not a "winner" in any gambling transaction because it was not involved in any such transaction, and it has not received money or property that a player "lost" in such a transaction. Instead, as the Complaint alleges, Apple receives a commission from the user's in-app purchase of virtual chips. Compl. ¶¶ 76, 90. That transaction occurs *before* any alleged gambling takes place—that is, before any player uses the chip to place what Plaintiffs allege to be a "bet." Apple thus receives no money or property lost through alleged gambling and is not a "winner" under any state law. The converse proves the point. If Plaintiffs "win" the alleged gambling transaction, Apple's commission does not get reduced and Apple does not pay the consumer. The statutes thus do not provide Plaintiffs with a cause of action against Apple, and all state gambling loss recovery claims should be dismissed on this basis.

> **1.    Under Most State Statutes at Issue, Including the Washington Statute, Plaintiffs May Seek Recovery of Gambling Losses Only from the "Winner."**

Most state recovery laws expressly permit a person to bring a civil action to recover money or property lost through illegal gambling only from the "winner." The Illinois recovery law, for example, provides: "Any person who by gambling shall ***lose*** to any other person, any sum of money or thing of value … may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action ***against the winner*** thereof … ." 720 Ill. Comp. Stat. Ann. 5/28-8 (emphasis added). As shown in Appendix A (Rows 2–4, 7, 13–16, 19), nine of the state statutes permit a person who loses money or property through illegal gambling to recover the loss only from the "winner" (in Washington and Oregon, the "winner" or "proprietor"). *See* Conn. Gen. Stat. Ann. § 52-554; Ga. Code Ann. § 13-8-3(b); 720 Ill. Comp. Stat. Ann. 5/28-8; Minn. Stat. Ann. § 541.20; N.Y. Gen. Oblig. Law §§ 5-419 & 5-421; Ohio Rev. Code § 3763.02; Or. Rev. Stat. § 30.740; S.C. Code § 32-1-10; Wash. Rev. Code § 4.24.070.

The term "winner" in these statutes means "a person whom a player had played with and

lost to." *Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509, 510 (7th Cir. 2016). As the Seventh Circuit has explained in analyzing the Illinois cause of action, to be a "winner" and thus a proper defendant under the statute, a person must have a "stake in the outcome of the games played." *Id.* at 511. A person who oversees or facilitates a game but does not have a stake in the wager "is not a gambler, let alone a winner." *Id.*; *see also Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 740 (N.D. Ill. 2016) (to be a "winner" under Illinois recovery statute, the person must have "a direct stake in the outcome of any games"); *Ristic v. Mach. Zone, Inc.*, 2016 WL 4987943, *3 (N.D. Ill. Sep. 19, 2016) ("[Defendant] keeps the money a player pays to buy additional chips no matter what Prize the player wins in the Casino, and therefore there is no way for [Plaintiff] to win or lose that money."); *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *9-10 (D.N.J. June 19, 2007) (explaining that under recovery statutes of Georgia, Illinois, South Carolina, and other states, a party who administers or facilitates alleged gambling without a stake in winning is not a "winner," and that under the plain statutory language "the 'winner' must be a participant in the card, dice or other game at issue").

Courts accordingly hold that state recovery laws do not permit a "loser" to seek recovery against parties who are not direct participants with a stake in the outcome, even if they facilitate online gambling. *See, e.g.*, *Sonnenberg*, 810 F.3d at 511 (no cause of action against internet gambling website because "charging a fee for engaging in gambling" or "supervising a game" is not the same as "winning a gamble"). In *Humphrey*, for example, the District of New Jersey concluded that plaintiffs had no cause of action against operators of internet fantasy sports leagues under the laws of Georgia, Illinois, South Carolina, and other states. 2007 WL 1797648, at *10. The operators administered the leagues and provided support services in exchange for participants' entry fees, but did not participate in any bet. The court held that "[a]bsent such participation, Defendants cannot be 'winners' as a matter of law" because one cannot be a winner "without risking the possibility of being a loser." *Id.* at *9; *see also Nagle v. Randall*, 132 N.W. 266, 267 (Sup. Ct. Minn. 1911) (no right of recovery under Minnesota recovery law against defendant who "provided the room and other facilities for the game, but had no interest in the winnings made," because "recovery must be had from the winner – the person to whom it was lost"). Here, Apple did not risk the possibility of

being a loser in the in-app purchase transaction.

