JOHN SAMUEL GIBSON (SBN 140647)
john.gibson@us.dlapiper.com
COLIN MCGRATH (SBN 351947)
colin.mcgrath@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, CA 90067-4704
Tel: 310.595.3039
Fax: 310.595.3339

RAJ N. SHAH (*pro hac vice*)
raj.shah@dlapiper.com
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
Tel: 312.368.4000
Fax: 312.236.7516

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE

| | |
|---|---|
| IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-02985-EJD<br><br>**APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED MASTER COMPLAINT**<br><br>Date: March 7, 2025<br>Time: 9:00 a.m.<br>Judge: Hon. Edward J. Davila<br>Room: Courtroom 4–5th Floor |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.     SECTION 230 BARS PLAINTIFFS' CLAIMS ............................................. 2

          A.    The Ninth Circuit Ordered a Claim-By-Claim Analysis ................................ 2

          B.    Plaintiffs' Claims Seek to Hold Apple Liable as a Publisher. ...................... 2

          C.    Plaintiffs Fail to Allege Claims Based on Apple's "Own Bad Acts." ........... 4

          D.    The Duty Plaintiffs Assert Requires Apple to Monitor Third-Party Content. ................................................................................................................ 6

    II.    ALL STATE LAW CLAIMS SHOULD BE DISMISSED ........................... 7

          A.    Plaintiffs Fail to Allege Plausible Loss Recovery Claims. ........................... 7

              1.    Plaintiffs Fail to Show that Apple is a "Winner" or "Proprietor." ..... 7

              2.    Apple Received No Property "Lost" through Gambling. ................. 11

          B.    Plaintiffs Lack Standing to Pursue Consumer Protection Law Claims ......... 13

          C.    Plaintiffs Fail to Allege Plausible Unjust Enrichment Claims. .................... 14

          D.    Plaintiffs' Claims Should be Dismissed for Additional Reasons ................. 15

    III.    PLAINTIFFS FAIL TO ALLEGE PLAUSIBLE RICO CLAIMS ......................... 15

CONCLUSION ............................................................................................................. 15

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Alford v. Burke*,
    21 Ga. 46 (1857)................................................................................................. 11

5

6

*Armstrong v. Aragon*,
    79 P. 291 (N.M. 1905)...................................................................................... 12

7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 1

8

9

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ........................................................................... 3

10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................... 1

11

12

*Berns v. Shaw*,
    65 W. Va. 667 (1909) ...................................................................................... 10

13

14

*Best Carpet Values, Inc. v. Google, LLC*,
    90 F.4th 962 (9th Cir. 2024)............................................................................... 2

15

*Brilliant v. Raidy*,
    70 N.Y.S.2d 126 (N.Y. Mun. Ct. 1947) ......................................................... 10

16

17

*Cafferata v. Ginnochio*,
    222 S.W. 867 (Mo. Ct. App. 1920) ................................................................ 12

18

19

*Calise v. Meta Platforms, Inc.*,
    103 F.4th 732 (9th Cir. 2024)............................................................................. 2

20

*Coffee v. Google, LLC*,
    2021 WL 493387 (N.D. Cal. Feb. 10, 2021).............................................. 13, 14

21

22

*Coffee v. Google, LLC*,
    2022 WL 94986 (N.D. Cal. Jan. 10, 2022) ................................................. 5, 15

23

24

*Colvin v. Roblox Corp.*,
    2024 WL 4231090 (N.D. Cal. Sept. 19, 2024)................................................ 15

25

*Crooks v. McMahon*,
    48 Mo. App. 48 (1892).................................................................................... 12

26

27

*Cross v. Sam Katz Distinctive Tours, Ltd.*,
    338 N.Y.S.2d 717 (Civ. Ct. 1972).................................................................... 11

28

*Doe v. Grindr Inc.*,
No. 24-475, -- F.4th --, 2025 WL 517817 (9th Cir. Feb. 18, 2025) .................................*passim*

*Dyroff v. Ultimate Software Grp.*,
934 F.3d 1093 (9th Cir. 2019) .............................................................................................. 3

*In re Facebook Simulated Casino-Style Games Litig.*,
2024 WL 2287200 (9th Cir. May 21, 2024) ......................................................................... 2

*Foley v. Whelan*,
219 Minn. 209 (1945) ........................................................................................................... 9

*Foreman v. Bank of Am., N.A.*,
401 F. Supp. 3d 914 (N.D. Cal. 2019) .................................................................................. 2

*Frenzel v. AliphCom*,
76 F. Supp. 3d 999 (N.D. Cal. 2014) .................................................................................. 13

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ............................................................................................... 6

*Humphrey v. Viacom, Inc.*,
2007 WL 1797648 (D.N.J. June 20, 2007) ........................................................................ 11

*Kater v. Churchill Downs Inc.*,
886 F.3d 784 (9th Cir. 2018) ........................................................................................... 8, 9

*Lairmore v. Drake*,
185 Or. 239 (1949) ............................................................................................................... 9

*Larsen v. PTT, LLC*,
737 F. Supp. 3d 1076 (W.D. Wash. 2024) ................................................................... 14, 15

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ............................................................................................. 3

*Leon v. Hayward Bldg. Dep't*,
2018 WL 1142112 (N.D. Cal. Mar. 2, 2018) ....................................................................... 4

*Lester v. Buel*,
49 Ohio St. 240 (1892) ....................................................................................................... 11

*Mai v. Supercell Oy*,
2021 WL 4267487 (N.D. Cal. Sept. 20, 2021) ................................................................... 14