Washington's recovery statute, as applied in *Kater v. Churchill Downs* and *Larsen v. PPT*, is just as limited. Washington provides a cause of action to "to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost." Wash. Rev. Code § 4.24.070. The Ninth Circuit in *Kater* held that the *owner/developer* of Big Fish Casino, a virtual social casino containing various casino-style gaming apps, was the "proprietor" for liability purposes under that Washington statute. *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 789 (9th Cir. 2018). And the district court judge in *Larsen* likewise held defendant there liable under the same statute because it was the *developer* of the social casino apps—High 5 Casino and High 5 Vegas— and was thus the "proprietor" of illegal gambling games. *Larsen v. PTT, LLC*, ___ F.Supp.3d ___, 2024 WL 2943892, at *5 (W.D. Wash. June 11, 2024).

## 2. All Other State Gambling Recovery Statutes at Issue Narrowly Permit Recovery Only of Money or Property "Lost" through Gambling.

The gambling loss recovery statutes of Alabama, Indiana, Mississippi, Missouri, New Mexico, and Tennessee, do not use the term "winner," but the statutes are similarly limited in only permitting recovery of money or property a person "lost" through gambling. As detailed in Appendix A (Rows 1, 5, 8, 9, 12, 17), these state statutes follow the same pattern: the person must have (1) lost money (or property, or a thing of value) (2) through a "game" (or "gambling device" or "wager"), and (3) may bring an action to "recover the same" (or the money or property "so lost").[8] By specifying that an action may be brought to recover the property *lost* through the game or wager,

---

[8] For example, the Alabama loss recovery statute provides: "Any person who has paid any money or delivered any thing of value **lost upon any game or wager** may **recover such money**, thing, or its value by an action … ." Ala. Code § 8-1-150(a) (emphasis added). Under Mississippi's recovery law, an action may be brought only against "the *person **knowingly receiving***" money or property "lost and paid or delivered" from "playing at any game whatever … or by any wager whatever." Miss. Code Ann. § 87-1-5 (emphasis added).

1  the statutes only provide a right of action against a defendant who receives the property lost in the

2  game or wager. *See, e.g.*, *Crooks v. McMahon*, 48 Mo. App. 48, 50 (1892) (explaining that, under

3  Missouri's loss recovery statute, "[t]he money finally lost by the loser is in the hands of those who

4  are winners at the close of the game and against these the loser has a separate action for whatever

5  sum they have respectively won").

6          For example, Missouri courts have explained that the Missouri recovery statute "allows a

7  recovery of money or property *won* [through gambling]." *Williams v. Wall*, 60 Mo. 318, 320 (1875)

8  (emphasis added). The law narrowly permits an action against the person in possession of the lost

9  property; it does not permit recovery of general damages from any person involved in the gambling.

10  In *Cafferata v. Ginnochio*, 222 S.W. 867 (Mo. Ct. App. 1920), the plaintiff gave $375 to the

11  defendant to place a bet on a horse race (which he then lost). Plaintiff sued defendant to recover the

12  lost money. The court held that, because the bet was not between plaintiff and defendant, but rather

13  a bet made through the defendant, "[i]t is plain that plaintiff has no cause of action arising under the

14  statute." *Id.* at 868. And in *Crooks v. McMahon*, plaintiff brought an action for money lost in a poker

15  game involving three players. Plaintiff (A) first lost his money to one player (B), but a third player

16  (C) then won the money from B. 48 Mo. App. at 49–50. The court concluded that the plaintiff "may