*Manning v. Creative Headquarters, LLC*,
2012 U.S. Dist. LEXIS 191219 (N.D. Ill. Mar. 30, 2012) ................................................. 11

*In re Mastercard Int'l Inc.*,
132 F. Supp. 2d 468 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002)............................ 5

*In re Mastercard Int'l Internet Gambling Litig.*,
    313 F.3d 257 (5th Cir. 2002) ........................................................................... 4, 13

*In re MasterCard Int'l, Inc.*,
    2004 WL 369729 (E.D. La. Feb. 19, 2004) .................................................. 12, 13

*McCurry v. Keith*,
    312 S.C. 254 (Ct. App. 1994) .................................................................................... 9

*Mendelsohn v. BidCactus, LLC*,
    2012 WL 1059702 (D. Conn. Mar. 28, 2012) ...................................... 10, 14, 15

*Moushon v. AAA Amusement, Inc.*,
    267 Ill. App. 3d 187 (1994) ....................................................................................... 9

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) ........................................................................... 3, 7

*Phillips v. Double Down Interactive LLC*,
    173 F. Supp. 3d 731 (N.D. Ill. 2016) .................................................................... 8

*Quillian v. Johnson*,
    122 Ga. 49 (1905) .......................................................................................................... 11

*Reuter v. MasterCard Int'l, Inc.*,
    397 Ill. App. 3d 915 (2010) ............................................................................... 4, 13

*Ristic v. Mach. Zone, Inc.*,
    2016 WL 4987943 (N.D. Ill. Sept. 19, 2016) ....................................................... 8

*Ruckman v. Pitcher*,
    1 N.Y. 392 (1848) ........................................................................................................ 11

*Taylor v. Apple, Inc.*,
    2022 WL 35601 (N.D. Cal. Jan. 4, 2022) .............................................................. 14

*Yantis v. Murnan*,
    1935 WL 3292 (Ohio Ct. App. Nov. 4, 1935) ..................................................... 11

*YZ Productions, Inc. v. Redbubble, Inc.*,
    545 F. Supp. 3d 756 (N.D. Cal. 2021) .................................................................. 14

**Statutes**

47 U.S.C. § 230 ............................................................................................................*passim*

47 U.S.C. § 230(b)(2) ..................................................................................................... 7

47 U.S.C. § 230(c)(1) ..................................................................................................... 4

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ............................................................................ 10

1 Corbin on Contracts § 86.02 (2024) ............................................................................. 10

1

**INTRODUCTION**

2      Even after multiple opportunities to allege Apple's purported "own bad acts" under a

3   revenue-based theory of liability, Plaintiffs have alleged only that Apple provided content-neutral

4   tools for facilitating the sale of published content. This is publishing activity protected by Section

5   230. Therefore, Plaintiffs' theatrical attempt to cast Apple as the corrupt police prefect in

6   *Casablanca* falls flat; they once again base their entire case on ever-evolving metaphors, similes,

7   and speculation that appear nowhere in the factual allegations they have pleaded. In their

8   Opposition, Plaintiffs' list of unfounded analogies continues to grow. Apple, they assert, should be

9   held liable for acting variously as a "bookie," a "broker," a "stakeholder," or "cashier's cage" for

10  the Simulated Casino Apps, or even as a "proprietor" of the games. They argue, for example, that

11  the platforms are responsible for "booking the bets, doling out the chips to players, tallying up the

12  proceeds, and dividing up the spoils" with the app developers. Opp. at 58. But these are merely

13  arguments—*not* the factual allegations required to state a plausible claim for relief. *Bell Atl. Corp.*

14  *v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

15     Plaintiffs do not *allege* that Apple brokers or books any bets, or otherwise plays any role in

16  operating any gaming apps. Nor can they. Apple provides only neutral payment-processing services

17  for developers to sell third-party content. In fact, the Complaint alleges that the *app developers*

18  created and operate the Social Casino Apps and that the developers—*not* Apple—are involved in

19  the alleged gambling transaction in which a player uses virtual chips within the app.

20     Plaintiffs' claims thus fail as a matter of law for several reasons. As the Ninth Circuit recently

21  reaffirmed in *Doe v. Grindr Inc.*, No. 24-475, -- F.4th --, 2025 WL 517817, at *3 (9th Cir. Feb. 18,

22  2025), Section 230 bars every claim because each is based on Apple providing neutral tools for

23  hosting and "facilitat[ing] the communication and content of others." Plaintiffs' gambling loss

24  recovery, consumer protection, unjust enrichment, and RICO claims all fail independently because

25  the Complaint nowhere alleges that Apple is involved in gambling—which allegedly occurs *after*

26  the virtual chip purchase—or that Apple received money or property Plaintiffs lost from alleged

27  gambling. Plaintiffs had another opportunity on remand to address these deficiencies by amending

28  their Complaint, but they were unable to allege facts supporting their metaphors. The Court should

reject Plaintiffs' use of analogies to "recast" the claims they actually alleged, *see Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 972 (9th Cir. 2024) ("Plaintiffs cannot escape their Complaint"), and should dismiss all claims with prejudice given Plaintiffs' "repeated failure to cure deficiencies by amendment." *Foreman v. Bank of Am., N.A.*, 401 F. Supp. 3d 914, 918 (N.D. Cal. 2019).