17  maintain the action against C," because the money lost was "in the hands of … [the] winner[] at the

18  close of the game." *Id.* at 50. Thus, while Missouri courts have noted that the recovery statute is not

19  expressly "restrictive in its operation as to the person or persons, from whom such recovery may be

20  had," *Williams*, 60 Mo. at 320, the cause of action only permits recovery of the specific money or

21  property lost through the gambling. *See also Swaggard v. Hancock*, 25 Mo. App. 596, 605 (1887)

22  (plaintiff may demand return of specific horses lost through gambling from the person "who

23  had taken them with knowledge of the facts").

24          Courts have found state gambling recovery causes of action in other jurisdictions that do not

25  use the term "winner" just as limited. *See, e.g.*, *In re MasterCard Int'l, Inc.*, 2004 WL 369729, at

26  *3 (E.D. La. Feb. 19, 2004) (dismissing claims for recovery under Alabama law, including Ala.

27  Code § 8-1-150(a), because MasterCard was involved only in plaintiff's first transaction for credit

28  on online gambling site, not the subsequent online gambling transaction). Further, while Section 44-

5-1 of New Mexico's loss recovery statute does not contain the word "winner," its neighboring provisions confirm that, by permitting recovery only of money or property "at any game at cards, or at any gambling device," N.M. Stat. Ann. § 44-5-1, the law permits an action solely against the "winner." *See* N.M. Stat. Ann. § 44-5-3 ("The spouse, children, heirs, executors, administrators and creditors of the person losing may have *the same remedy against the winner as provided in Sections 44-5-1* and 44-5-2 NMSA 1978." (emphasis added)); *Armstrong v. Aragon*, 79 P. 291, 292 (Sup. Ct. N.M. 1905) ("[T]he intent of the [New Mexico recovery] statute ... was to give the right of action not against the party in whose favor the wager is merely theoretically decided, but against one to whom, in addition, the money or property wagered has been delivered. Until this delivery is made he cannot *be said in law to have won the money or property ... .*" (emphasis added)).

### 3. Plaintiffs Have Not Alleged Facts Plausibly Showing that Apple "Won" Anything or Received Anything "Lost" through Alleged Gambling.

Each state gambling recovery claim must be dismissed because Plaintiffs do not allege that Apple has (1) won anything through a gambling transaction or (2) received any money or property that Plaintiffs lost after wagering a virtual chip or currency. Each gambling recovery claim alleges that, by "purchasing coins from Apple to wager on social casinos, Plaintiffs [and class members] paid money or gambled and lost money" and seek "to recover from Apple the amounts they lost when gambling in social casinos." *See* Compl. ¶¶ 186, 190, 216, 220, 243, 247, 271, 275, 300, 304, 317, 321, 334, 338, 351, 355, 381, 385, 410, 414, 427, 431, 446, 450, 463, 467, 480, 484, 497, 504.

First, Plaintiffs cannot allege that they purchased the virtual coins from Apple. They did not. They purchased the coins from the app developers through the app, which simply uses Apple's in-app purchase processing. Moreover, the Complaint does not allege that any gambling occurs at the one point where Apple has any alleged involvement—when the player purchases virtual currency. According to the Complaint, the only value that allegedly flows to Apple comes through the commission it receives on a player's in-app purchase of virtual chips, Compl. ¶¶ 76, 90, which necessarily occurs *before* a player can then use the currency to place an alleged bet, *id.* ¶ 62 (alleging that a player who does not want to wait to receive free chips must "purchase more chips to keep playing"). The alleged gambling transaction—in which the player wagers or otherwise spends the

virtual chip—occurs after the purchase, and is solely between the player and developer.

Apple has no alleged involvement in the second transaction involving the player's use of the virtual currency on the app. Plaintiffs do not allege that Apple had a "stake" in any Plaintiff's alleged "wager" of virtual chips. They do not allege that Apple receives anything of value in connection with any player's alleged lost wager, bet, or other simulated gambling transaction. Plaintiffs thus fail to allege facts plausibly showing that Apple is a "winner" under any state gambling recovery law, or that it received any money or property that Plaintiffs "lost" through gambling.