## ARGUMENT

## I. SECTION 230 BARS PLAINTIFFS' CLAIMS

Section 230 bars Plaintiffs' claims because each imposes a duty that treats Apple as a publisher—*i.e.*, a duty that "derives from the defendant's status or conduct as a publisher or speaker," or "would necessarily require an internet company to monitor third-party content." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740–41 (9th Cir. 2024) (cleaned up). Plaintiffs' allegations here are insufficient to show that Apple is directly engaged in alleged gambling. The Complaint instead seeks to hold Apple liable for hosting and facilitating the sale of published content created and sold by third parties (here, virtual chips and games). But that is immune publishing activity.[1]

### A. The Ninth Circuit Ordered a Claim-By-Claim Analysis.

Plaintiffs rely primarily on the Court's prior Section 230 decision, arguing that it "should have largely settled the Section 230 issue as far as the pleadings are concerned." Opp. at 7. This disregards the Ninth Circuit's ruling on appeal. In dismissing the appeal, the Ninth Circuit instructed the Court on remand to "examin[e] each individual claim" and "consider what the underlying legal duty '*actually* requires'" to determine whether it seeks to hold the defendant liable as a publisher of third-party content. *In re Facebook Simulated Casino-Style Games Litig.*, 2024 WL 2287200, at *2 (9th Cir. May 21, 2024) (emphasis added).[2] Because the Court's order did not "determine which causes of action should be dismissed," *id.*, it has not resolved whether Section 230 bars each claim.

### B. Plaintiffs' Claims Seek to Hold Apple Liable as a Publisher.

Plaintiffs have no answer to Apple's claim-by-claim analysis. Mot. at 11–15. Each of

---

[1] Apple also incorporates and joins the Section 230 arguments in § II.A. of Google's Reply.

[2] Given this requirement to conduct a new claim-by-claim analysis, Plaintiffs are wrong in asserting that the platforms' Section 230 arguments are "effectively" a request for reconsideration. Opp. at 8.

1    Plaintiffs' state gambling loss recovery, unjust enrichment, RICO, and consumer protection claims

2    seeks to impose on Apple a duty to refrain from hosting and facilitating payments for third-party

3    content. Because that duty depends on the nature of third-party content, it involves quintessential

4    publishing activity. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *Perfect 10, Inc. v.*

5    *CCBill LLC*, 488 F.3d 1102, 1118, 1121 (9th Cir. 2007) (affirming dismissal of claims based on

6    processing payments to purchase access to third-party digital content).

7        In response, Plaintiffs argue primarily that, by facilitating transactions for in-app content,

8    the platforms are involved in "brokering gambling transactions." Opp. at 8. But even with this false

9    reframing—which lacks any supporting factual allegations—Plaintiffs' claims still treat Apple as a

10   publisher. In *Doe v. Grindr Inc.*, 2025 WL 517817, at *2, the Ninth Circuit confirmed that when a

11   claim "faults [a platform] for facilitating communications among users for illegal activity," it

12   "necessarily implicate[s] [the platform's] role as a publisher of third-party content." *Id*. There,

13   plaintiff argued that Grindr breached its "duty" to "suppress matches and communications between

14   adults and children." *Id.* But Section 230 provided immunity because plaintiff used "features and

15   functions" meant to "facilitate the communication and content of others," that "were 'content

16   neutral' on their own." *Id.* at *3. As *Grindr* shows, a platform acts as a publisher when it uses

17   "neutral" tools to facilitate third-party content or communications. *Id.* (citing *Dyroff v. Ultimate*

18   *Software Grp.*, 934 F.3d 1093, 1097–98 (9th Cir. 2019)).

19       That analysis applies even more forcefully here. Apple provides a neutral platform and its

20   neutral in-app payment-processing tools ("IAP") to "facilitate the communication and content of

21   others"—specifically, developers' sale of in-app published content, including virtual chips used in

22   gaming apps. *Id.* The Complaint shows IAP is "content neutral": IAP is available to all developers,

23   regardless of the content featured on an app. *See* Compl. ¶ 76; *see also* RJN, Ex. 3. Plaintiffs do not

24   dispute that IAP is a neutral tool but instead attack a strawman by arguing that Apple's "'neutral

25   tools' argument" relates only to the third *Barnes* factor— *i.e.*, whether content was provided by a

26   third party. Opp. at 14–16. *Grindr* rejects that argument. 2025 WL 517817, at *3.

27       Further, *Grindr* distinguished *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), on which

28   Plaintiffs rely. The court reasoned that, unlike the speed filter in *Lemmon*,  the "challenged features

of the [Grindr] App"—functions that matched adults and children for illegal sexual activity—were "not independent of Grindr's role as a facilitator and publisher of third-party content." 2025 WL 517817, at *3 Here, too, the challenged aspect of Apple's platform—functions that process payments for virtual chips created by third-party developers—is not independent from Apple's role as a publisher. As Plaintiffs conceded on appeal, paid transactions for content—*e.g.*, "offer[ing] app[s] for sale"—is publishing activity. Mot. at 9–10. That admission establishes that Section 230 bars every claim because Plaintiffs cannot distinguish apps from in-app content. Transactions for either are for "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

### C.    Plaintiffs Fail to Allege Claims Based on Apple's "Own Bad Acts."

Plaintiffs also fail in their attempt to blur the lines between the two transactions alleged in the Complaint. Apple is involved in the first transaction, in which a consumer receives virtual currency—*not* the second transaction in which Plaintiffs use virtual currency in the app. *See* Mot. at 4–5, 8–9; Compl. ¶¶ 63, 153. Courts have consistently held that credit card networks are not involved in gambling when they process payments for virtual chip sales. *See Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915, 923 (2010); *In re Mastercard Int'l Internet Gambling Litig.*, 313 F.3d 257, 262 (5th Cir. 2002). Apple's role is, if anything, further removed from any alleged gambling and instead is limited to hosting and facilitating transactions for published content.