Plaintiffs also fail to allege a claim under Washington law because, unlike the app *developers* held liable or potentially liable in *Kater* and *Larsen*, Apple is not a "proprietor" of the social casino gaming apps or a "winner." Plaintiffs here—represented by Edelson PC, which represented plaintiffs in *Kater* and *Larsen*—allege illegal gambling through some of the same apps involved in *Kater* and *Larsen*. Apple was not named or referenced in either *Kater* or *Larsen*. Nor were Google or Meta. Unlike the defendants in *Kater* and *Larsen*, Apple is not a "proprietor." A "proprietor" is "[a]n owner," *see Proprietor*, Black's Law Dictionary (11th ed. 2019), or a "person who has the legal right or exclusive title to something," *Proprietor*, Merriam-Webster (2024). Apple does not own, let alone operate, any of the apps alleged in the complaint, and thus could not be a "proprietor for whose benefit [a] game was played or dealt." Wash. Rev. Code § 4.24.070. Under Washington law, Plaintiffs thus have no cause of action against Apple. Plaintiffs have presumably already sought their remedies against developers in other litigation.

Accordingly, Counts III, VI, IX, XII, XV, XVII, XIX, XXI, XXIV, XXVII, XXIV, XXXI, XXXIII, XXXV, and XXXVII should be dismissed.

**B.    Plaintiffs' State Consumer Protection Law Claims Should Be Dismissed.**

**1.    Plaintiffs Lack Standing Because They Fail to Allege a Loss or Injury Caused by Apple.**

Plaintiffs fail to plausibly allege an economic injury as required to demonstrate statutory standing for their claims under state consumer protection laws. *See* Counts I, IV, VII, X, XII, XXII, XXV, and XXXVIII. Under each statute cited in the Complaint (*see* Appendix B, Rows 1, 2, 4, 5, 6, 8, 10, 11), Plaintiffs must demonstrate statutory standing by alleging that they suffered an injury-

1    in-fact caused by a loss of money or property as a result of the challenged business practice. *See,*

2    *e.g.*, *Tamraz v. Bakotic Pathology Assocs., LLC*, 2022 WL 16985001, at *5 (S.D. Cal. Nov. 16,

3    2022) (holding that the plaintiff "must demonstrate some form of economic injury" to establish

4    standing under the CA UCL); *In re Atlas Roofing Corp. Chalet Single Prods. Liab. Litig.*, 2018 WL

5    2929831, at *7 (N.D. Ga. June 8, 2018) ("In order for a plaintiff to recover under the ADTPA, he

6    or she must prove … monetary damages as a result of the Defendant's violation."); *Dane v.*

7    *UnitedHealthcare Ins. Co.*, 974 F.3d 183, 192 (2d Cir. 2020) (affirming dismissal of Connecticut

8    UTPA claim for "failure to allege any loss or injury resulting from [the plaintiff's] purchase");

9    *Ussery v. Goodrich Restoration, Inc.*, 341 Ga. App. 390, 394–95 (Ga. Ct. App. 2017) (affirming

10   dismissal of GFBPA claim where there was "no evidence of any injury to [plaintiff] or his

11   property"); *Flores v. Aon Corp.*, 242 N.E.3d 340, at 357 (Ill. Ct. App. 2023) ("The failure to allege

12   specific economic damages precludes a claim brought under the Consumer Fraud Act [ICFA].");

13   *Hennessy v. Gap, Inc.*, 86 F.4th 823, 827 (8th Cir. 2023) (stating that recovery under the MMPA

14   requires showing that the plaintiff "*suffered an ascertainable loss of money or property*" which is

15   determined by applying the "'benefit of the bargain' rule"); *Salazar v. Green Square Co.*, 2022 WL

16   1492577, at *12 (D.N.M. Mar. 16, 2022) (denying recovery under the NMUPA for emotional harm

17   because the statute permits recovery to "only those persons who suffer any loss of money or

18   property") (internal quotations omitted); *Cousineau v. Microsoft Corp.*, 992 F. Supp. 2d 1116, 1128

19   (W.D. Wash. 2012) ("[I]njury to business or property [is] a crucial element of a [Washington] CPA

20   claim.").