Plaintiffs argue that "when they ask [Platforms] to complete a gambling transaction[,] they are asking a cage cashier to allow them 'to purchase virtual chips for gambling.'" Opp. at 11. But the Complaint belies this: Plaintiffs allege that users purchase virtual chips from the developers. They allege, for example, that "*[S]ocial casinos* allow users to purchase virtual 'chips,'" and that "players purchase 'chip packages'" in the apps. Compl. ¶¶ 3, 13 (emphasis added); *see also id.* ¶ 95 (alleging that developers use "Apple's payment system to process all in-game purchases"). Plaintiffs cannot rely on metaphors and argument not factually alleged in the Complaint. *See Leon v. Hayward Bldg. Dep't*, 2018 WL 1142112, at *1 n.7 (N.D. Cal. Mar. 2, 2018) (argument in brief unsupported by factual allegations insufficient to oppose motion to dismiss).

Plaintiffs argue that the platforms "broker unlawful gambling transactions," or "act as the

social casinos' house, cage, and bookmaker." Opp. at 4 (citing Compl. ¶¶ 5–6, 8); *id.* at 7. Plaintiffs never explain what these terms mean, how each is different from the other, or how the platforms could be all these things at once. In any event, these argumentative metaphors do not come from Plaintiffs' actual allegations, which merely state that the platforms retain "control over allowing social casinos into their stores," Compl. ¶ 5, and provide "a trustworthy marketplace to conduct payment transactions," *id.* ¶ 6. Though Plaintiffs also allege the platforms share a "portion of the gamblers' losses, which are collected and controlled by the Platforms themselves," *id.* ¶ 5, Plaintiffs mean only that Apple "operates as the payment processor for all in-app purchases of virtual chips," "collects the money players spend on virtual chips," and "takes a cut [of the payment]," *id.* ¶ 63, which is the same "30 percent commission [it receives] off of *every* in-app purchase," *id.* ¶ 76 (emphasis added). Apple receives that commission no matter the outcome of a game. It never stands to "win" if a player "loses." Nor does it pay out if a player wins. Thus, Apple's role in "operat[ing] as the payment processor for all in-app purchases of virtual chips," *id.* ¶ 63, does not involve "gambling transactions," but instead content-neutral transactions for published digital content created by third-parties. Plaintiffs' broker, bookie, house, and cage metaphors are all inapt.

Plaintiffs contend that "[w]hen players purchase virtual chips … the alleged illegal gambling has already begun, since 'substantially all virtual chips are used on slot machine spins.'" *See* Opp. at 20 (citing Compl. ¶¶ 56, 65). But this allegation concedes that virtual chips are used for purposes *other* than alleged gambling. *See* Google Reply at 7. Regardless, the chips, spins, games, and apps are all published digital content provided by third parties.

Courts have consistently rejected similar efforts to hold platforms liable for transactions involving virtual currency that players allegedly may later use for gambling. *See Coffee v. Google, LLC*, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022)[3]; *In re Mastercard Int'l Inc.*, 132 F. Supp. 2d 468,

---

[3] Plaintiffs fail to distinguish *Coffee* by arguing that plaintiffs in that case "sought to impose liability for 'lawful transactions for virtual currency.'" Opp. at 16 n.2. Because plaintiffs there alleged that the currency could be used to purchase allegedly illegal loot boxes, *Coffee* shows that a transaction

479 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002) ("It is a temporal impossibility for the [credit card companies] to have completed their transaction with the plaintiff before he gambled and to then be prosecuted for collecting the proceeds of a gambling device, which can only take place after some form of gambling is completed."). As Plaintiffs appear to concede, a credit card network does not engage in an "unlawful gambling transaction" by processing a payment for virtual casino chips. Opp. at 36–37. Plaintiffs fail to show how the platforms' limited role is any different.

For these reasons, Plaintiffs also fail to show that *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 684 (9th Cir. 2019), applies here. Opp. at 8–9. And if there is any doubt, the Court should invoke constitutional avoidance to conclude that *HomeAway* does not apply to transactions for published content. Plaintiffs argue that their theory of liability does not raise First Amendment concerns, primarily because "this case is about brokering gambling transactions," and gambling is subject to regulation under the "States' police power." Opp. at 17. That argument fails because the Complaint does not allege that the platforms are involved in "brokering gambling transactions." Apple is involved only in transactions for published content (content inside published games) and the First Amendment fully protects the sale of video game content. *See* Mot. at 15.

### D.    The Duty Plaintiffs Assert Requires Apple to Monitor Third-Party Content.

Plaintiffs' claims also implicate publishing activity because the duty they impose necessarily requires Apple to monitor third-party content. Mot. at 11–14; *Grindr*, 2025 WL 517817, at *2 (holding that plaintiffs' claims implicate defendant's role as a publisher because "discharging the alleged duty would require Grindr to monitor third-party content"). Plaintiffs argue that *HomeAway* "rejected 'the view that CDA immunity follows whenever a legal duty "affects" how an internet company "monitors" a website.'" Opp. at 12. But Apple's argument is that Plaintiffs' claims necessarily require monitoring—not that they merely "affect" how Apple monitors content.

Plaintiffs are wrong that the platforms "fail to identify any editorial decision [*i.e.*, monitoring] they are being forced to make." Opp. at 12. *Id*. Plaintiffs' claims require Apple to

_____

for virtual currency may be lawful even if the currency could be used for an allegedly unlawful purpose. *See Coffee*, 2022 WL 94986 at *6.

identify gaming apps that involve illegal gambling and to cease hosting or facilitating transactions for virtual chips used in those apps. Mot. at 13–14. Those actions necessarily involve monitoring. A user, for example, may buy virtual coins in the Paperless Post app, and then use the coins to buy customized virtual invitation cards—which is clearly lawful. *See* RJN Ex. 4 at 3. Because transactions for in-app currency are not inherently unlawful, Apple would need to monitor the app's content to determine whether the currency might be used for an illegal purpose.