21        Here, Plaintiffs fail to plausibly allege that they suffered any economic injury attributable to

22   Apple. As explained above, Plaintiffs only allege that Apple is involved in the initial in-app

23   purchases of virtual coins, of which Plaintiffs allege Apple retains a 30 percent commission. *See*

24   Compl. ¶ 76. Plaintiffs allege no specific facts suggesting they did not receive the benefit of their

25   bargain when purchasing virtual chips. Rather, they got exactly what they paid for. For example,

26   the Complaint nowhere suggests that Plaintiffs received fewer virtual coins than the amount they

27   paid for, or that they were not able to use the chips for extended game play. In *Coffee v. Google,*

28   *LLC* ("*Coffee I*"), another court in this District dismissed the plaintiff's UCL claim under similar

circumstances. 2021 WL 493387, at *9 (N.D. Cal. Feb. 10, 2021). Applying the same two-transaction distinction applicable here, the court reasoned that "Google was involved only in the first part of [the] [p]laintiffs' transactions, that is, [their] purchases of virtual currency," and found that the plaintiffs failed to "explain how their purchases of virtual currency resulted in economic loss" since they received the amount of virtual currency for which they paid. *Id.* Without any plausible allegations of economic loss arising out of Plaintiffs' in-app virtual coin purchases, the consumer protection claims here suffer from the same fundamental deficiency. *See also Taylor v. Apple, Inc.* ("*Taylor II*"), 2022 WL 35601, at *3 (N.D. Cal. Jan. 4, 2022) (rejecting economic loss theory premised on purchase of virtual coins used to purchase loot boxes in gaming apps); *Mai v. Supercell Oy*, 2021 WL 4267487, at *3 (N.D. Cal. Sept. 20, 2021) (dismissing consumer protection claims for failure to allege economic loss because the plaintiff "received exactly what he paid real-world currency for: gems to use as he pleased in [the gaming app]," and the fact that he "chose to use his gems on loot boxes does not create an economic injury because he got what he paid for").

Nor do Plaintiffs plausibly allege any economic injury caused by Apple arising from the second transaction where Plaintiffs used their virtual coins in the Simulated Casino Apps, in which Apple has *no involvement*. In *Coffee*, the court found no economic injury based on the plaintiffs' "in-game purchases … using virtual currency" because "the in-app purchase … is a transaction between the player and the app developer, in which Google is not involved." 2021 WL 493387, at *10. The same is true here. Plaintiffs' conclusory allegations that they suffered harm from Apple's alleged "hosting, promoting, and facilitating of illegal gambling" are insufficient to plausibly allege that Apple caused any loss. Compl. ¶¶ 104, 151–52, 201, 228, 256, 271, 351, 394, 517.

Courts in this District have already rejected the theory that the alleged processing of virtual currency sales could result in economic injury. *See, e.g.*, *Coffee II*, 2022 WL 94986, at *8-9 (allegations that defendant processed virtual currency sales "do not give rise to a plausible claim that Plaintiffs lost money or property" as a result of defendant's conduct). Although one court has held that an *app developer* may be held liable under Washington's consumer protection law for operating simulated casino games, *see Larsen v. PTT, LLC*, --- F. Supp. 3d ---, 2024 WL 2943892, at *8-9 (W.D. Wash. June 11, 2024), Plaintiffs do not and cannot demonstrate any causal link

between their purported injuries and *Apple*, which, at most, operates as the *platform* on which the games can be downloaded. *See* Compl. ¶ 55.