Plaintiffs claim to have identified alternatives to monitoring. Opp. at 12. But as Google shows in its Reply (at 9–10), their proposals still require Apple to either monitor content or cease all transactions for published content, which is itself publishing activity under *Perfect 10* and Plaintiffs' own admissions. Plaintiffs claim the latter is just "a solution that Apple dislikes," Opp. at 13, but that "solution" is akin to requiring a bookstore to stop selling all books to avoid liability for the content of certain books. The whole point of Section 230 is to avoid that kind of dilemma. And in the digital context, it would stifle the very innovation that Section 230 was enacted to protect. *See* 47 U.S.C. § 230(b)(2). Plaintiffs' failure to explain how Apple could discharge its "alleged duty" without "monitor[ing] third-party content" shows that each claim treats Apple as a publisher. *Grindr*, 2025 WL 517817, at *2. Section 230 accordingly requires dismissal of the entire Complaint.

## II. ALL STATE LAW CLAIMS SHOULD BE DISMISSED

### A. Plaintiffs Fail to Allege Plausible Loss Recovery Claims.

#### 1. Plaintiffs Fail to Show that Apple is a "Winner" or "Proprietor."

Plaintiffs have no cause of action against Apple under any of the state gambling recovery laws that permit recovery from the "winner." Mot. at 23–25. Plaintiffs know Apple is not a "winner" under any statute, so they resort to arguing that the statutes applicable to Apple also allow recovery either from the "proprietor" (Washington and Oregon) or the "stakeholder or other persons in whose hands shall be deposited any such wager, bet or stake, or any part thereof" (New York). Opp. at 23. But Apple fits none of these categories. *First*, Plaintiffs identify no allegations suggesting that the platforms are "winners" in alleged gambling. As courts have consistently held, a person with no "stake" in a wager is not a "winner," and Apple has no alleged stake because the only payment it allegedly receives—the 30 percent in-app purchase commission—does not depend on the outcome

of any alleged bet or wager. Mot. at 24, 28. Apple collects the same commission even if a user never uses the in-app currency or places a "wager." No allegations suggest otherwise. Plaintiffs argue repeatedly that platforms "*directly* participate" in alleged "illegal gambling transactions," Opp. at 5, 18, 20 (emphasis added), but the Complaint alleges only the platforms' *indirect* involvement through processing payments. *See supra* § I.C.

The only possible "stake" they identify is the platforms' supposed indirect interest in a player's decision—after any gambling takes place—to then purchase more chips. *See* Opp. at 32 (asserting that if players win, "they don't run out of chips, which means that they don't have to buy more chips, and that cuts into the Platforms' transaction-brokering income"); *see also id.* at 34 (asserting that a "risk by which [platforms'] future cash flow must be discounted is the risk that the player wins the slots and doesn't have to give more money to the Platforms to keep spinning"). That is no stake in the outcome of a bet, and it cannot make a platform a "winner" under any statute. Each statute provides a person a right of action against the "winner" to recover the specific money or property wagered and lost in the game. *See* Mot., Appendix A (Rows 2–4, 7, 13–16, 19).

The "winner" is the party that obtains property that was bet or wagered in the game and lost. Plaintiffs' sole reliance on the platforms' supposed interest in "future sales" highlights that they have failed to identify any stake the platforms have in any bet or wager allegedly placed through a Simulated Casino App. Plaintiffs identify no case supporting their theory, and they concede that multiple courts have rejected this exact argument. *See* Opp. at 33; *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 740 (N.D. Ill. 2016); *Ristic v. Mach. Zone, Inc.*, 2016 WL 4987943, at *3 (N.D. Ill. Sept. 19, 2016). They have no response to *Phillips* and *Ristic*, other than their disagreement with the courts' reasoning. Opp. at 33.

*Second*, Apple is not a "proprietor" under any statute. Mot. at 23–25, 27–28. For Washington and Oregon, Plaintiffs rely on the term "proprietor," arguing that courts have found that "operators and beneficial owners of social casino apps … qualify as 'proprietor[s] for whose benefit such game was played.'" Opp. at 23–24. But Apple is not a "proprietor" under either statute because it has no ownership interest in or title to the Social Casino Apps, which Plaintiffs allege only the app developers own and operate. *See* Mot. at 28.

Plaintiffs rely heavily on *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018), to support their theory. But the Ninth Circuit in *Kater* held only that the *owner/developer* (parent and subsidiary companies) of Big Fish Casino, a virtual social casino containing various casino-style gaming apps, was the "proprietor" under the Washington statute. 886 F.3d at 789. It did *not* hold that a third-party company doing business with the owner/developer was liable by association. Plaintiffs here urge the Court to make an unsupported leap that the Ninth Circuit did not make. Likewise, Plaintiffs rely on *Lairmore v. Drake*, 185 Or. 239 (1949), but that case shows that Apple is not a "proprietor." The *Lairmore* defendants operated a "gambling place where games of cards were played for money." *Id.* at 241. The court held that defendants, who took a share *from the betting pot*, could be held liable as "proprietors" for the sums they took. *Id.* at 248. Unlike in *Lairmore*, Plaintiffs here do not allege that Apple owns or operates any Simulated Casino App.