Because Plaintiffs fail to plausibly allege facts demonstrating that they suffered any cognizable losses caused by Apple, each of the state consumer protection claims must be dismissed.

### 2.    California Public Policy Bars Claims For Recovery of Gambling Losses.

Apple joins and incorporates Meta's argument in its motion to dismiss that California public policy precludes claims to recover money lost through gambling. *See* Meta MTD § IV.A.2; *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 477, 84 Cal. Rptr. 2d 810, 819 (1999). The California Plaintiffs' UCL and unjust enrichment claims (*see* Counts I–II) should be dismissed because both claims seek recovery for money allegedly lost through gambling. *See* Compl. ¶¶ 114, 137, 140(a), 151, 176, 180.

### C.    Plaintiffs' Claims for Equitable and Injunctive Relief Fail Because the Complaint Alleges the Adequacy of Legal Remedies.

Apple joins and incorporates Meta's argument that federal district courts must dismiss claims for equitable and injunctive relief where an adequate remedy at law exists. *See* Meta MTD § IV.A.3; *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022). Plaintiffs make only a conclusory allegation in support of their UCL claim that "[n]o plain, adequate, and complete remedy for Defendant's conduct exists at law." Compl. ¶ 172. The Court need not accept this conclusory allegation. *See Hartman*, 536 F.3d at 1055. Although Plaintiffs vaguely allude to non-economic injuries such as "strained marriages, unsought medical treatments, skipped meals, and anxiety and self-loathing," which they claim cannot be fixed by "[a]fter-the-fact money damages," Compl. ¶ 108, these attenuated alleged harms are insufficient to establish standing and therefore cannot serve as the basis for Plaintiffs' claims for equitable and injunctive relief. *See supra* § III.B.1. Moreover, the alleged injury underlying all of Plaintiffs' claims is that they "have *lost money*" as a result of Apple's actions. Compl. ¶ 104 (emphasis added); *see also id.* ¶ 140. Because "Plaintiffs do not explain why [putative class members] could not sufficiently be 'made whole' by monetary damages," *In re MacBook Keyboard Litigation*, 2020 WL 6047253, at *3-4 (N.D. Cal. Oct. 13, 2020) (Davila, J.), their claims seeking an injunction, restitution, and other equitable relief should

be dismissed with prejudice.

**D.    Plaintiffs' Unjust Enrichment Claims Fail for Additional Reasons.**

**1.    The Complaint Fails to Plausibly Allege Apple Unjustly Retained a Benefit.**

Plaintiffs fail to state a claim for unjust enrichment under each state's common law because they do not allege that a benefit has been conferred on Apple that would be unjust for it to retain. Generally, "[t]o allege unjust enrichment as an independent cause of action, a plaintiff must show that a defendant received and unjustly retained a benefit at the plaintiff's expense" under inequitable or unconscionable circumstances such as "mistake, fraud, coercion, or request." *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. July 5, 2023) (applying California law). As set forth in Appendix C, these elements must be present under the laws of each state in which Plaintiffs assert unjust enrichment claims. Moreover, courts in many states specifically recognize that claims for unjust enrichment are viable only when specific inequitable conduct is alleged, such as fraud, mistake, coercion, or undue influence. *See* Appendix C; *see also Russell*, 680 F. Supp. at 1130 ("Absent qualifying mistake, fraud, coercion, or request by [defendant], there is no injustice."); *Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112, 1124 (S.D. Ind. 2011) (plaintiff must allege "an actual wrong or misleading conduct").