Plaintiffs' only response is that the platforms are "proprietors" of the apps because they "are co-conspirators in the operation of the apps and benefit from the games through their 30% cut of the 'house' winnings." Opp. at 24. But Plaintiffs do not allege that Apple receives a "cut" of the "'house' winnings"—they allege only that Apple receives a 30 percent commission for in-app transactions before a consumer ever decides to use a virtual chip within a game, and without regard to whether the player wins or loses in the game. The Complaint does not allege that Apple is a "co-conspirator in the operation of the apps"—it only implausibly and vaguely alleges a conspiracy to "commit [RICO] predicate acts." Compl. ¶¶ 558–60. And Plaintiffs cite no case suggesting that a "proprietor" under these statutes includes an alleged conspirator who has no ownership interest in a game.

*Third*, while Plaintiffs argue that some "winner" statutes allow recovery against the beneficial owner of a game or the "stakeholder," the Complaint makes clear that Apple is neither an owner nor stakeholder. Plaintiffs argue that courts in Minnesota, South Carolina, and Illinois have found that the owner of a slot machine "can be considered the 'winner,' and have therefore allowed players to recover money spent on illegal slot machines from the keepers of that machine." Opp. 27–28 (citing *Foley v. Whelan,* 219 Minn. 209, 214–15 (1945); *McCurry v. Keith,* 312 S.C. 254, 255 (Ct. App. 1994); *Moushon v. AAA Amusement, Inc.*, 267 Ill. App. 3d 187, 188 (1994)). Of course, if a player loses money on a slot machine, the machine's owner is the party who stands to

1    gain from the player's loss and is thus the "winner." These cases thus confirm only that Apple is *not*

2    a "winner" under the statutes. The Complaint does not—and cannot—allege that Apple is the

3    "beneficial owner" of the Simulated Casino Apps because the app developers own and operate the

4    games. And the Complaint does not allege that Apple receives any winnings if a player uses a virtual

5    chip in a game and loses. Apple receives a 30 percent portion of an in-app purchase at the time of

6    that first transaction for a content-neutral service it provides, regardless of whether or for what

7    purpose the consumer uses the virtual chip. Compl. ¶¶ 76, 95.

8         No authority supports Plaintiffs' vague, sweeping assertion that other states have recognized

9    that a "winner" includes parties who "facilitate, broker, and profit from illegal gambling." Opp. at

10   28–29. Their interpretation defies the plain language of the statutes. And if the laws reached as

11   broadly as Plaintiffs claim, potential liability would be boundless. In such a *Through the Looking-*

12   *Glass* world, the utility company that provides electricity to the app developer and the internet

13   provider would all "facilitate" or "profit" from alleged gambling, too. Plaintiffs cite *Berns v. Shaw*,

14   65 W. Va. 667, 671 (1909), a decision addressing a West Virginia statute not applicable to any

15   claims against Apple. While *Berns* noted that the defendant "furnish[ed] the room, lights, and the

16   money to back the games with," the court ultimately held that plaintiff could recover from defendant

17   because "plaintiff lost his money as much to defendant as he did to [the co-partner with whom

18   defendant ran the game]." *Id.* at 672. Here, the Complaint does not allege that Apple received any

19   money that Plaintiffs lost through gambling or provided money to back any game. *Mendelsohn v.*

20   *BidCactus, LLC* addressed only whether a bidding contest constituted illegal gambling under

21   Connecticut law, not the meaning of "winner" under Connecticut's gambling recovery statute. 2012

22   WL 1059702, at *5 (D. Conn. Mar. 28, 2012). In any event, the defendant in *BidCactus* obtained all

23   alleged gambling winnings because it received the bids customers placed in hope of winning a prize.

24   *Id.* at *4. In contrast, Plaintiffs here do not allege they placed any bet or wager with the platforms.

25         And while Plaintiffs argue that Georgia and Ohio courts have allowed recovery from the

26   "stakeholder," Opp. at 29–30, the Complaint does not allege that Apple plays such a role. A

27   "stakeholder" is "one who holds a wager pending the outcome of an event, and then pays the same

28   to the winner." *Brilliant v. Raidy*, 70 N.Y.S.2d 126, 128 (N.Y. Mun. Ct. 1947); *see also*

"Stakeholder," Black's Law Dictionary (12th ed. 2024) ("Someone who holds the money or valuables bet by others in a wager"); 1 Corbin on Contracts § 86.02 (2024) ("[B]ets are deposited with a third party—a stakeholder—who holds the bets and pays out the winnings once the wagering event is complete."). Plaintiffs do not allege Apple holds any wagered money pending the outcome of a game. They allege only that Apple receives a 30 percent commission for all in-app transactions, before a consumer ever participates in a game. Plaintiffs do not allege that platforms ever pay out winnings to consumers who use the apps. Thus, *Alford v. Burke*, 21 Ga. 46 (1857), *Quillian v. Johnson*, 122 Ga. 49 (1905), *Lester v. Buel*, 49 Ohio St. 240 (1892), and *Yantis v. Murnan*, 1935 WL 3292 (Ohio Ct. App. Nov. 4, 1935), are inapplicable. Further, modern courts applying the Georgia and Ohio statutes have construed the laws strictly because they are "penal in nature." *Manning v. Creative Headquarters, LLC*, 2012 U.S. Dist. LEXIS 191219, at *3 (N.D. Ill. Mar. 30, 2012) (addressing Ohio, Georgia, and other states' recovery laws). In cases where contest organizers received entry fees from plaintiffs, courts have held the organizers were not permissible defendants under Georgia or Ohio gambling recovery statutes because they retained the fee regardless of whether the plaintiff won or lost, and thus do not meet the statutory definition of a "winner." *Id.* at *6 (holding that defendants are not "winners" under Georgia, Ohio, and other states' recovery laws because "all participants' entry and bidding fees are certain to be lost"); *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *9 (D.N.J. June 20, 2007) (defendants that received entry fees "cannot be 'winners' as a matter of law" because they did not "participate in any bet").