Plaintiffs fail to allege any inequitable circumstances that would render Apple's alleged retention of any benefit unjust. Plaintiffs base each unjust enrichment claim on their theory that "Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and [putative] Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store." Compl. ¶¶ 176, 206, 233, 261, 290, 307, 324, 341, 371, 400, 417, 434, 453, 471, 487, 523. But as Plaintiffs acknowledge, their in-app purchases of virtual chips using Apple's payment processing tools were made for the purpose of allowing them "to keep playing" the games when their chip balance falls low. *Id.* ¶¶ 61–62, 109–39. Plaintiffs do not allege they received less than the amount of virtual chips promised, or that the virtual chips could not be used their intended purpose. Because they received exactly what they bargained for, Plaintiffs' unjust enrichment claims must be dismissed. *See, e.g.*, *Am. DJ Supply Inc. v. Am. Pro Int'l Corp.*,

2013 WL 12123986, at *3 (C.D. Cal. Feb. 22, 2013) ("[A] claim for unjust enrichment . . . cannot lie where the plaintiff has received the benefit of the alleged bargain.").[9]

Nor does the Complaint allege that Apple had any involvement in Plaintiffs' subsequent transactions using the virtual chips they purchased. Apple *retains no benefit at all* from Plaintiffs' use of virtual coins for continued use of third-party gaming apps. Plaintiffs' unjust enrichment claims fail as a matter of law on this basis alone. *See, e.g.*, *Coffee v. Google, LLC*, 2022 WL 94986, at *11 (N.D. Cal. Jan. 10, 2022) (dismissing unjust enrichment claim where "Plaintiffs received exactly the amount of virtual currency purchased through [Defendant's store]" and because "Plaintiffs have not alleged facts showing that [Defendant] was involved in or profited from subsequent transactions [third-party developers] in which players used virtual currency").

### 2. The Unjust Enrichment Claims Are Duplicative of Plaintiffs' Other Failed Claims.

Plaintiffs' unjust enrichment claims also fail because they are duplicative of Plaintiffs' other deficient state statutory claims. Courts have consistently held that when an unjust enrichment claim is based on the same alleged misconduct underlying a plaintiff's other failed claims, the unjust enrichment claim is duplicative and must be dismissed for the same deficiencies. *See In re Arris Cable Modem Consumer Litig.*, 2018 WL 288085, at *10 (N.D. Cal. Jan. 4, 2018) (dismissing California unjust enrichment claim because it "is based on the same allegations and theory as [the deficient] UCL claim"); *In re Ford Tailgate Litig.*, 2014 WL 3899545, at *3-4 (N.D. Cal. Aug. 8, 2014) (dismissing unjust enrichment claims under Alabama, Connecticut, Georgia, Illinois, Indiana, Mississippi, New York, Ohio, and Tennessee law which relied on the same factual predicates as the remaining claims); *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 987 (8th Cir. 2008) (same under Minnesota law). Because Plaintiffs' unjust enrichment claims rest on their allegations that Apple profits from hosting Simulated Casino Apps on its platform—the same factual premise

---

[9] *See also Marlowe v. Nature's Bounty Co.*, 2017 WL 2291683, at *4 (N.D. Ohio May 25, 2017) (no claim where plaintiff "received the benefit of what he paid for"); *McAlexander v. Otsuka Am. Pharm., Inc.*, 2022 WL 17549788, at *9 (N.D. Ga. Aug. 19, 2022) (similar).

1    underlying their state statutory claims, which fail for the reasons discussed *supra*, Section III.B—

2    each unjust enrichment claim must be dismissed. *See, e.g.*, *Clark v. Incomm Fin. Servs., Inc.*, 2024

3    WL 3005905, at *5 (C.D. Cal. May 30, 2024) ("Plaintiff's unjust enrichment claim is derivative of

4    her [consumer protection] claims, and therefore rises or falls with those claims.").

**CONCLUSION**

6        For the foregoing reasons, Apple respectfully requests that this Court dismiss the Complaint

7    in its entirety with prejudice.

9    Dated:  November 22, 2024              Respectfully submitted,

10                                         **DLA PIPER LLP (US)**

11                                         By: */s/ John Samuel Gibson*
12                                              JOHN SAMUEL GIBSON

13                                              Attorneys for Defendant
14                                              APPLE INC.