Plaintiffs note that New York's statute permits recovery against "the stakeholder." Opp. at 25–26. But as explained, the Complaint does not allege that Apple is a stakeholder. Unlike the "stakeholder" defendants in the cases Plaintiffs cite—*Ruckman v. Pitcher*, 1 N.Y. 392 (1848); *Cross v. Sam Katz Distinctive Tours, Ltd.*, 338 N.Y.S.2d 717 (Civ. Ct. 1972)—the Complaint here does not allege that Apple received deposits for any bet or had any obligation to later pay out winnings.

## 2.    Apple Received No Property "Lost" through Gambling.

Plaintiffs also have no cause of action against Apple under the Alabama, Indiana, Mississippi, Missouri, New Mexico, and Tennessee gambling recovery statutes. Each statute permits recovery only of money or property "lost" through gambling, and Plaintiffs do not seek to

recover from Apple any money "lost" through a wager or gambling. *See* Mot. at 25–27. Plaintiffs respond by again mischaracterizing their own allegations. They *argue* that "the purchase of virtual chips is itself an unlawful gambling transaction, and so the money paid to Apple and the other Platforms is money lost at gambling." Opp. at 35. And they attempt to analogize this case to "a physical casino," where "if a player purchased chips first and then wagered them at a slot machine at the other end of the floor, the money spent on chips is money lost at gambling." Opp. at 36. But once again, the Complaint refutes Plaintiffs' analogies. It does not allege that Apple sold chips to players or stands to receive money or property "lost" from gambling. The Complaint alleges that Apple receives a 30 percent commission from in-app transactions for virtual chips regardless of whether the player wins or loses in a game, shares the chip with a friend, uses the virtual chip for some activity other than a spin, or simply never uses the chip at all. The Complaint thus shows that Apple is not involved in any "unlawful gambling transaction," and that any payment it receives is not money "won" or that any Plaintiff "lost" from alleged gambling. *See* Mot. at 27–28; *supra* § I.C.

Plaintiffs argue that courts have construed loss recovery laws "broadly" to allow recovery "even if [the] defendants are not holding the entire pot at the close of the game." Opp. at 34–35. But the statutes still permit recovery only against defendants who received a share of the money actually lost. Caselaw confirms the plain meaning of the statutory text: that the laws provide a cause of action only against the party holding the money "lost." Plaintiffs fail to explain how the cases Apple cites (Mot. at 26–27) could mean anything different. The court in *Armstrong v. Aragon*, 79 P. 291 (N.M. 1905), clearly held that under New Mexico's statute, even the fact that a player won a game is insufficient to give rise to a cause of action against that player: "*in addition*," the court explained, the wagered money or property must have also "been delivered" to that person. *Id.* at 292 (emphasis added). As the court reasoned, until the winning player receives the money or property lost, "he cannot be said in law to have won the money or property." *Id. Armstrong* thus clarifies that the statute provides a cause of action only against the person who received the property "lost" as a result of gambling. *Id. Cafferata v. Ginnochio*, 222 S.W. 867, 868 (Mo. Ct. App. 1920), and *Crooks v. McMahon*, 48 Mo. App. 48, 50 (1892), similarly confirm that the statutes provide a cause of action against a person in possession of money or property the plaintiff lost from gambling.

Indeed, the allegations against Apple here are like those against the credit card companies in *In re MasterCard International, Inc.*, which processed payments for "chips" that plaintiffs then "gambled at on-line casinos." 2004 WL 369729, at *1 (E.D. La. Feb. 19, 2004). The credit cards were involved in the first transaction for chip purchases—*not* "plaintiff's subsequent online gambling." *Id.* at *3. The court thus held that the credit card companies could not be liable under Alabama's loss recovery statute. *Id.* Plaintiffs fail to distinguish this case, and merely argue that the Simulated Casino Apps are "*only* available to play" via platforms and the developers "are required to use Apple's payment system to process all in-game purchases." Opp. at 37. But none of those allegations suggest that Apple received money or property that Plaintiffs lost from gambling.[4]

### B.    Plaintiffs Lack Standing to Pursue Consumer Protection Law Claims.

Plaintiffs do not dispute that they received the benefit of their bargain in connection with their alleged in-app transactions. Instead, Plaintiffs contend that "[t]he 'benefit of the bargain' logic has no applicability to an illegal transaction," and that Apple's "brokering of illegal chip sales" caused Plaintiffs' loss because "the purchase of virtual chips is itself an unlawful gambling transaction." Opp. at 41. But Plaintiffs do not point to any allegation in their Complaint that supports this argument, and "[t]he complaint may not be amended by the briefs in opposition to a motion to dismiss." *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014).

Moreover, the allegations that *are* in the Complaint show the implausibility of Plaintiffs' "brokering" metaphor. Plaintiffs concede that the app developers, not Apple, sell virtual chips. *See supra* § I.C; Compl. ¶¶ 3, 13. Apple's only involvement arises out of its "operat[ion] as the payment processor for all in-app purchases of virtual chips." Compl. ¶ 63. This first transaction does not involve illegal gambling or an ascertainable loss because Plaintiffs received the precise amount of virtual currency they purchased. Plaintiffs do not plead any facts demonstrating otherwise.

---

[4] Although Plaintiffs argue that Apple is more "inextricably entwined" with developers than credit card networks, Opp. at 37, the *MasterCard* plaintiffs alleged that "95% of Internet gambling business involves the use of credit cards." *MasterCard*, 313 F.3d at 260 n.3.

1    Nor does the Complaint establish that Apple has any involvement in the second transaction

2    in which Plaintiffs allegedly use virtual currency *within the app*, "a transaction between the player

3    and the app developer," not Apple. *Coffee v. Google, LLC*, 2021 WL 493387, at *10 (N.D. Cal. Feb.

4    10, 2021). Plaintiffs rely on the conclusory allegation that Apple engaged in unlawful gambling, yet

5    disregard that courts in this District have dismissed consumer protection claims under factually

6    analogous circumstances. *See* Mot. at 30 (citing *Taylor v. Apple, Inc.*, 2022 WL 35601, at *3 (N.D.

7    Cal. Jan. 4, 2022); *Mai v. Supercell Oy*, 2021 WL 4267487, at *3 (N.D. Cal. Sept. 20, 2021); *Coffee*,

8    2021 WL 493387, at *10). Instead, Plaintiffs rely on inapposite cases in which consumers suffered

9    losses directly attributable to defendants who—unlike Apple—actively participated in gambling

10   activities. *See, e.g.*, *Bidcactus*, 2012 WL 1059702, at *1, 6 (finding that defendant violated CUTPA

11   by acting as a "'penny auction' website"); *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076, 1089 (W.D.

12   Wash. 2024) (granting summary judgment against *app developer*). Because Plaintiffs cannot dispute

13   that they received exactly what they bargained for and fail to allege any unlawful conduct

14   attributable to Apple that caused economic loss, each of their state consumer protection claims fails

15   as a matter of law.

16       **C.      Plaintiffs Fail to Allege Plausible Unjust Enrichment Claims.**

17   Plaintiffs attempt to defend their unjust enrichment claims by relying on the same

18   unsupported theory: that Apple "brokered illegal gambling transactions and pocketed the proceeds."

19   Opp. at 38. Plaintiffs broadly argue that because "the transaction itself is unlawful, there can be no

20   legitimate benefit to Plaintiffs." *Id.* at 40. Their argument again conflates the two separate

21   transactions described in the Complaint. No allegations in the Complaint establish Apple's

22   involvement in—let alone brokering of—alleged illegal gambling. *See supra* § I.C. Nor does the

23   Complaint contain any allegations that Apple "'directly request[ed]' Plaintiffs' funds for the sale of

24   illegal virtual chips," another new assertion advanced improperly for the first time in Plaintiffs'

25   Opposition. Opp. at 39; *see also YZ Productions, Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756, 764

26   (N.D. Cal. 2021) (declining "to consider an allegation raised for the first time in opposition" to a

27   motion to dismiss). None of the cases Plaintiffs cite can save their unjust enrichment claims because

28   the Complaint does not allege that Apple engaged in any illegal transactions.

Moreover, Plaintiffs argue that "there [was] no valid bargain that could confer a benefit," Opp. at 39, yet they do not dispute that they received exactly the virtual currency they allegedly purchased. Nor do Plaintiffs contest Apple's lack of involvement in subsequent transactions in which Plaintiffs used the virtual currency for continued game play. Their reliance on cases where unjust enrichment claims were asserted against app developers or bidding websites, not neutral platforms, is therefore misplaced. *See Larsen*, 737 F. Supp. 3d at 1093 (game developer); *BidCactus*, 2012 WL 1059702, at *8 (bidding website owner); *Colvin v. Roblox Corp.*, 2024 WL 4231090, at *2 (N.D. Cal. Sept. 19, 2024) (game developer). Instead, *Coffee* is dispositive, as it similarly involved claims against a platform for hosting apps the plaintiffs claimed were illegal slot machines. *See* Mot. at 33 (citing *Coffee*, 2022 WL 94986, at *11). There, the court dismissed the unjust enrichment claim with prejudice because "the facts alleged show that Plaintiffs received exactly the amount of virtual currency purchased" and "Plaintiffs have not alleged facts showing that [the platform] was involved in or profited from subsequent transactions in which players used virtual currency" within the app. *Coffee*, 2022 WL 94986, at *11. The same result should follow here.

### D.    Plaintiffs' Claims Should be Dismissed for Additional Reasons.

Apple joins and incorporates Meta's argument that California public policy precludes claims to recover gambling losses, *see* Meta Reply § II.A.2, and that Plaintiffs' claims for equitable relief must be dismissed because an adequate remedy at law exists, *see* Meta Reply § II.A.3.

## III.    PLAINTIFFS FAIL TO ALLEGE PLAUSIBLE RICO CLAIMS

Apple joins and incorporates Meta's argument that Plaintiffs fail to demonstrate they have plausibly alleged any RICO claims. *See* Meta Reply § II.B. Additionally, Plaintiffs' allegations that Apple had the required intent to participate in a RICO enterprise or conspiracy are particularly implausible because Apple requires the developers to verify that their apps comply with laws in all jurisdictions. *See* RJN, Ex. 2 at 60 (Guideline 5).

### CONCLUSION

For the foregoing reasons and those in Apple's Motion, the Court should dismiss the Complaint in its entirety. Dismissal with prejudice is appropriate because despite having multiple opportunities to amend the Complaint, Plaintiffs still fail to allege any plausible claim for relief.

Dated:  February 26, 2025

Respectfully submitted,

**DLA PIPER LLP (US)**

By: */s/ John Samuel Gibson*
    JOHN SAMUEL GIBSON

Attorneys for Defendant
APPLE INC.

REPLY ISO APPLE'S MOTION TO DISMISS
CASE NO. 5:21-MD-02985-EJD